NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
ANN C. KIM (Cal. Bar No. 212438)
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorneys
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2579/4849
     Facsimile: (213) 894-6269
     E-mail:    ann.kim@usdoj.gov
                eddie.jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 18-00022-CAS |
|---|---|
| Plaintiff, | TRIAL MEMORANDUM |
| v. | Trial Date: May 29, 2018 |
| | Trial Time: 9:30 a.m. |
| BENJAMIN KOZIOL, | Location:  Courtroom of the |
| | Hon. Christina A. |
| Defendant. | Snyder |

Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

//

//

//

//

//

//

//

//

California and Assistant United States Attorneys Ann C. Kim and Eddie
A. Jauregui, hereby submits its trial memorandum.

Dated: May 23, 2018                    Respectfully submitted,

                                       NICOLA T. HANNA
                                       United States Attorney

                                       LAWRENCE S. MIDDLETON
                                       Assistant United States Attorney
                                       Chief, Criminal Division


                                       _____/s/_____
                                       ANN C. KIM
                                       EDDIE A. JAUREGUI
                                       Assistant United States Attorneys

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION................................................1

II.   STATUS OF THE CASE..........................................1

      A.   Trial..................................................1

      B.   Pretrial Motions.......................................2

III.  THE INDICTMENT AND ELEMENTS OF THE OFFENSE..................2

IV.   STATEMENT OF FACTS..........................................4

      A.   December 25, 2015 Text Messages Between Manager and
           Sweet..................................................4

      B.   January 10, 2016 Text Messages Between Manager and
           Sweet, and the Nude Massage............................4

      C.   Sweet's January 2016 Demand Letter, Manager's
           Response, and the Confidential Settlement Agreement.......5

      D.   Defendant's August 2016 Calls to Manager and His
           Representatives........................................6

      E.   The December 2016 Letters From Defendant's Counsel.......7

      F.   Defendant's October 2017 Demand to Entertainer for  $1
           Million................................................8

      G.   Entertainer's Whereabouts on December 25, 2015 and
           January 10, 2016.......................................9

      H.   Threat to Defendant's Reputation.......................10

V.    EVIDENTIARY AND LEGAL ISSUES...............................11

      A.   Testimony of Defendant's Wife, Jordan Koziol............11

      B.   Recorded Conversations................................12

           1.   Rule of Completeness.............................15

           2.   Transcripts of Recorded Conversations..............16

      C.   Summary Charts.........................................16

      D.   Hearsay................................................17

           1.   Defendant's Admissions...........................17

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                      PAGE

     2.   Effect on the Listener.............................18

E.   Expert and Related Evidence.............................18

F.   Cross-Examination of Defendant..........................20

G.   Cross-Examination of Character Witnesses................21

H.   Affirmative Defenses....................................22

I.   Reciprocal Discovery....................................22

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

**Federal Cases**

Fitzpatrick v. United States,
    178 U.S. 304 (1971)  ........................................ 20-21

McGautha v. California,
    402 U.S. 183 (1971)  ........................................ 20

Michelson v. United States,
    335 U.S. 469 (1948)  ........................................ 21

Ohler v. United States,
    529 U.S. 753 (2000)  ........................................ 20

Tamarin v. Adam Caterers, Inc.,
    13 F.3d 51 (2d Cir. 1993)  .................................. 17

United States v. Bailleaux,
    685 F.2d 1105 (9th Cir. 1982)  ............................. 20

United States v. Basey,
    613 F.2d 198 (9th Cir. 1979)  .............................. 14

United States v. Bonilla-Guizar,
    729 F.3d 1179 (9th Cir. 2013)  ............................. 19

United States v. Bright,
    630 F.2d 804 (5th Cir. 1980)  .............................. 13

United States v. Black,
    767 F.2d 1334 (9th Cir. 1985)  ............................. 21

United States v. Carlson,
    423 F.2d 431 (9th Cir. 1970)  .............................. 15

United States v. Caswell,
    825 F.2d 1228 (8th Cir. 1989)  ............................. 17

United States v. Cerone,
    830 F.2d 938 (8th Cir. 1987)  .............................. 14

United States v. Collicott,
    92 F.3d 973 (9th Cir. 1996)  ............................... 15

United States v. Cowley,
    720 F.2d 1037 (9th Cir. 1983)  ............................. 17

United States v. Cummings,
    468 F.2d 274 (9th Cir. 1972)  .............................. 21

i

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                    PAGE

<u>United States v. Cuozzo</u>,
    962 F.2d 945 (9th Cir. 1992) ................................ 21

<u>United States v. Day</u>,
    591 F.2d 861 (D.C. Cir. 1978) .............................. 20

<u>United States v. Felix-Jerez</u>,
    667 F.2d 1297 (9th Cir. 1982) ............................. 17

<u>United States v. Fernandez</u>,
    839 F.2d 639 (9th Cir. 1988) .............................. 18

<u>United States v. Fuentes</u>,
    563 F.2d 527 (2d Cir. 1977) ............................... 13

<u>United States v. Gardner</u>,
    611 F.2d 770 (9th Cir. 1980) .............................. 17

<u>United States v. Hsieh Hui Mei Chen</u>,
    754 F.2d 817 (9th Cir. 1985) .............................. 16

<u>United States v. Kizer</u>,
    569 F.2d 504 (9th Cir. 1978) .............................. 10

<u>United States v. Liera-Morales</u>,
    759 F.3d 1105 (9th Cir. 2014) ............................. 15

<u>United States v. Matta-Ballesteros</u>,
    71 F.3d 754 (9th Cir. 1995) ............................... 13

<u>United States v. Miranda-Uriarte</u>,
    649 F.2d 1345 (9th Cir. 1981) ............................. 21

<u>United States v. Nakai</u>,
    413 F.3d 1019 (9th Cir. 2005) ............................. 18

<u>United States v. Noushfar</u>,
    78 F.3d 1442 (9th Cir. 1996) .............................. 12

<u>United States v. Ortega</u>,
    203 F.3d 675 (9th Cir. 2000) ........................... 15, 18

<u>United States v. Patterson</u>,
    819 F.2d 1495 (9th Cir. 1987) ............................. 19

<u>United States v. Payne</u>,
    944 F.2d 1458 (9th Cir. 1991) ............................. 18

<u>United States v. Phillips</u>,
    577 F.2d 495 (9th Cir. 1978) .............................. 16

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                      PAGE

United States v. Plunk,
    153 F.3d 1011 (9th Cir. 1998) ................................. 14

United States v. Plunk,
    161 F.3d 1195 (9th Cir. 1998) ................................. 14

United States v. Polk,
    56 F.3d 613 (5th Cir. 1995) ............................... 12-13

United States v. Rrapi,
    175 F.3d 742 (9th Cir. 1999) ............................. 14-15

United States v. Tafollo-Cardenas,
    897 F.2d 976 (9th Cir. 1990) ................................. 17

United States v. Torres,
    908 F.2d 1417 (9th Cir. 1990) ................................ 14

United States v. Tsinnijinnie,
    601 F.2d 1035 (9th Cir. 1979) ................................ 12

United States v. Turner,
    528 F.2d 143 (9th Cir. 1975) ................................. 14

United States v. Vallejos,
    742 F.3d 902 (9th Cir. 2014) ................................. 15

United States v. Vandevort,
    539 F. App'x 783 (9th Cir. 2013) ............................. 15

United States v. Young,
    248 F.3d 260 (4th Cir. 2001) ................................. 22

**Federal Statutes**

18 U.S.C. § 1951(a) ................................... 2, 3, 4

**Other**

Fed. R. Evid. 405(a) ...................................... 21
Fed. R. Evid. 611(a) ...................................... 10
Fed. R. Evid. 702 ......................................... 19
Fed. R. Evid. 801(a) ...................................... 17
Fed. R. Evid. 801(c) ...................................... 17
Fed. R. Evid. 801(d) ................................... 15, 18
Fed. R. Evid. 801(d)(2)(A) ................................ 18

iii

## TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                                 PAGE

Fed. R. Evid. 802, 803, 804, 807 ................................. 17

Fed. R. Evid. 901(a) ............................................ 13

Fed. R. Evid. 901(b)(5) ......................................... 14

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2
### I.    INTRODUCTION

3         This case concerns an attempted extortion of a popular and
4    successful Entertainer by defendant Benjamin Koziol ("defendant").
5    As detailed below, defendant attempted to extort Entertainer for $1
6    million by threatening to sue Entertainer on the basis of knowingly
7    false, harmful, and salacious accusations.  Defendant alleged, among
8    other things, that Entertainer physically assaulted defendant and
9    sexually assaulted defendant's wife during a nude massage.  Defendant
10   alleges that during the course of a nude massage that Entertainer
11   supposedly received from defendant's wife, Entertainer tried to grope
12   his wife's breasts and vagina.  Defendant claims that he overheard
13   his wife yelling at Entertainer and that he entered the room and
14   confronted Entertainer to defend his wife's honor.  Entertainer then
15   supposedly cursed defendant and punched him in the face, knocking him
16   unconscious.

17        The evidence at trial will show that these are lies, defendant
18   knew they were lies, and that defendant targeted Entertainer because
19   his wife had previous success extorting Entertainer's Manager
20   (relating to this same nude massage), and defendant likely believed
21   he could get even more money by targeting a successful Entertainer.

22
### II.   STATUS OF THE CASE

23
#### A.    Trial

24        Trial is set for May 29, 2018 at 9:30 a.m.  Jury trial has not
25   been waived.  Defendant is detained pending trial.

26        The government estimates that it will take no more than two full
27   court days to present its case-in-chief (not including the time for

28

jury selection).  Should defendant offer witnesses in his defense, the government also may choose to call rebuttal witnesses.

The government anticipates that it will call seven to nine witnesses in its case-in-chief, including Entertainer and Manager. The government also expects to call witnesses knowledgeable about the successful extortion of Entertainer's Manager by defendant's wife.

### B.    Pretrial Motions

In advance of trial, the government filed a motion in limine to admit defendant's prior felony convictions for pimping and pandering. (Dkt. 38).  Defendant filed an opposition to the motion (Dkt. 45), and the government filed a reply (Dkt. 47).  On May 14, 2018, at the status conference, the Court noted that the circuit is split on this issue, and deferred ruling on the government's motion until the issue becomes ripe should defendant elect to testify.  The government submits that defendant's pimping and pandering convictions should be admitted should he testify.

At approximately 10:33 p.m. and 10:54 p.m. on May 21, 2018, defendant filed two motions in limine to exclude testimony regarding a conversation between defendant's wife and an attorney for Manager, and to exclude the introduction of portions of a jail call.  (Dkt. 63 and 64).  The government will respond to these motions forthwith.

### III. THE INDICTMENT AND ELEMENTS OF THE OFFENSE

The one-count indictment charges defendant with attempted extortion affecting interstate commerce by nonviolent threat, in violation of 18 U.S.C. § 1951(a).

The elements of 18 U.S.C. § 1951(a), Hobbs Act – Attempted Extortion by Nonviolent Threat, are: (1) the defendant intended to induce Entertainer to part with property by wrongful threat of

economic or reputational harm; (2) the defendant acted with the intent to obtain property; (3) commerce from one state to another would have been affected in some way; and (4) the defendant did something that was a substantial step toward committing the crime and that strongly corroborated the defendant's intent to commit the crime. See Ninth Circuit Model Criminal Jury Instructions, No. 8.142A.

Mere preparation is not a substantial step toward committing the crime. See id. To constitute a substantial step, a defendant's act or actions must demonstrate that the crime will take place unless interrupted by independent circumstances. See id.

Jurors do not need to agree unanimously as to which particular act or actions constituted a substantial step toward the commission of a crime. See id.

A threat is wrongful if it is unlawful or if the defendant knew he was not entitled to obtain the property. See id.

To convict the defendant of Attempted Extortion Affecting Interstate Commerce By Nonviolent Threat, the government must prove that the defendant's conduct affected or could have affected interstate commerce. See Ninth Circuit Model Criminal Jury Instructions, No. 8.143B. Conduct affects interstate commerce if it in any way involves, interferes with, changes, or alters the movement or transportation or flow of goods, merchandise, money, or other property in commerce between or among the states or between the United States and a foreign country. See id. The effect can be minimal. See id.

It is not necessary for the government to prove that the defendant knew or intended that his conduct would affect commerce; it must prove only that the natural consequences of his conduct affected

3

commerce in some way.  <u>See</u> <u>id.</u>  Also, the jury need not find that there was an actual effect on commerce.  <u>See</u> <u>id.</u>  The government must show only that the natural result of the offense would be to cause an effect on interstate commerce to any degree, however minimal or slight.

## IV.  STATEMENT OF FACTS

At trial, the United States intends to prove the following facts, among others:

### A.  December 25, 2015 Text Messages Between Manager and Sweet

On December 25, 2015, Manager began text messaging a masseuse, who advertised "naked massage" services on the website, www.backpage.com, regarding her availability for a nude massage that day.  At the time Manager was text messaging the masseuse, he did not know her name.  Manager later learned that the masseuse's name was Jordan Sweet, also known as Jordan Koziol ("Sweet").  Manager used his cellular telephone to text message Sweet and was in Santa Monica when he was texting her on December 25, 2015.  Manager asked for an appointment right away, but Sweet was not available until 5 p.m., so the massage did not take place that day.

### B.  January 10, 2016 Text Messages Between Manager and Sweet, and the Nude Massage

On January 10, 2016, Manager again text messaged Sweet to schedule a massage.  Manager was in Santa Monica at the time and Sweet was in Playa Vista.  Sweet stated that she charged $100 for a half hour massage and $170 for a full hour.  At approximately 7:00 p.m., Manager arrived at Sweet's apartment complex in Playa Vista, and Sweet met him at the door to enter the complex.  Manager went into Sweet's apartment, paid her $100 for half an hour, and disrobed.

4

Manager asked Sweet if there was mutual touching allowed during the massage. Sweet told Manager "no."

At the end of the half hour massage, Sweet told Manager the massage was over, told him to get dressed, and left the room. Shortly after, Sweet returned with a large Doberman dog and told Manager to leave, which he promptly did. Manager was disappointed with the massage Sweet provided and felt that the massage he received from Sweet was a scam.

After Manager left Sweet's apartment, he began text messaging her, telling her that he was going to report her to her apartment manager for operating a naked massage business from her unit, that she was a bad person who enjoyed taking guys' money, and that she took advantage of him. Sweet responded to Manager via text message that she was going to do some digging on him using his telephone number. At approximately 9:24 p.m. that evening, almost two hours after the end of the massage, Sweet began text messaging Manager and said that he made her upset, she can't stop crying, she wasn't a hooker, and that she "never felt that violated, intimidated or belittled . . . ." Sweet also text messaged and asked Manager if he touched all massage therapists he goes to and that it was a "shitty" thing for a married person to do. Manager was not married and he told her so.

**C.   Sweet's January 2016 Demand Letter, Manager's Response, and the Confidential Settlement Agreement**

Less than 48 hours later, on January 12, 2016, Manager received a series of calls, including two voicemail messages from a man named Bobby Saadian ("Saadian"), who claimed he represented a client in relation to "inappropriate behavior" during a massage. The voicemail

messages left on Manager's phone were addressed to Entertainer.  On
January 14, 2016, Sweet's lawyer, Saadian, sent a demand letter
seeking $250,000 from Manager or else Sweet would "promptly file and
serve a lawsuit and notify the media of said incident."  Sweet's
allegations in the January 14, 2016 demand letter included, among
other things, that Manager touched or groped Sweet's breasts twice,
and placed Sweet's hands on Manager's genitalia.

Manager denies touching or grabbing Sweet during the massage.
Manager's counsel at that time (Patricia Glaser and Kerry Garvis
Wright) responded to the demand and denied Sweet's allegations
against Manager.  Ultimately, Manager settled with Sweet for $225,000
pursuant to a Confidential Settlement Agreement.  Manager paid Sweet
$225,000 via cashier's check.

**D.   Defendant's August 2016 Calls to Manager and His
       Representatives**

In August 2016, eight months after the settlement agreement,
Manager received a voicemail message from someone purporting to be
Sweet's husband, accusing Manager of assaulting defendant.  Manager
asked his attorney, Kerry Garvis Wright, to call the person
purporting to be Sweet's husband.  On August 22, 2016, Garvis Wright,
returned defendant's call from her office, and spoke to defendant.
During the call, defendant said that he was hoping to talk to Manager
about something that happened several months before, but defendant
gave little detail and was cryptic about what he wanted.  Garvis
Wright told defendant that they needed to meet in person to discuss
the issue.  Defendant said he was "up north," but that he would be in
Los Angeles later that week and would arrange to meet with Garvis
Wright.  Sometime shortly after that first call, defendant called

6

Garvis Wright and told her that he would not meet with her in person. During this second call, defendant claimed that he was present during the January 2016 nude massage and that he, defendant, was verbally and physically assaulted by Manager.  Ms. Garvis Wright responded to defendant that the settlement agreement between Sweet and Manager was confidential.  Defendant replied that he was originally in the retainer agreement with Sweet's lawyer, Saadian, but was left out of the settlement and he did not know why.  Garvis Wright responded that her client, Manager, was extorted once and it would not happen again. Importantly, defendant never mentioned Entertainer during his August 22, 2016 call with Garvis Wright.

**E.    The December 2016 Letters From Defendant's Counsel**

At the end of December 2016, Sherwin Arzani, an attorney representing defendant, sent two letters to attorneys he believed represented *Entertainer* (Gary Stiffleman and Patricia Glaser), this time claiming that *Entertainer*, not Manager, physically assaulted defendant during the January 10, 2016 massage and threatening to sue. Defendant claimed that Entertainer knocked him unconscious during an altercation after defendant tried to protect Sweet from Entertainer's "unwanted physical advances."

On January 3, 2017, Garvis Wright, Patricia Glaser's partner at their law firm, Glaser Weil, drafted a response letter to Arzani. The response letter was sent under Glaser's name.  The letter stated that defendant well knew that (1) the Glaser firm represented Manager, not Entertainer, (2) it was Manager, not Entertainer, who was at the Playa Vista address on January 10, 2016, and (3) the claim that Sweet was assaulted on January 10, 2016 is and always was a

1   fraud.[1]  The Glaser firm warned Arzani against pursuing "this [] same
2   criminal shakedown" again and further advised that Entertainer's
3   counsel was prepared to pursue sanctions against Arzani if he
4   persisted in his frivolous and fraudulent threats against
5   Entertainer.  The Glaser firm never received a response from Mr.
6   Arzani.

7          F.    Defendant's October 2017 Demand to Entertainer for
8                $1 Million

9          Having lay dormant for ten months, defendant resurfaced again in
10  October 2017.[2]  On October 16 and 17, 2017, defendant sent
11  Entertainer's entertainment lawyer, J. Reid Hunter, emails containing
12  a demand letter, text messages defendant claimed were from
13  Entertainer, and a picture depicting defendant with a black eye.
14  Defendant claimed, among other things, that (1) defendant was present
15  during the January 2016 nude massage in a bedroom of the apartment,
16  (2) Entertainer repeatedly tried to touch Sweet during a January 2016
17  nude massage although he was repeatedly told "no touching," (3) after
18  Sweet told Entertainer to get dressed and leave, Entertainer
19  immediately began cursing her out and telling her this was a scam,
20  (4) Entertainer called Sweet a "fucking bitch" and several other
21  names and became more irate, (5) at this point, defendant came out of
22  the bedroom and confronted Entertainer and told him to "get the fuck
23  out," (6) Entertainer then advanced toward defendant and punched
24  defendant in the face, knocking defendant to the ground and rendering

25  ───────────────────────────

26          [1] The letter noted that Manager honored the settlement agreement
    but that he was in tremendous shock at the time and had come to
27  realize that he acted hastily in settling with Sweet.

28          [2] Defendant was arrested for pimping and pandering on or about
    August 3, 2016.  On May 5, 2017, he was convicted by jury.  On August
    29, 2017, he was sentenced to a term of four years.

him unconscious for 20 to 30 seconds, and (7) Entertainer said that he was going to report Sweet to building management about the nude massages being performed in their apartment.  Defendant claimed that he suffered physical pain, emotional pain and suffering, and feelings of embarrassment and insecurity because he did not do more to protect Sweet that day.  Defendant then demanded $1 million in damages on or before November 1, 2017, or otherwise he would file a complaint with the court.

Attached to defendant's demand email was a photo (a .jpeg image), which he claimed was a picture of his injury.  The .jpeg image purported to show defendant with a black eye.  Analysis on the metadata for the .jpeg image revealed that the photograph was taken on or about December 7, 2016, almost 11 months <u>after</u> the alleged assault.

Representatives for Entertainer tried to call defendant to schedule a meeting, but defendant refused to meet and continued to reiterate his demand for money from Entertainer.  Defendant's last demand for payment was on November 27, 2017.  Defendant never filed a lawsuit against Entertainer alleging the claims made in his October 2017 demand.

**G.    Entertainer's Whereabouts on December 25, 2015 and January 10, 2016**

On December 25, 2015, Entertainer was hosting a Christmas party at his home in the Highland Park section of Los Angeles with his wife.  The party began at approximately 2 p.m. on Christmas day.  In attendance were Entertainer's in-laws and the couple's friends. Guests began arriving in the early afternoon and left between approximately 8 p.m. to 10 p.m.  Entertainer did not text Sweet

9

1    during the Christmas party (or ever), nor did he seek a nude massage

2    from Sweet.

3        Likewise, Entertainer did not text Sweet or obtain a massage

4    from her on January 10, 2016.  While Entertainer cannot remember

5    specifically what he was doing that day – now almost two and a half

6    years ago - he believes he was near his home in Highland Park.  Based

7    on his credit card transactions, Entertainer believes that at the

8    time of the massage (which Manager obtained, not him), Entertainer

9    was picking up drinks and pizzas to take back home.

10        **H.    Threat to Defendant's Reputation**

11        The evidence at trial will show that while Entertainer viewed

12   the claims against him as baseless, he nevertheless feared the

13   allegations would be made public.  Not only is the alleged conduct

14   contrary to defendant's own moral code, it is contrary to his public

15   image, including specifically his publicly-stated views on

16   relationships, the treatment of women, and his adherence to his

17   faith.  Defendant feared that the allegations, even if baseless,

18   would hurt his reputation and business interests.[3]

19        Entertainer has been a successful entertainer since

20   approximately 2010 and he continues to be successful today.[4]  He has

21

22        [3] As noted above, both Entertainer and Manager will testify at
     trial.  The government anticipates that on cross-examination, the
23   defense will seek to elicit information from these witnesses about
     intimate personal sexual details and behavior.  While the nature of
24   this case can lead to some line of inquiry into this area, the
     government requests that the Court exercise its discretion under Fed.
25   R. Evid. 611(a) to protect Entertainer and Manager from harassment
     and undue embarrassment on cross-examination.  Fed. R. Evid. 611(a);
26   <u>United States v. Kizer</u>, 569 F.2d 504, 505 (9th Cir. 1978).

27        [4] In order not to prematurely disclose Entertainer's identity,
     the government will not spell out the nature of Entertainer's
28   business interests at length in this trial memorandum.

                                    10

1  a presence in music and television.  Entertainer's name is

2  trademarked so he makes money using his name and likeness.

3  Allegations such as those at issue in this case represented a true

4  threat to Entertainer's business interests.

5  **V.    EVIDENTIARY AND LEGAL ISSUES**

6       **A.    Testimony of Defendant's Wife, Jordan Koziol**

7       The government subpoenaed defendant's wife, Jordan Koziol to

8  testify in this matter.[5]  The government anticipates that should she

9  testify, Jordan Koziol will testify that while defendant was in the

10  apartment during the nude massage on January 10, 2016, defendant

11  never came out of the bedroom, never saw the person she was

12  massaging, never confronted the person she was massaging, and was not

13  punched in the face that day.  It is anticipated that Jordan Koziol

14  will testify that the photograph of the black eye that was attached

15  to defendant's demand for payment was taken by her and she believes

16  he received the black eye during a bar fight.

17       During the May 14, 2018 status conference, the parties agreed

18  that Jordan Koziol should be appointed counsel to advise her on the

19  Marital Testimonial Privilege and her Fifth Amendment Right against

20  self-incrimination.  The Court has appointed James Tedford from the

21  CJA Panel to advise Jordan Koziol on these issues.

22       Should Jordan Koziol elect not to testify based on the Marital

23  Testimonial Privilege or refuse to answer questions based on her

24

25      [5] On May 19, 2018, defense counsel emailed the government and
stated that Jordan Koziol informed them that she would not be

26  testifying at trial and does not want to speak with the government or
its agents further.  On May 20, 2018, Mr. Tedford informed the

27  government that he was scheduled to meet with Jordan Koziol on May
23, 2018 at 1:30 p.m., and would advise the government on her

28  position to testify after his meeting.  As of this filing, we have
not heard from Mr. Tedford.

1  right against self-incrimination, the government would seek an order

2  precluding the defense from making any comment, whether direct or

3  veiled, about the fact that Jordan Koziol did not testify.  Should

4  the defense make any comments during questioning of witnesses or at

5  any other time in the presence of the jury, the government requests

6  that the Court explain to the jury why Jordan Koziol did not testify.

7  See United States v. Tsinnijinnie, 601 F.2d 1035, 1039 (9th Cir.

8  1979) (finding that where defendant's counsel "commented, albeit in a

9  veiled manner, on the Government's failure to call [defendant's wife]

10  as a witness," that the court's explanation to the jury that

11  defendant's wife did not testify because defendant asserted his

12  husband/wife privilege to not have her testify was proper).

13      **B.   Recorded Conversations**

14      At trial the government expects to introduce excerpts of an

15  audio recorded jail call between defendant and an unidentified female

16  on March 17, 2018, along with transcripts of the excerpts.  Each

17  recording and transcripts corresponding to those excerpts were

18  produced to the defense and has been placed onto compact discs, which

19  the government will offer as exhibits at trial.  The conversations

20  captured by the records occurred entirely in English.

21      All duly admitted recorded conversations must be played in open

22  court.[6]  The foundation that must be laid for the introduction into

23  evidence of recorded conversations is a matter largely within the

24  discretion of the trial court.  See, e.g., United States v. Polk, 56

25

26      [6] Allowing jurors to take into the jury deliberation room
    recorded conversations that were not played in open court is
27  structural error requiring automatic reversal if a defendant objects
    to allowing the jurors to have the un-played recordings in the jury
28  room.  United States v. Noushfar, 78 F.3d 1442, 1444-45 (9th Cir.
    1996).

F.3d 613, 631 (5th Cir. 1995).  There is no rigid set of foundational requirements.  It is very clear, however, that there simply is no requirement that the tapes be put in evidence through the person wearing the recorder or, for that matter, through a contemporaneous witness to the recorded conversations.  United States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977); United States v. Bright, 630 F.2d 804, 819-21 (5th Cir. 1980).  The requirement of authentication remains only that the proponent of the evidence provides evidence sufficient to support a finding that the matter in question is what its proponent claims.  Fed. R. Evid. 901(a).  As the Ninth Circuit has held, recordings are sufficiently authenticated under Rule 901(a) if "sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.  This is done by proving a connection between the evidence and the party against whom the evidence is admitted, and can be done by both direct and circumstantial evidence."  United States v. Matta-Ballesteros, 71 F.3d 754, 768 (9th Cir. 1995) (internal citation and quotations omitted), amended by 98 F.3d 1100 (9th Cir. 1996).

Here, the government expects to authenticate the jail call through a 902(11) declaration, which notice was filed, from an Intelligence Operations Officer with the Federal Bureau of Prison.  This Intelligence Operations Officer certified that the recording was made at or near the time of the occurrence of the matter set forth therein; was made by or from information transmitted by a person with knowledge of those matters; was kept in the course of the regularly conducted activity; was made by and in the course of the regularly conducted activity as a regular practice; and if not original records, are exact duplicates of original records.

13

Witnesses may testify competently as to the identification of a voice on a recording.  A witness's opinion testimony in this regard may be based upon his having heard the voice on another occasion under circumstances connecting it with the alleged speaker.  Fed. R. Evid. 901(b)(5); United States v. Torres, 908 F.2d 1417, 1425 (9th Cir. 1990) ("Testimony of voice recognition constitutes sufficient authentication."); United States v. Basey, 613 F.2d 198, 202 n.2 (9th Cir. 1979); United States v. Turner, 528 F.2d 143, 163 (9th Cir. 1975).  The Ninth Circuit has further explained that "Rule 901(b)(5) establishes a low threshold for voice identifications offered to determine the admissibility of recorded conversations," and that "[s]o long as the identifying witness is 'minimally familiar' with the voice he identifies, Rule 901(b) is satisfied." See United States v. Plunk, 153 F.3d 1011, 1022-23 (9th Cir.), opinion amended on denial of reh'g, 161 F.3d 1195 (9th Cir. 1998), (overruled on other grounds).[7]

Here, the government expects that Federal Bureau of Investigation ("FBI") Special Agent ("SA") Cody Burke, will identify defendant's voice on the call based in part on his familiarity with the voice of defendant.

Recorded conversations are competent evidence even when they are partly inaudible, unless the unintelligible portions are so substantial as to render the recording untrustworthy as a whole. United States v. Rrapi, 175 F.3d 742, 746-48 (9th Cir. 1999) (court listens to recordings and admits portion of one recording and denies

---

[7] "Attacks on the accuracy of the identification go to the weight of the evidence, and the issue is for the jury to decide." United States v. Cerone, 830 F.2d 938, 949 (8th Cir. 1987).

14

admissibility of two others, in the Albanian language, which were of very poor quality); United States v. Carlson, 423 F.2d 431, 440 (9th Cir. 1970).

### 1.   Rule of Completeness

The rule of completeness, which is codified in Federal Rule of Evidence 106, is applicable only where one party seeks to introduce a "misleadingly-tailored snippet" of a statement that creates a misleading impression by being taken out of context. United States v. Collicott, 92 F.3d 973, 983 (9th Cir. 1996); see also, e.g., United States v. Vallejos, 742 F.3d 902, 905 (9th Cir. 2014); United States v. Liera-Morales, 759 F.3d 1105 (9th Cir. 2014). The rule of completeness does not render evidence admissible which is otherwise inadmissible under the hearsay rules. Collicott, 92 F.3d at 983. (Indeed, as discussed below, out-of-court statements made by defendant constitute inadmissible hearsay when offered by the defendant. See infra Section IV.D.2.)

Accordingly, a defendant's "non-self-inculpatory statements are inadmissible even if they were made contemporaneously with other self-inculpatory statements." United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000); see id. ("[S]elf-inculpatory statements, when offered by the government, are admissions by a party-opponent and are therefore not hearsay, see Fed. R. Evid. 801(d)(2), but the non-self-inculpatory statements are inadmissible hearsay."); see also United States v. Vandevort, 539 F. App'x 783, 784 (9th Cir. 2013) (decision to permit government to play incomplete version of defendant's statement was not abuse of discretion because defendant's "non-self-inculpatory statement was inadmissible hearsay not subject to an exception").

15

Here, the government has produced to the defense excerpts of the recordings that the government may seek to introduce at trial. Defendant has objected to the introduction of the recordings.

2.    Transcripts of Recorded Conversations

All of the recordings in this case are in English.  For recorded conversations in the English language, the recording itself is the evidence, and a transcript of the recording may be provided as an aid in following the conversation.  United States v. Hsieh Hui Mei Chen, 754 F.2d 817, 824 (9th Cir. 1985); United States v. Phillips, 577 F.2d 495, 501–02 (9th Cir. 1978).

The government produced draft transcripts of the portions of the recorded conversation to the defense prior to trial, on May 18, 2018.

At trial, the government intends to provide a transcript binder to the Court and jury as an aid in following the conversations.  The government further intends to synchronize the transcripts to the corresponding recordings (resembling closed captioning), so that the Court and jury can more easily follow the transcript while watching/listening to the recordings.

C.    **Summary Charts**

The government will seek to introduce charts summarizing defendant's e-mail account activity, including login information and IP addresses, and information about defendant's location in the October-November 2017 time period – the time period in which defendant transmitted his threats against Entertainer to Entertainer's lawyers.  The records underlying the charts have been produced in discovery and thus have been made available for inspection by the defense.  The individual who prepared the chart(s) will be available for cross-examination.

16

Under Federal Rule of Evidence 1006, the Court may admit summaries into evidence where those summaries are based on voluminous records that cannot be conveniently examined in court.  Fed. R. Crim. P. 1006.  Trial courts routinely admit into evidence summary charts that organize other evidence and aid the jury's understanding, as long as the underlying evidence is admissible, has been made available to the adverse party, and a witness with knowledge of the chart or summary is available for cross-examination.  United States v. Gardner, 611 F.2d 770, 776 (9th Cir. 1980); Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 53 (2d Cir. 1993); United States v. Caswell, 825 F.2d 1228, 1235-36 (8th Cir. 1989).

**D.  Hearsay**

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  See Fed. R. Evid. 801(c); United States v. Cowley, 720 F.2d 1037, 1044 (9th Cir. 1983).  A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended to be an assertion.  Fed. R. Evid. 801(a); United States v. Felix-Jerez, 667 F.2d 1297, 1304 (9th Cir. 1982).  Hearsay is admissible as substantive evidence only as provided by the Federal Rules of Evidence.  See Fed. R. Evid. 802, 803, 804, 807; United States v. Tafollo-Cardenas, 897 F.2d 976, 979 (9th Cir. 1990).

    1.    Defendant's Admissions

The audio recordings that the government intends to offer into evidence contain out-of-court statements by the defendant. Statements by a party-opponent are admissible non-hearsay.  Fed. R. Evid. (d)(2)(A).  Moreover, under the Federal Rules of Evidence, a

17

defendant's statement is admissible only if offered against him; a
defendant may not elicit his own prior statements.  Fed. R. Evid.
801(d)(2)(A); United States v. Fernandez, 839 F.2d 639 (9th Cir.
1988).  In other words, after the government has introduced a portion
of the defendant's recorded jail call, a defendant may not put in
additional statements he made during that call, because such
statements would be hearsay when offered by the defendant.  Fed. R.
Evid. 801(d) (2); United States v. Nakai, 413 F.3d 1019, 1022 (9th
Cir. 2005) (recognizing that out-of-court statements that defendant
makes to witness, even if exculpatory, constitute inadmissible
hearsay); Ortega, 203 F.3d at 681-82 (defendant prohibited from
eliciting his own exculpatory statements during cross examination of
government agent).

### 2.   Effect on the Listener

A statement that is offered to demonstrate its effect on the
listener is not offered for the truth of the matter asserted, and
therefore is not hearsay.  See United States v. Payne, 944 F.2d 1458,
1472 (9th Cir. 1991) (finding that a statement introduced "to show
the effect on the listener" is "properly treated as non-hearsay").

The government intends to introduce text messages sent between
Manager and Sweet.  While Manager will testify regarding his own text
messages, Sweet's text messages will be offered to demonstrate its
effect on Manager and is not offered for the truth of the matter
asserted.

### E.   Expert and Related Evidence

On May 11, 2018, the government provided a supplemental notice
to the defendant, pursuant to Federal Rule of Criminal Procedure
16(a)(1)(G), that it intends to call as a witness, Chris H. Nam, an

18

Information Technology Specialist ("ITS") and Forensic Examiner with the FBI.  ITS Nam will testify about his analysis of a photograph defendant attached to his demand for payment, which defendant claimed was a photograph of the injury he sustained when Entertainer punched him in the face on January 10, 2016.  Specifically, the government anticipates that ITS Nam will testify that the metadata associated with the photograph attached to defendant's demand for $1 million shows that the photograph was taken on December 7, 2016, 11 months after the alleged assault.  The government also expects ITS Nam to testify about what metadata is generally, the type of information found in metadata, how metadata is created, how it can be manipulated and/or changed, and what information is contained in metadata associated with a photograph, specifically, a .jpeg image.  ITS Nam's testimony will be based on his review of the .jpeg image attached to the October 16, 2017 demand email from defendant and its metadata, his training, his experience conducting examinations, analysis and/or evaluation of digital evidence, and his experience conducting forensic examinations on computer evidence.

If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide testimony in the form of an opinion or otherwise.  Fed. R. Evid. 702.

The Court has broad discretion to determine whether to admit expert testimony.  See, e.g., United States v. Bonilla-Guizar, 729 F.3d 1179, 1183 (9th Cir. 2013); United States v. Patterson, 819 F.2d 1495, 1507 (9th Cir. 1987) (the "decision to admit expert testimony is committed to the discretion of the trial judge").

1    Finally, the probative value of ITS Nam's testimony is not

2    outweighed by the potential for prejudice under Federal Rule of

3    Evidence 403.  "In determining whether 'the probative value is

4    substantially outweighed by the danger of unfair prejudice,' it is a

5    sound rule that the balance should generally be struck in favor of

6    admission when the evidence indicates a close relationship to the

7    offense charged."  United States v. Day, 591 F.2d 861, 878 (D.C. Cir.

8    1978) (internal quotation marks omitted).  Evidence is unduly

9    prejudicial only to the extent that it "provokes an emotional

10   response in the jury or otherwise tends to affect adversely the

11   jury's attitude toward the defendant wholly apart from its judgment

12   as to his guilt or innocence of the crime charged."  United States v.

13   Bailleaux, 685 F.2d 1105, 1111 (9th Cir. 1982).  Here, testimony

14   about metadata associated with a photograph would not provoke an

15   emotional response.

16   **F.    Cross-Examination of Defendant**

17   A defendant who testifies at trial waives his right against

18   self-incrimination and subjects himself to cross-examination

19   concerning all matters reasonably related to the subject matter of

20   his testimony.  See, e.g., Ohler v. United States, 529 U.S. 753, 759

21   (2000) (citing McGautha v. California, 402 U.S. 183, 215 (1971),

22   vacated in part on other grounds sub nom., Crampton v. Ohio, 408 U.S.

23   941 (1972) ("It has long been held that a defendant who takes the

24   stand in his own behalf cannot then claim the privilege against

25   cross-examination on matters reasonably related to the subject matter

26   of his direct examination . . ."));  Fitzpatrick v. United States, 178

27   U.S. 304 (1971) ("The defendant cannot assert a self-incrimination

28   privilege 'on matters reasonably related to the subject matter of his

20

cross-examination.'"").   The scope of a defendant's waiver is co-extensive with the scope of relevant cross-examination.   A defendant has no right to avoid cross-examination on matters which call into question his claim of innocence.   United States v. Miranda-Uriarte, 649 F.2d 1345, 1353–54 (9th Cir. 1981).   United States v. Cuozzo, 962 F.2d 945, 948 (9th Cir. 1992); United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985)("What the defendant actually discusses on direct does not determine the extent of permissible cross-examination or his waiver.   Rather, the inquiry is whether 'the government's questions are reasonably related' to the subjects covered by the defendant's testimony.").

This issue has been briefed as noted above in Section I.B. above, and the Court has not ruled on the motion as of this filing.

**G.    Cross-Examination of Character Witnesses**

On cross-examination of a defendant's character witnesses, the government may inquire into specific instances of defendant's past conduct relevant to the character trait at issue (although a character witness may not testify as to specific instances on direct examination).   Fed. R. Evid. 405(a); Michelson v. United States, 335 U.S. 469, 479 (1948).   While it is unknown whether and on what subjects defense witnesses may testify at trial, evidence of defendant's arrest and conviction for pimping and pandering, and other bad acts, including his arrests for domestic abuse and depriving another of her parental custodial rights, may become relevant if defense witnesses testify to defendant's good character.   See United States v. Cummings, 468 F.2d 274, 281 (9th Cir. 1972) (character witnesses may be cross-examined about arrests and only

limitation on cross-examination is that questions be asked in good faith).

### H. Affirmative Defenses

Defendant has not given notice of his intent to rely on any defense of entrapment, mental incapacity, duress, or alibi. Therefore, to the extent defendant may attempt to rely on any such defense, the government reserves the right to object and to seek preclusion of such defenses.

### I. Reciprocal Discovery

Despite the government's requests, defendant has not produced any reciprocal discovery to the government, nor has the defense provided any expert notice.  Accordingly, to the extent there exists reciprocal discovery to which the government is entitled under Federal Rules of Criminal Procedure 12.1, 12.2, 16(b), or 26.2 that defendant has not produced, the government reserves the right to seek exclusion of such materials at trial.  See United States v. Young, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).