1          UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,

6              Plaintiff,

7        vs.                          Case No. CR 18-22-CAS

8    BENJAMIN KOZIOL,

9              Defendant.
     _____/

10

11

12        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
               TRIAL DAY 3 - PM SESSION
13             THURSDAY, MAY 31, 2018
                    1:00 P.M.
14             LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22    _____

23        TERRI A. HOURIGAN, CSR NO. 3838, CCRR
            FEDERAL OFFICIAL COURT REPORTER
24            350 WEST FIRST, ROOM 4311
          LOS ANGELES, CALIFORNIA  90012
25                (213) 894-2849

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        NICOLA T. HANNA
         United States Attorney
5        BY:  ANN KIM
              EDDIE JAUREGUI
6              Assistant United States Attorneys
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California  90012
8

9
     **FOR THE DEFENDANT:**
10
         HILARY LEE POTASHNER
11       Federal Public Defender
         BY:  CHRISTY O'CONNOR
12            WASEEM SALAHI
         Deputy Federal Public Defenders
13       Central District of California
         321 East Second Street
14       Los Angeles, California 90012

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                    INDEX OF EXAMINATIONS

 2
       WITNESS:                              PAGE
 3
          JOHN REID HUNTER
 4
              Direct Examination by Mr. Jauregui    11
 5            Cross-Examination by Ms. O'Connor      35
              Redirect Examination by Mr. Jauregui   48
 6            Recross Examination by Ms. O'Connor     51

 7
          KRISTOPHER NAM
 8
              Direct Examination by Mr. Jauregui    53
 9

10        ANDREW CHARLES GRAMMER

11            Direct Examination by Mr. Jauregui    60

12
          SARA SHIVARANI
13
              Direct Examination by Ms. Kim         97
14

15      CODY BURKE

16            Direct Examination by Mr. Jauregui    113

17

18

19

20

21

22

23

24

25
```

# INDEX OF EXHIBITS

| EXHIBIT NO. | PAGE |
|---|---|
| 106 | 6 |
| 14 | 18 |
| 15 | 18 |
| 16 | 18 |
| 17 | 18 |
| 18 | 18 |
| 19 | 18 |
| 48 | 18 |
| 49 | 58 |
| 1 | 83 |
| 2 | 85 |
| 32 | 87 |
| 33 | 89 |
| 25 | 91 |
| 3 | 100 |
| 4 | 100 |
| 5 | 100 |
| 27 | 132 |
| 52 | 137 |
| 43 | 139 |
| 50 | 143 |

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, MAY 31, 2018

 2                            1:00 P.M.

 3                             --oOo--

 4

 5              THE COURTROOM DEPUTY:  Please remain seated and come

 6    to order.  This Court is again in session.  Are we ready for

 7    the jury?

 8              MS. KIM:  Your Honor, just couple of housekeeping

 9    matters.

10              THE COURT:  Yes.

11              MS. KIM:  The government has had a chance, during

12    the lunch break, to review the Defense Exhibit 106 that we just

13    discussed on sidebar.

14              THE COURT:  Right.

15              MS. KIM:  The government is fine with admitting

16    Exhibit 106 with the condition that the defense has agreed to

17    allow the government to introduce Mr. Koziol's response should

18    it be necessary, which is Exhibit 21.

19              THE COURT:  Okay.

20              MS. O'CONNOR:  That is correct, Your Honor.

21              THE COURT:  That's fine.

22         CJ, I think I dropped the Tylenol in the hallway.

23              THE COURTROOM DEPUTY:  I will be right back.

24              MS. KIM:  In light of that, may we excuse witness,

25    Ben Singer?
```

```
1              THE COURT:  Yes.

2              MS. O'CONNOR:  We agree.

3              THE COURT:  So now that is solved.

4          (Defendant Exhibit 106 received into evidence.)

5          Okay.  So, that is one problem down.

6          We will hear from the jury, just remind me who else we

7   have today, I'm sorry, I have forgotten.

8              MS. KIM:  Next up would be Reid Hunter.

9              THE COURT:  Okay.  After that will be Khris Nam,

10  and after that it will be Andy Grammer.

11             THE COURT:  Okay.

12             MS. KIM:  After that, it will be Sara Shivarani.

13  And then we will conclude with Special Agent Burke.

14             THE COURT:  Okay.

15             MS. KIM:  We're hopeful we will get it all done

16  today.

17             THE COURT:  I'm hopeful, too.

18             MS. KIM:  Your Honor, I believe that because we

19  agreed to admit Defense 106, that the subpoena for Ms. Neils

20  has been cancelled, or at least she has been released from her

21  obligation to show up.

22             THE COURT:  Thank you for your help and cooperation

23  on this.

24         So we will bring the jury in and see.

25             MS. O'CONNOR:  Your Honor, I have something.
```

```
 1              THE COURT:  Go ahead.
 2              MS. O'CONNOR:  Thank you.  I have a clarification
 3   from the Court about the Court's order to clean up the
 4   transcript of the jail call and the recording of the jail call.
 5        It had been my understanding that the Court was
 6   instructing the government to excerpt from that jail call two
 7   portions, both of which refer to past conversations or past
 8   statements Jordan Sweet might have had.
 9              THE COURT:  Right.  I thought there was only one.
10   Is there two?
11              MS. KIM:  Your Honor, the issue is when I asked the
12   Court what to excise, it was the phrase "any more interviews."
13              THE COURT:  Right.
14              MS. KIM:  The defense now would like us to redact in
15   the "anybody else portion," "else."
16        And that was not my understanding.  We spent the lunch
17   hour fixing all of these things, redoing the clip and the
18   binders.
19              THE COURT:  I see what you are saying.
20              MS. KIM:  It doesn't imply that she has talked to
21   the FBI.
22              THE COURT:  I understand.
23              MS. KIM:  It's a generic statement.  Maybe she's
24   talking to anybody, family, friends, or what have you.
25              THE COURT:  Can you read the statement to me just so
```

1    I'm sure I know what we're doing?

2         MS. KIM:  Of course, Your Honor.

3    "Make sure Jordan is not -- when you talk to Ben, tell

4    Jordan not to talk to anybody else.  And make sure she's not

5    talking over the phone, will you?  She can really f--- me in

6    anything that she says.  I don't think she realizes anything

7    she says can."

8         THE COURT:  It does implies that she has talked to

9    someone before.  I know it is a tremendous burden.

10        I realize that we all would have been better off if this

11   had been raised earlier.

12        However, I understand the defense's objection, and if

13   there is anything we can do to fix it before we get to the

14   conclusion of the case, I would grateful.

15        MR. JAUREGUI:  Yes, Your Honor.  The only thing I

16   would say -- the concern with the other clips were they that

17   mentioned talking to the government and FBI and giving the

18   government the smoking gun.

19        That is not present in this clip.

20        THE COURT:  I know.  But if you go back to my

21   fundamental concern that the question -- the speculation is

22   what did she say to the FBI?  What did she say to anyone else?

23   I mean, it's the same problem.

24        I know it's an inconvenience, I apologize.

25        Unfortunately, this case has taken on a life of its own

```
 1    with redactions.
 2         All I'm saying is if we can fix it before you use it, I
 3    would be grateful.
 4              MS. KIM:  Your Honor, we will do exactly that.
 5              THE COURT:  Thank you.
 6              MS. KIM:  May I have a moment to speak with my
 7    assistant?
 8              THE COURT:  Sure.
 9              MS. KIM:  Thank you.
10              MR. JAUREGUI:  Your Honor, in terms of schedule, if
11    we finish today --
12              THE COURT:  Yes.
13              MR. JAUREGUI:  -- can we get a proffer from the
14    defense what the defense case will look like in terms of length
15    so that we will do jury instructions and closing.
16              THE COURT:  Right.  Well, I think you have --
17    obviously, we don't know what your client's decision is on
18    testifying, but if you have other witnesses, you certainly
19    should let them know.
20              MS. O'CONNOR:  Will do.  I don't anticipate calling
21    any other witnesses, Your Honor.
22              THE COURT:  Okay.  On jury instructions, as I recall
23    there are really a couple that we have a disagreement on.
24         And so, let's see where we are at the end of the day.  I
25    would obviously like to get everything done this week and not
```

1  go into next week, but what I would suggest is let's see how

2  quickly we go today, then we will assign a time to do jury

3  instructions, and maybe you can take one more stab with

4  agreeing with one another, and we will schedule where we go

5  tomorrow once we know a little bit more information.

6           MR. JAUREGUI:  Sure.  There is a pending motion

7  should the defendant testify.

8           THE COURT:  I understand.

9           THE COURTROOM DEPUTY:  Anything further?

10          MS. KIM:  Nothing further from the government.

11          MS. O'CONNOR:  No, thank you, Your Honor.

12          THE COURT:  Are we ready for the jury then?

13          MS. KIM:  Yes.  Thank you.

14          THE COURTROOM DEPUTY:  All rise.

15           (JURY ENTERS THE COURTROOM AT 1:24 P.M.)

16          THE COURTROOM DEPUTY:  Please be seated.

17          THE COURT:  Mr. Payne, do you want anything further?

18          JUROR PAYNE:  I talked to my boss.  She's obligated

19  to say that I could stay, but she is not happy.

20     I would like to point out I will not get today's pay

21  without making it up, but I am available.

22          THE COURT:  I'm grateful.  We are going to do

23  everything we can to be done before you have to do anything on

24  Monday.

25          PROSPECTIVE JUROR:  Okay, great.

```
 1              THE COURT:  Okay.  Anyone else with an update?
 2         Why don't we forge ahead.
 3         Who is next?
 4              MR. JAUREGUI:  Your Honor, the United States calls
 5    Reid Hunter.
 6              THE COURTROOM DEPUTY:  Stand right here for me
 7    please.
 8                   (Oath was administered.)
 9              THE WITNESS:  I do.
10              THE COURTROOM DEPUTY:  Please be seated.  Will you
11    please state your full name and spell your last name for the
12    record?
13              THE WITNESS:  Sure.  John Reid Hunter.  H-u-n-t-e-r.
14              THE COURTROOM DEPUTY:  Thank you.
15                        JOHN REID HUNTER,
16         having been duly sworn, testified as follows:
17
18                        DIRECT EXAMINATION
19    BY MR. JAUREGUI:
20    Q    Good afternoon, Mr. Hunter.
21         What do you do for a living, sir?
22    A    I'm a transactional attorney in the entertainment
23    business.
24    Q    Where do you practice?
25    A    New York City.
```

1  Q    What does it mean to be a transactional entertainment

2  attorney?

3  A    I handle transactional commercial transactions for our

4  clients in the entertainment business.

5  Q    Could you put that in kind of lay terms for me and for the

6  jury?

7  A    Yeah.  Contract negotiations, contract review, drafting,

8  general business advice, that is generally what we do.

9  Q    What types of clients do you represent?

10 A    Well, it's all companies and individuals in the music

11 business, mostly artists.

12 Q    Is one of your clients the singer songwriter, Andy

13 Grammer?

14 A    Yes.

15 Q    Can you tell the jury what type of work you do for

16 Mr. Grammer?

17 A    The kind of work I described, negotiation of contractual

18 matters with record companies, his music publisher,

19 sponsorship, agreements, things of that nature.

20 Q    Have you ever performed any other legal work for

21 Mr. Grammer?

22 A    Yes.

23 Q    And what is that without divulging work product.  What

24 kind of work have you done for Mr. Grammer?

25 A    I was called upon to assist him in connection with some

```
 1   demands that were made upon him by Mr. Koziol.
 2   Q     When did you begin representing Andy Grammer?
 3   A     It was June of 2016.
 4   Q     How was it that you met him?
 5   A     Through his manager, Ben Singer.
 6   Q     Do you or does your firm represent Ben Singer?
 7   A     We represent several of Mr. Singer's entertainment-related
 8   companies.
 9   Q     And you mentioned the name Benjamin Koziol.  When did you
10   first become familiar with that name?
11   A     The name first came to my attention in December of 2016.
12   Q     How so?
13   A     A letter by an attorney representing him was forwarded to
14   me.  It was addressed to Mr. Grammer's former attorney.
15   Q     Who is that?
16   A     A gentleman named Gary Stickelman.
17   Q     What happened after you received that letter?
18   A     Well, at that point I spoke to Mr. Grammer.  I spoke to
19   Mr. Singer, and also Mr. Singer's attorneys.
20   Q     I got a little ahead of myself.
21         What did that letter concern?
22   A     Well, it contained a number of allegations that were
23   lodged against Mr. Grammer.
24   Q     What types of allegations?
25   A     Well, allegations that he was present at an address in Los
```

**UNITED STATES DISTRICT COURT**

1    Angeles and had assaulted Mr. Koziol.

2    Q    Now, what did you do after receiving and reviewing this

3    letter?

4    A    Well, I discussed it with Mr. Grammer.  I discussed it

5    with Mr. Singer as Mr. Grammer's manager, and ultimately

6    discussed it with Mr. Singer's attorneys.

7    Q    Who is that?

8    A    He was represented by Patty Glaser from Los Angeles.

9    Q    What did you do next?

10   A    Well, it was decided amongst Mr. Singer's attorneys and

11   myself, on behalf of Mr. Grammer that Mr. Singer's attorneys

12   would respond.

13   Q    Why was that decision made?

14   A    Well, because it was clear to me as well as I think to

15   Mr. Singer and his attorneys that --

16         MS. O'CONNOR:  Objection as to speculation and

17   personal knowledge.

18         THE COURT:  Sustained.

19         MR. JAUREGUI:  Your Honor, Mr. Hunter testified that

20   he met with Mr. Singer and his attorneys and his client, so I

21   believe he does have personal knowledge.

22         THE COURT:  He does.  Of course, the question is

23   whether it's hearsay.

24       What -- tell me again the question, maybe I'm needing that

25   again.

1          MR. JAUREGUI:  I think I just asked him what did he

2    do next, Your Honor.

3          THE COURT:  Okay.  Well, that he can certainly

4    answer.

5          THE WITNESS:  Okay.  What did I do next after

6    receiving the letter?

7    BY MR. JAUREGUI:

8    Q    No.  I think I'm incorrect.

9         I think I asked you why was it decided that Patty Glaser

10   would respond?

11   A    Well, because the facts appeared to relate to -- well,

12   Mr. Grammer was not -- Mr. Grammer didn't know Koziol or who he

13   was at the address in question on the date.

14         MS. O'CONNOR:  Objection to personal knowledge, Your

15   Honor, and hearsay.

16         THE COURT:  What -- try to do this again.

17   BY MR. JAUREGUI:

18   Q    Okay.  Mr. Hunter, you testified that Patty Glaser's firm

19   responded to the letter sent by attorneys representing Benjamin

20   Koziol, correct?

21   A    Correct.

22   Q    You were part of the group that decided it should be the

23   Glaser firm that responds, correct?

24   A    Correct.

25   Q    Okay.  And on what basis did you make that determination?

```
 1   A     Well, it was made on the basis that our client was -- the

 2   events that were alleged according to Mr. Singer.

 3            MS. O'CONNOR:  Same objection.

 4            MR. JAUREGUI:  I will try again, Your Honor.

 5            THE COURT:  Yes.

 6   BY MR. JAUREGUI:

 7   Q   Mr. Hunter, did you have an understanding about the events

 8   that were alleged in the letter from Benjamin Koziol's

 9   attorneys to Mr. Stickelman, did you have an understanding

10   about those events?

11            MS. O'CONNOR:  Same objection to the extent it calls

12   for hearsay.

13            MR. JAUREGUI:  We're not there yet.  He has to say

14   whether he had an understanding.

15            THE COURT:  He has to say yes, he did have an

16   understanding.  The next question is, what he did.  We don't

17   have to worry about who said what to whom.

18            THE WITNESS:  Okay.  I understood the allegation was

19   in the letter.

20   BY MR. JAUREGUI:

21   Q    Okay.  And did you have a basis for -- let me think about

22   this for a second.

23        Without telling us what you believe about who was

24   involved, can you explain to the jury why you and the rest of

25   the group made the determination that Patty Glaser's firm
```

```
 1   should respond?
 2             MS. O'CONNOR:  Objection.  Same objection.
 3             THE COURT:  Overruled at the moment.
 4   BY MR. JAUREGUI:
 5   Q    You may answer.
 6   A    Yes.  Because Mr. Singer admitted to me and to Andy that
 7   he was at that address at the given time.
 8   Q    Okay.  And did Patty Glaser's firm ultimately respond?
 9   A    Yes.
10   Q    In the months that followed, that response from Glaser to
11   the attorneys for Benjamin Koziol, did you hear anything about
12   Mr. Koziol again?
13   A    Well, not immediately, no.
14   Q    Did there come a time again in 2016, when you did?
15   A    Yes.
16   Q    Approximately, when was that?
17   A    The middle of October of 2016.
18   Q    Mr. Hunter, I want to direct your attention to an
19   exhibit -- stand by for one second.
20   A    The black binder, I assume?
21   Q    Yes.  Can you please take a look at Exhibit No. 14.  I'm
22   going to ask you to take a look at a series of exhibits.
23        Okay, so 14 through 19.
24   A    Okay.  Would you like me to review those now?
25   Q    Just take a look at those.
```

1    A      Okay.

2    Q      Then when you are done with 19, go to 48, please.

3    A      So 14 through?

4    Q      19.  If you have seen the exhibits before, Mr. Hunter, you

5    should take your time to make sure they are accurate.

6    A      Okay.

7    Q      Okay.  Do you recognize those exhibits?

8    A      Yes, I do.

9    Q      How do you recognize them?

10   A      These are printouts of e-mail exchanges between myself and

11   Mr. Koziol.

12   Q      And are they true and correct copies of those e-mail

13   exchanges?

14   A      They are.  I think the only thing I would note is that I

15   believe that the times on the printouts probably reflect the

16   Pacific Time Zone and I was not in the Pacific Time Zone.

17   Q      Right now you are looking at Exhibit 14?

18   A      Yes.

19   Q      Okay.

20          MR. JAUREGUI:  Your Honor, government moves to admit

21   14 through 19, and Number 48.

22          THE COURT:  They will be received.

23          (Exhibits 14, 15, 16, 17, 18, 19, and 48 were received

24   into evidence.)

25   BY MR. JAUREGUI:

| | |
|---|---|
| 1 | Q    Mr. Hunter, you testified you next heard from Mr. Koziol |
| 2 | in October of 2016. |
| 3 | Did you mean 2017? |
| 4 | A    Sorry, yes, 2017. |
| 5 | Q    What happened then? |
| 6 | A    Well, in mid October of 2017, I received an e-mail from |
| 7 | Mr. Singer forwarding an e-mail to Mr. Singer from Mr. Koziol |
| 8 | asking to be put in touch with Andy Grammer's attorney. |
| 9 | Q    Can we please publish Number 14? |
| 10 | Can we go to page 2?  Is this the e-mail you are talking |
| 11 | about, Mr. Hunter? |
| 12 | A    Yes. |
| 13 | Q    And this is the e-mail that Singer forwarded to you? |
| 14 | A    That's correct. |
| 15 | Q    And could you go back to page 1? |
| 16 | Did you respond to it? |
| 17 | A    I did. |
| 18 | Q    And was that on October 16th, 2017, there at the time? |
| 19 | A    Yes. |
| 20 | Q    The e-mail says, below forwarded to me by Ben Singer. |
| 21 | "I'm currently out of the country on business," et cetera. |
| 22 | Do you see that? |
| 23 | A    Yes. |
| 24 | Q    Were you actually out of the country on business at that |
| 25 | time? |

1   A     I was.

2   Q     What happened after this initial e-mail exchange?

3   A     Well, after I received the e-mail, I began looking for

4   putting out inquiries for a referral to a criminal attorney.

5   Q     Why did you do that?

6   A     Well, I believed that --

7              MS. O'CONNOR:  Objection to improper opinion.  It

8   goes to the ultimate issue that is for the finder of fact, Your

9   Honor.

10             MR. JAUREGUI:  Your Honor, again the question is why

11  you did that, so it would explain what he did next.

12             THE COURT:  Ladies and gentlemen -- let's try this

13  again.  I think it's pretty clear to you, and I don't want to

14  be overbearing.

15        You are hearing witnesses talk about why they did what

16  they did, and they did it based on opinions that they formed

17  based upon the facts before them.

18        At the end of the day in this case, you are going to be

19  required to make decisions as to people's motives, and whether

20  in fact the government has made out a case or not.

21        That is for you to decide.

22        So when these witnesses are talking about their opinions,

23  you should not take them to be opinions as to the matters upon

24  which you are going to be asked to make a judgment.

25        I don't know if I'm making that clear or not.  If any of

1   you have some questions, let me know.

2            MS. O'CONNOR:  And Rule 403 as well.

3            THE COURT:  Thank you.

4   BY MR. JAUREGUI:

5   Q    With that being said, Mr. Hunter, why did you reach out to

6   the attorney with criminal law experience?

7   A    It appeared to me a crime was being committed.

8   Q    So directing your attention to Exhibit No. 15.

9        This e-mail is dated October 16, 2017, at 3:46 p.m.

10  understanding that there might be a time issue here,

11  Mr. Hunter.

12       But, what is it?

13  A    This is one of a series of e-mails that followed my e-mail

14  to Mr. Koziol.  This is an e-mail from Mr. Koziol to me.

15  Q    And could you read what it says in the body, please?

16  A    Yes.  "I've enclosed my demand letter, texts from Andy on

17  the date of the incident and a pic from the assault.  I was not

18  able to fit everything into one e-mail, so I will be sending

19  another e-mail with the rest of everything.  Sincerely,

20  Benjamin Koziol."

21       And an e-mail address and phone number.

22  Q    If you look at the actual exhibit in the binder in front

23  of you, it should be 19 pages, correct?

24  A    Correct.

25  Q    Okay.  What does it contain?

1    A     Well, attached were a text document, then a number of

2    screen shots of what appeared to be a mobile telephone taken

3    off of a mobile phone and then a jpeg file which was a

4    photograph.

5    Q     And could you please go to page 19, Ms. Kim?

6          Was this the photograph?

7    A     Yes.

8    Q     We will go back to page 1.

9          Mr. Hunter, was this the only jpeg image?

10   A     I'm sorry, what was the question?

11   Q     The question was is this the only jpeg image that was

12   attached to this e-mail?

13   A     Yes.

14   Q     Could you tell the jury what the name of the image is?

15   A     The file name was 20161207-211212.jpeg.

16   Q     Did you get another e-mail after this from Mr. Koziol?

17   A     Yes.

18   Q     And is that the exhibit at Number 16?

19   A     Yes.

20   Q     And if you could just briefly summarize this, what is

21   happening in this e-mail?

22   A     Well, he is sending along what he claims to be our reviews

23   from other folks who have utilized his wife's services.

24   Q     And -- now I figured this out.

25         What does it say in the part that I circled in blue?

1    A    I'm sure you are aware there is a two-year statute of

2    limitations on personal injury cases in California, there for I

3    have less than three months to file my complaint.  Please

4    respond ASAP to let me know if your client wants to settle this

5    out of court or if I should move forward with filing my

6    complaint."

7    Q    And then moving on to Exhibit Number 17.

8         What is this?

9    A    This is what ultimately turned out or he represented to me

10   in a subsequent e-mail was the text that was contained in what

11   was presumably a text file in the first e-mail.

12        The first e-mail, I was not able to read the text of the

13   first e-mail, so I responded to him.  It appears he copied it

14   into another e-mail and forwarded it to me subsequently.

15   Q    Mr. Hunter, could you please read the e-mail starting

16   with, "Dear Mr. Grammer"?

17   A    Yes.  "Dear Mr. Grammer, you first contacted my wife for a

18   nude massage via text on December 24th, 2015.  She informed you

19   she would not be available for about two hours.  You stated

20   okay, thank you.  I will try again on a future date.

21        You then contacted her again via text and phone call on

22   January 8th at approximately 6:30 p.m. 2016.

23        This time she informed you she was available immediately.

24        You arrived at approximately 7:00 p.m. and she came down

25   to let you in the security gate, like she always did with her

customers.

She walked you back to our apartment, to the living room where she had her massage table set up.

She told you to get undressed and put the towel that was on the table around your waist and lie face down on the table.

She then told you she was going to the room to get undressed for the nude massage and would be back in just a few mins.  My wife then went back out to start the massage after just a few mins.  Everything was going fine for about the first ten mins until I heard you -- I heard her tell you no touching.

She continued with the massage, even after this, and just a few minutes later I again heard you tell her, no touching in a firm voice.

Again, she continued the massage, and again several mins later I heard her in a very firm tone tell you, I told you no touching, and then told you the massage was over and to get dressed and leave.

I immediately heard you start cussing her out and telling her this was a scam and that she was with a fucking tease.

She replied to you saying, I'm sorry, but there is nothing in the ad about a happy ending and she does nude massages and nothing more.

After this I heard you call her a fucking bitch and several other names and you became more irate by the second. It was at that time, I came out of the bedroom next door to

1   confront you.

2        When I came out of the room you were fully clothed, and

3   the look on your face obviously surprised to see me.

4        I immediately asked you what the fuck your problem was and

5   told you to get the fuck out.

6        I was located in the hallway between you and the door.

7   You advanced toward me very quickly and four to five steps and

8   punched me in the face knocking me to the ground and

9   unconscious for 20 to 30 seconds, at which time, you took off

10  out of the building.

11       You then continued to send text messages after you left

12  saying how my wife was a tease and how you were going to

13  contact building management to report that she was doing nude

14  massages out of our apartment.

15       You willfully and intentionally assaulted my wife and

16  myself.  Just because my wife advertised nude massages on

17  backpage.com does not give you the right to assume that she was

18  a prostitute.

19       In fact, my wife has many reviews online from California

20  and Minnesota from clients giving her negative reviews about

21  the fact she gives nude massages and nothing more.

22       They state in the reviews over and over that she does not

23  allow touching of any kind including happy endings or sex.

24       Because of your negligence you have caused me a great deal

25  of physical pain as well as emotional pain and suffering.

1     I now suffer migraine headaches and have a permanent blur

2  in the eye you punched me in.

3     This event has put an extreme emotional toll on my

4  marriage as well.

5     My wife was molested from her step dad from age five to

6  16, and this has brought back the memories of that which has

7  caused an extreme amount of emotional distress on our marriage.

8     Her step dad admitted to these charges and is still

9  serving out his sentence in state prison today.

10     My wife informed me after the incident happened that you

11  had reached down and touched her breasts twice and third time

12  grabbed her vagina.

13     I now have a constant feeling of embarrassment and

14  insecurity that I did not do more to protect my wife that day.

15     I have copies of the text you sent that night to the phone

16  my wife and I shared from your personal phone.

17     I also have pics of my black eye from after you punched

18  me, hospital bills from the eye doctor, copies of the negative

19  reviews other clients left on various websites confirming my

20  wife only did nude massages and nothing sexual.

21     There is also video showing you coming and leaving out of

22  the apartment that night.  And I will also call my wife to

23  testify if we end up going to trial.

24     I am seeking $1 million in damages on or before

25  November 1st, 2017.

1          I am also open to a structured settlement.

2          If I don't receive payment by this date, I'm prepared to

3    promptly file my complaint and supporting documents with the

4    Court.

5          This letter is for settlement purposes only."  Exclamation

6    points.  "Sincerely, Benjamin Koziol."  And e-mail and phone

7    number.

8    Q    Now, Mr. Hunter, at this time you were abroad, right?

9    A    That's correct.

10   Q    What did you do when you got this e-mail making detailed

11   allegations of sexual and physical assault against your client,

12   Andy Grammer?

13   A    Well, I made Mr. Grammer aware that we had received this,

14   and I suggested that I seek out the assistance of a criminal

15   attorney.

16   Q    Did you respond to this e-mail?

17   A    I did.

18   Q    I want to direct your attention to Exhibit Number 48.

19        Focusing you on the bottom half of page 1 of Exhibit 48,

20   is this your response to Mr. Koziol?

21   A    It is.

22   Q    What did you say?

23   A    "Mr. Koziol, I would discuss with our client but I have a

24   few clarifying questions:

25        One, how did you determine the person you speak of, who

```
 1    used a New York mobile number was Mr. Grammer.
 2         Two, did the person that you describe below come to your
 3    home alone.  Were there any witnesses to the alleged events
 4    other than your wife?
 5         Three, please provide me with a copy of the police report
 6    filed by you relating to the alleged assault.
 7         Of course, the above communication is without prejudice to
 8    our client's rights, all of which are hereby reserved.  Reid
 9    Hunter."
10    Q    Why did you respond this way?
11    A    I wanted to test his -- well, first of all, I wanted him
12    to provide me with whatever proof he might have, for instance,
13    that he had gone to the police and also wanted to test his
14    version of these facts.
15    Q    In paragraph 1, it says, "How did you determine the person
16    you speak of who used a New York mobile number was
17    Mr. Grammer"?
18    A    Yes.
19    Q    Why did you say "who used a New York mobile number"?
20    A    Because Andy, to my knowledge has never lived in New York
21    and does not -- did not have a New York telephone number.
22    Q    Did Mr. Koziol respond to you?
23    A    He did.
24    Q    And blowing up the top part of page 1 of Exhibit 48, is
25    this his response?
```

1    A     Yes.

2    Q     Could you read it, please?

3    A     "I Googled the phone number he was texting with which

4    brought me to his website with his pic, and I immediately

5    recognized Andy as being the one at the apartment who committed

6    the assault.  Yes, he did come alone, and my wife was the only

7    witness.

8          I did not make a police report.  There does not need to be

9    a police report to file civil suit.  Of course, that would help

10   my case, however, I feel my case is very strong without it.

11   Sincerely, Benjamin Koziol."

12   Q     Mr. Hunter, the subject line says, Andy Grammer//subject

13   to Federal Rule of Evidence 408."

14         Is that your subject line or his?

15   A     That is mine.

16   Q     Did you ultimately connect with a criminal -- with an

17   attorney with criminal law experience?

18   A     I did.

19   Q     Who was that?

20   A     I ultimately spoke with Lynn Neils in the New York office

21   of Baker Botts.

22   Q     Was she retained to represent Mr. Grammer in connection

23   with this case?

24   A     She was.

25   Q     Or I should say with the case being referenced in these

1    documents?

2    A    Yes.

3    Q    At some point, Mr. Hunter, did you and Ms. Neils begin

4    working with the FBI?

5    A    Yes.

6    Q    Approximately, when was that?

7    A    Well, I think Ms. Neils was engaged around the 20th -- the

8    Friday after the same week that I received the e-mails, and I

9    believe she made contact with U. S. Attorney's Office the next

10   week.

11   Q    And did you come to understand that the U.S. -- excuse me

12   that the FBI had opened a case?

13   A    Yes.

14   Q    I want to direct your attention to Exhibit No. 18, and

15   let's start at the bottom.

16        So now we have moved from October 17th to October 31st.

17   October 31st, 2017.  At this point, had you begun working with

18   the U. S. Attorney's Office or the FBI?

19   A    Yes.

20   Q    Okay.  And is this the next-in-time response you had with

21   Mr. Koziol?

22   A    It's the next communication I had with him, yes.

23   Q    He had given you a November 1st deadline, right?

24   A    That's correct.

25   Q    What did you say to him here?

```
 1   A     Do you want me to read it or just paraphrase?

 2   Q     You can paraphrase.

 3   A     I asked him for additional time to respond to him.

 4   Q     Why did you do that?

 5   A     Well, we were at that point cooperating with the U. S.

 6   Attorney's Office and the FBI, so they had begun their

 7   investigation.  And I understood it would be helpful if we

 8   could have a little extra time for them to investigate.

 9   Q     And did Mr. Koziol end up responding to this e-mail?

10   A     Yes, he did.

11   Q     And that is his response there?

12   A     Correct.

13   Q     Did he end up giving you more time as you requested?

14   A     Yes.  He offered to keep his offer open until

15   November 7th.

16   Q     I'm going to turn your attention to Exhibit 19.  This is a

17   multi-page exhibit, right, Mr. Hunter?

18   A     Yes.

19   Q     I want to start at the back on page 4, which is the first

20   in time with this series of e-mail exchanges.

21         Here you say, "I have had an opportunity to discuss your

22   allegations with our client.  I have some additional questions

23   that are probably best discussed by phone."

24         And then you go on to propose talking on Monday.

25         Why did you do that?
```

1    A    The FBI had asked me to try to set up a call with him.

2    Q    And did he respond to this?

3    A    He did.

4    Q    And his response, I think, straddles, you see from page 3

5    to page 4, why don't we go to page 3 at the bottom?

6    A    Right.  Would you like me to read it?

7    Q    No.  Did he agree to do a phone call with you?

8    A    He declined.

9    Q    And then if you can go onto the next page.  And does he

10   reiterate his demand for $1 million?

11   A    Yes.

12   Q    Then he says:  "If I have not received the $1 million I

13   asked for my demand letter or a signed agreement to pay this

14   amount from your client by November 7th, I will be filing my

15   lawsuit with all evidence I sent to you attached and possibly

16   more."  Correct?

17   A    Yes.

18   Q    And then he said he won't extend it any more?

19   A    Correct.

20   Q    Did you try to get Mr. Koziol on the phone?

21   A    I did.

22   Q    When did you do that, approximately?

23   A    The following Monday and I believe the following Tuesday.

24   Q    Did you reach him?

25   A    No.

1   Q      What happened?

2   A      Both times the phone rang a few times, then went to a

3   message that said that I had reached a voicemail that had not

4   been set up.

5   Q      And did you call the number that he had provided in his

6   e-mails?

7   A      Yes, that's right.

8   Q      Ultimately, did you respond to his demand?

9   A      Which demand?

10  Q      Did you ultimately tell him whether or not you were

11  agreeing or not agreeing to his one -- his demand for

12  $1 million?

13  A      Well, I did -- I did send him one further communication in

14  which, yes, I did.

15  Q      And, if we can go to page 2 of Exhibit 19, bottom please.

16         Could you read this and then we will continue to the next

17  page?

18  A      Sure.  "Mr. Koziol, your demand that our client pay you

19  $1 million without any understanding of the merits of your

20  allegations without receiving any proof and without any

21  discussion of the terms of the settlement is ridiculous.

22         Please understand that should you follow through on your

23  threat to file an action against Mr. Grammer, which appears to

24  be a threat to smear Mr. Grammer's good reputation in order to

25  obtain a payment, our client will take legal action against you

1    and any others involved in this scheme.

2        Should you wish to reconsider your decision and speak to

3    me about your allegations and your demands, I can be reached at

4    the direct line below.  Truly yours, Reid Hunter."

5    Q    Why did you respond like this at this time?

6    A    Well, the -- his deadline was upon us, and at that point I

7    wanted to make it clear to him that should he pursue these

8    claims that there would be repercussions.

9    Q    Did he respond to you?

10   A    He did.

11   Q    And if you could just summarize briefly what his response

12   to you was?

13   A    Well, his response was basically reiterating the thought

14   that he thought he was very clear in his demands.

15       He reiterates some of his claims, and then he goes on to

16   point out that he's not intimidated by my threats because a

17   suit by us against him would be frivolous, and he had no money

18   or assets to go after, so good luck with that.  Then he

19   concluded he had no option but to move forward with a jury

20   trial.

21   Q    As far as you know, Mr. Hunter, did Mr. Koziol ever file a

22   lawsuit against your client, Andy Grammer?

23   A    No, not to my knowledge.

24   Q    Did you continue communicating with Mr. Koziol after

25   November 7th, 2017?

```
 1   A     No.
 2   Q     Why not?
 3   A     At that point, I, in essence, handed off the communication
 4   with him to Ms. Neils.
 5   Q     Why did you do that?
 6   A     It was my belief that since it did not appear that he was
 7   taking my communications seriously, that perhaps he would take
 8   Ms. Neils' communications more seriously.
 9   Q     And was that in part because you are an transactional
10   lawyer?
11   A     Yes, I'm not a criminal lawyer.
12         MR. JAUREGUI:  No further questions, Your Honor.
13         THE COURT:  Thank you.
14       Ms. O'Connor?
15         MS. O'CONNOR:  Thank you, Your Honor.
16
17                         CROSS-EXAMINATION
18   BY MS. O'CONNOR:
19   Q     Hello, Mr. Hunter.
20   A     Yes.
21   Q     Don't rush, let me know when you are ready.
22   A     Okay.
23   Q     We heard from you in direct about the correspondences that
24   you were having with Mr. Koziol, right?
25   A     Correct.
```

```
1   Q    Okay.  I want to go over a few things about those letters
2   with you, and I direct your attention to Exhibit 16.
3        Let me know when you are there, I can put it up here, too.
4   I'm on the first page.
5   A    Okay.
6   Q    In this e-mail, Mr. Koziol refers to the fact that he
7   enclosed a picture of his wife's ex-step dad in prison to prove
8   that his wife was molested and the amount of damage your client
9   has done to their relationship; is that right?
10  A    Yes.
11  Q    And did he -- did you take any steps to investigate
12  whether that was true?
13  A    No.
14  Q    But he did include in that demand this, correct?  And this
15  is -- do you remember that, Mr. Hunter?
16  A    I recognize it, yes.
17  Q    So this appears to be somebody's mug shot, right?
18  A    Yes.
19  Q    And the name under there is Anthony Neal Sweet?
20  A    Correct.
21  Q    It says he's incarcerated?
22  A    It does as of 2/26/2013.
23  Q    Right.  And his offense down at the bottom is criminal
24  sexual conduct?
25  A    Correct.
```

```
 1   Q    And it says, go to the Court's website to look at the
 2   court case information down below?
 3   A    Yes.
 4   Q    Did you ever do that?
 5   A    No.
 6   Q    And I want to refer you back to the first page again.
 7        The last paragraph there says, "please respond ASAP to let
 8   me know if your client wants to settle this out of court or if
 9   I should move forward with filing my complaint."
10   A    It does.
11   Q    The complaint as in a court of law, right?
12   A    I assume that is what he was referring to, yes.
13   Q    He doesn't say, "I should move forward with going to the
14   press, right?
15   A    No, he does not.
16   Q    He doesn't say, I'm going to call up TMZ, right?
17   A    No.
18   Q    He doesn't say he is going to call Mr. Grammer's wife,
19   right?
20   A    No.
21   Q    And I want to direct your attention to page 2 of
22   Exhibit 17.
23        I have highlighted two parts, but I will refer you -- can
24   you see the screen what I'm referring to?
25   A    Yes.
```

1  Q    It says, "this event has put an extreme emotional toll on

2  my marriage as well."  And he talks about the stress on his

3  marriage.

4       Do you see that?

5  A    I do.

6  Q    And it says her step dad admitted to sexually abusing her

7  and is still serving his sentence in state prison.

8  A    It says her step dad admitted to these charges and is

9  still serving out his sentence in state prison today.

10 Q    Right.  It says she was molested by her step dad?

11 A    It does.  It doesn't say what the charges are, but that's

12 what it says.

13 Q    You don't think it's clear from that?

14 A    One could infer that, yes.

15 Q    I will move down to the bottom of the page where it says,

16 "if I don't receive payment by this date, I am prepared to

17 promptly file my complaint and supporting documents with the

18 court."

19      Do you see that?

20 A    I do.

21 Q    As in a court of law, right?

22 A    Yes.

23 Q    Again, he's not saying, I'm prepared to go to TMZ or

24 People magazine, right?

25 A    Correct.

```
 1   Q     This letter is for settlement purposes only, right?
 2   A     Yes.
 3   Q     Okay.  I want to direct your attention to Exhibit 18.
 4         Are you there?
 5   A     I am.
 6   Q     Okay.  The first part -- well, first he says, "I can only
 7   assume that this is a stall tactic."
 8         Do you see that?
 9   A     Yes.  With "stall" misspelled.
10   Q     Yes, "stall" is misspelled.
11         All right.  Are you aware of whether Mr. Koziol has a law
12   degree?
13   A     What is the question again?
14   Q     Are you aware of whether Mr. Koziol has a law degree?
15            MR. JAUREGUI:  Objection.  Relevance, Your Honor.
16            THE COURT:  Overruled.  You may answer.
17            THE WITNESS:  I have no idea.
18   BY MS. O'CONNOR:
19   Q     Or his level of education, in general?
20   A     I have no idea.
21   Q     And statute of limitations is a term that refers to the
22   time deadline for filing a civil suit.
23         Is that your understanding?
24   A     If you are an attorney, yes, that is my understanding.
25   Q     And at the bottom of this, it says, "I will move to
```

1  immediately file my complaint with the Superior Court of

2  California on November 8th, if we have not settled this matter

3  by this date."

4  A     Correct.

5  Q     Again, he's not saying that if he doesn't receive the

6  settlement, he will take other steps to go to the media or

7  anyone else to damage Andy Grammer's reputation; is that right?

8  A     It sounds like you were testifying.  Yes, that's right.

9  Q     It's a leading question, but sometimes it doesn't sound

10 like there is a question mark at the end, but it's still a

11 question mark.

12 A     Okay.

13 Q     Okay.  And I want to direct your attention to Exhibit 19.

14       Okay.  You had gone over this with the prosecutor -- I'm

15 sorry, and the first page is I'm going to refer you to the

16 bottom of page 2 of Exhibit 19.

17 A     Okay.

18 Q     Do you see that?

19 A     Yes.

20 Q     And this is a response you sent to Mr. Koziol at some

21 point, right?

22 A     Correct.

23 Q     And actually you didn't -- I know you sent it, but you

24 didn't draft that e-mail, did you?

25 A     I did not draft the initial draft of it.

```
1    Q    Right.  Lynn Neils drafted that?

2    A    Correct.

3    Q    She drafted that in consultation with Special Agent Burke

4    from the FBI?

5    A    I don't have a recollection as to who might have assisted

6    her.

7    Q    And do you recall that she drafted it with the

8    collaboration of Ann Kim from the United States Attorneys

9    Office?

10   A    I understood that there was input from someone in the

11   government, yes.

12   Q    Would it refresh your recollection if I showed you an

13   e-mail chain?

14          MR. JAUREGUI:  Your Honor, he said he doesn't

15   remember.

16          THE COURT:  I think that is correct.

17   BY MS. O'CONNOR:

18   Q    So it sounds right that this letter went through the

19   drafting process with the FBI and the U. S. Attorney's Office

20   and Lynn Neils?

21          MR. JAUREGUI:  Asked and answered.

22          THE COURT:  Overruled.  You may answer.

23          THE WITNESS:  Correct.

24   BY MS. O'CONNOR:

25   Q    And, in fact, during the course of this investigation, you
```

1    were in touch with Lynn Neils and with Ms. Ann Kim, from the

2    prosecutor's office?

3    A    I was in touch with Ms. Lynn Neils.

4    Q    It was your understanding that she was good to go, be the

5    go-between, between the U. S. Attorney's Office and the FBI?

6    A    Correct.

7    Q    Because she was the former federal prosecutor?

8    A    Correct.

9    Q    And you told me you selected Ms. Neils or you chose to

10   refer this matter to Lynn Neils because you had an

11   understanding about her criminal law experience, correct?

12   A    Yes.

13   Q    It was your understanding that she is a former federal

14   prosecutor?

15   A    Correct.

16   Q    And it's your understanding that she was a former chief of

17   the major crimes unit?

18             MR. JAUREGUI:  Objection.  Relevance and 403, Your

19   Honor.

20             THE COURT:  I just think we're getting far afield.

21             MS. O'CONNOR:  Understood.

22   BY MS. O'CONNOR:

23   Q    You testified on direct you got a former federal

24   prosecutor involved because you had a belief that this was a

25   crime, correct?

```
 1  A    Correct.

 2  Q    Like you said, you are not a criminal lawyer, correct?

 3  A    Yes.

 4  Q    Did you -- before you formed that belief -- did you do any

 5  research into the case law about whether a threat to go file a

 6  suit can be a crime?

 7            MR. JAUREGUI:  Your Honor, I think we are in 403

 8  territory again.

 9            THE COURT:  I think we probably are.  Never mind,

10  let me not speak, just rephrase.

11  BY MS. O'CONNOR:

12  Q    You testified about your opinion about that this was a

13  crime?

14  A    I did.

15  Q    And I'm just going to ask you about what that was based

16  on.

17       Okay.  Did you do any research into the case law?

18  A    No.  That is why I hired someone.

19  Q    Thank you.

20       And so you were exchanging e-mails back and forth with

21  Mr. Koziol, right?

22  A    Correct.

23  Q    And in one of those e-mails -- I'm going to refer you to

24  Exhibit 48, and in this exhibit, in this letter -- in your

25  e-mail you asked Mr. Koziol several follow-up questions, right?
```

UNITED STATES DISTRICT COURT

```
 1   A     That's correct.

 2   Q     That was drafted in consultation with Lynn Neils as well?

 3   A     No.

 4   Q     It was not?

 5   A     The answer was no.

 6   Q     Okay.  You had an interview with the FBI in this case?

 7   A     I'm sorry?

 8   Q     You interviewed with -- well, actually, Mr. Jauregui, you

 9   in this case, you had a discussion with him on May 24th, just a

10   few days ago?

11   A     It sounds accurate.

12   Q     Okay.  And you discussed the events underlying your

13   testimony today with Mr. Jauregui?

14   A     Correct.

15   Q     You said that you made contact with Lynn Neils on the date

16   of this e-mail, October 17th?

17   A     That sounds right.

18   Q     Okay.  And that after you sent this e-mail with three

19   questions?

20   A     Okay.

21   Q     The same day; is that right?

22   A     That sounds accurate, yes.

23   Q     So you think Lynn Neils had some input on this as well?

24   A     No, she did not.

25   Q     But that is the day you contacted her, right?
```

```
 1   A     That sounds right.  She wasn't engaged until the 20th.
 2   Q     Well, you spoke with her that day?
 3              MR. JAUREGUI:  It's been asked and answered several
 4   times.
 5              THE COURT:  It has been.  Overruled.  It has been
 6   but --
 7              MS. O'CONNOR:  I can move on.
 8              THE COURT:  Why don't you.
 9   BY MS. O'CONNOR:
10   Q     So you are exchanging e-mails with Mr. Koziol, right?
11   A     Correct.
12   Q     And there are e-mails going back and forth starting in mid
13   October, correct?
14   A     Yes.
15   Q     And you are saying things, right?
16   A     Yes.
17   Q     And Mr. Koziol is saying things, correct?
18   A     Yes.
19   Q     And he is referring to his threat to file a lawsuit,
20   correct?
21   A     Yes.
22   Q     And you are in consultation with the prosecutors and the
23   FBI during this time?
24   A     I think I answered that question, but my answer was that I
25   was in communication originally with the U. S. Attorney's
```

1    Office, and ultimately the FBI agent did speak to me.

2    Q    And on November 3rd, after exchanging a number of e-mails

3    with Mr. Koziol, the FBI requested that you try to get him on

4    the phone, right?

5    A    Yes.

6    Q    And not only did they request for you to get him on the

7    phone, they requested for you to use a recorder to record that

8    conversation, right?

9    A    Not exactly.  I was to make the call through a device that

10   would record it.  It wasn't my device, I wasn't recording it.

11   Q    Right.  But you agreed -- you consented to the use of the

12   recorder to record your phone calls with Mr. Koziol?

13   A    I did.

14   Q    And the FBI instructed you to call Mr. Koziol?

15   A    Yes.

16   Q    And after exchanging all of these e-mails about lawsuits,

17   they wanted a recorded conversation with Mr. Koziol; is that

18   right?

19   A    Yes.

20   Q    Okay.  Now there is -- Mr. Koziol sent you, among other

21   things, a photograph of himself with a black eye; is that

22   right?

23   A    Correct.

24   Q    And are you -- you are not a technology expert, are you?

25   A    I'm smarter than most lawyers in that area, but no, I'm

1    not an expert.

2    Q    I don't know how much that is saying, though.

3         So, are you familiar with the fact you can just -- if you

4    get a jpeg image, you can just right click on it and see the

5    date it was taken?

6    A    I am.

7    Q    Did you right click on that photograph?

8    A    I did.

9    Q    It was pretty easy to do, right?

10   A    It was.

11   Q    And the date taken was December 7th, right?

12   A    That's right.

13   Q    Okay.  But it didn't take -- you are not an IT master or

14   anything like that, right, so it wasn't -- it didn't take a lot

15   of sophistication to undercover the date taken on that

16   photograph, right?

17   A    Right.

18   Q    And again -- I will leave it at that.

19        And you are -- okay.  You are employed by Andy Grammer?

20   A    That's correct.

21   Q    And you work at -- what is the name of your firm?

22   A    Serling Rooks Hunter McKoy Worob & Averill.

23   Q    Are you a named partner in your law firm?

24   A    Yes.

25   Q    It's a New York City law firm?

```
 1    A    Yes.

 2    Q    It's a good law firm, right?

 3    A    We like to think so.

 4    Q    All right.  And you bill Mr. Grammer for your time, right?

 5    A    Correct.

 6    Q    And he pays those bills, right?

 7    A    Correct.

 8    Q    Okay.  And as his lawyer, it's your job to represent Andy

 9  Grammer's interests?

10    A    Yes.

11         MS. O'CONNOR:  May I have a moment?

12         THE COURT:  Sure.

13         MS. O'CONNOR:  Nothing further.

14         THE COURT:  Okay.  Mr. Jauregui?

15         MR. JAUREGUI:  One moment.

16

17                    REDIRECT EXAMINATION

18  BY MR. JAUREGUI:

19    Q    Just briefly, Mr. Hunter.

20         On cross-examination, Ms. O'Connor asked you whether you

21  conducted an investigation into the father of Jordan Sweet.

22         Do you remember that?

23    A    Yes.

24    Q    And you answered, did you not, right?

25    A    Correct.
```

1    Q     Why?

2    A     Because it was a correct answer.

3    Q     Why didn't you conduct the investigation?

4    A     Oh, sorry, because I didn't find it at all relevant to the

5    threat.

6    Q     And did you believe that your client was involved in that

7    situation that was being alleged by Mr. Koziol?

8              MS. O'CONNOR:  Objection, Your Honor.  Relevance

9    403.

10             THE COURT:  Overruled.  I think you opened it up.

11             THE WITNESS:  Would you repeat the question.

12   BY MR. JAUREGUI:

13   Q     Did you believe that your client was involved in the

14   alleged conduct that Mr. Koziol was alleging when he

15   transmitted these threats?

16   A     Absolutely not.

17   Q     Ms. O'Connor also asked you about the various letters that

18   Mr. Koziol sent saying that unless he got $1 million, he was

19   going to file a complaint or he was going to sue in court.

20         Do you remember that?

21   A     Yes.

22   Q     Did the fact that -- as Ms. O'Connor pointed out -- he did

23   not say he was going to TMZ; he did not say he was going to

24   People's magazine; was that any less concerning to you?

25             MS. O'CONNOR:  Objection.  Relevance, and 403.

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  Ask me that again, sorry.  I'm getting
 3    too caught up.
 4    BY MR. JAUREGUI:
 5    Q    Was the fact that the demand letters said that if you
 6    don't give me $1 million, I will sue you in court, and did not
 7    say, as Ms. O'Connor pointed out, I will go to TMZ, I will call
 8    your wife, I will go to People magazine.
 9              Did that make it any less concerning to you?
10    A    No.
11    Q    Why not?
12    A    This is --
13              MS. O'CONNOR:  Objection, as to relevance and 403.
14              THE COURT:  Overruled.
15              THE WITNESS:  It was my opinion, based on my
16    experience, that that was inherent in every one of these
17    e-mails.
18    BY MR. JAUREGUI:
19    Q    That what was inherent?
20    A    A threat of potential exposure, which could be damaging to
21    our client.
22              MR. JAUREGUI:  One moment, Your Honor.
23    BY MR. JAUREGUI:
24    Q    And when you say "potential exposure," Mr. Hunter, how
25    would filing a lawsuit in court lead to potential exposure for
```

```
 1   your client?
 2   A    Well, because when you are an artist of Mr. Grammer's
 3   stature, it's common for press outlets, blogs, and other
 4   outlets like that to track these things, and as soon as
 5   something is filed, to report them.
 6            MR. JAUREGUI:  No further questions, Your Honor.
 7            THE COURT:  Thank you.
 8        Ms. O'Connor, anything further?
 9
10                     RECROSS EXAMINATION
11   BY MS. O'CONNOR:
12   Q    And Mr. Hunter, as a very good transactional lawyer, you
13   represent these people of stature frequently, right?
14   A    Yes.
15   Q    Famous musicians, right?
16   A    Yes.
17   Q    Famous artists of different types?
18   A    Primarily musicians.
19   Q    People with high profiles?
20   A    Correct.
21   Q    So that is how you are familiar with your answer to the
22   last question?
23   A    Correct.
24            MS. O'CONNOR:  Nothing further.
25            THE COURT:  All right.  Anything further?
```

1          MR. JAUREGUI:  No, Your Honor.  May the witness be

2     excused?

3          THE COURT:  Yes.

4       Do we need a break?

5          THE WITNESS:  Why don't we then -- I saw a nod, yes?

6       Let's try to take a ten-minute break and then we will come

7     back.  Thank you.

8          THE COURTROOM DEPUTY:  All rise.

9            (JURY EXITS THE COURTROOM AT 2:27 P.M.)

10         THE COURTROOM DEPUTY:  Please be seated.

11         THE COURT:  How long is the next witness?

12         MR. JAUREGUI:  Ten minutes or less, Your Honor.  And

13    then the witness after that is Mr. Grammer.

14         THE COURT:  Okay.  Then our agent.

15       Okay.  I let them go because I'm informed that one of the

16    jurors has a kidney stone problem, so she needs to have breaks.

17    So we will be back in ten minutes.

18         THE COURTROOM DEPUTY:  Court is in recess.

19                    (Recess.)

20         THE COURTROOM DEPUTY:  Please remain seated and come

21    to order.  This Court is again in session.

22       Are we ready for the jury?

23         MS. O'CONNOR:  Yes.

24         MS. KIM:  Yes.

25         THE COURTROOM DEPUTY:  All rise.

```
 1                    (JURY ENTERS THE COURTROOM AT 2:43 P.M.)

 2                    THE COURTROOM DEPUTY:  Please be seated.

 3                    THE COURT:  Okay.  Who is next?

 4                    MR. JAUREGUI:  Your Honor, the United States calls

 5      Kristopher Nam.

 6                    THE COURT:  Mr. Nam, if you could come forward and I

 7      could swear you in.

 8                         (Oath was administered.)

 9                    THE WITNESS:  I do.

10                    THE COURTROOM DEPUTY:  Please be seated.

11           Please state your full name, and spell the last name for

12      the record.

13                    THE WITNESS:  Kris Nam.  N-a-m.

14                              KRIS NAM,

15           having been duly sworn, testified as follows:

16

17                         DIRECT EXAMINATION

18      BY MR. JAUREGUI:

19      Q    Mr. Nam, where do you work?

20      A    I work at FBI Los Angeles, field office.

21      Q    What is your job?

22      A    I am an IT specialist forensic examiner.

23      Q    How long have you been a forensic examiner at the FBI?

24      A    About five and a half years.

25      Q    What do you do as a forensic examiner?
```

54

```
1    A     I conduct examinations for digital evidence such as
2    computer, computer hard drives, cell phones, and any other
3    digital media that contains any storage.
4    Q     What does it mean to do forensic examinations?
5    A     Could you repeat the question?
6    Q     Sure.  What do you do, what is your job?  If you could
7    explain in lay terms.
8    A     So I conduct the exam of digital evidence that is seized
9    by agents or any other investigator in FBI, and I help the case
10   to solve the crime.
11   Q     How are you trained, sir?
12   A     I am a certified computer forensic examiner by FBI, and I
13   also took some classes to be trained in Windows, MacIntosh,
14   cell phones, and audio and video forensics.
15   Q     What's your educational background?
16   A     I have a bachelor of science in network communication
17   management.
18   Q     When did you get that?
19   A     July 2004.
20   Q     Did you provide digital trainings to other members of the
21   FBI?
22   A     Yes, I do.
23   Q     And are you regularly trained by members of the FBI in
24   your line of work?
25   A     Yes.
```

UNITED STATES DISTRICT COURT

```
1    Q    Are you trained by other law enforcement entities as well?

2    A    Yes.

3    Q    Have you -- are you now or have you been a member of any

4    professional associations?

5    A    I was a member of HTCIA, High Tech Crime Association.

6    Q    Was that recent?

7    A    No.  It was year of 2012.  But not any more.

8    Q    And approximately how many pieces of media, so, digital

9    media have you examined in your career?

10   A    I examined about 370 digital evidence media.

11   Q    And how many -- that is in five and a half years?

12   A    Yes.

13   Q    How many cases have you worked on?

14   A    I have worked on about 120.

15   Q    And are you a member of any squad or team within the FBI?

16   A    Yes.  I am in a computer analysis response team called

17   CART.

18   Q    Do you have any -- do you have a CART cell phone

19   certification?

20   A    Yes, I do.

21   Q    Is that current?

22   A    Yes.

23        MR. JAUREGUI:  Your Honor, the government offers

24   Mr. Nam as an expert in digital forensic examinations.

25        MS. O'CONNOR:  No objection.
```

```
 1              THE COURT:  All right.  He will be so designated.
 2   BY MR. JAUREGUI:
 3   Q    Mr. Nam, how did you come to get involved in this case?
 4   A    I was asked by Special Agent Cody Burke to conduct the
 5   analysis of a jpeg image.
 6   Q    That jpeg image, what was it associated with, if anything?
 7   A    That was the attachment from the e-mail from Mr. Koziol to
 8   Reid Hunter on October 16th, 2015.
 9   Q    I'm going to show you an exhibit that is currently --
10   already been admitted into evidence.  That is Exhibit
11   Number 15.
12         It's going to be on the screen in front of you in a
13   moment, okay?
14         There it is.  Do you recognize that e-mail?
15   A    Yes, I do.
16   Q    Is that the e-mail you were just talking about?
17   A    Yes.
18   Q    And the image that was associated with the e-mail, was
19   that image attached to a copy of this e-mail?
20   A    Yes.
21   Q    Okay.  Did you take any steps to retrieve the original
22   e-mail version of this?
23   A    Yes.  I accessed to Reid Hunter's actual e-mail.
24   Q    How did you do that?
25   A    I had a consent from Mr. Hunter, and I accessed his
```

1    Windmill and I looked at this e-mail and downloaded the

2    attachment which is a jpeg image file, and then I conducted

3    analysis of it.

4    Q    Right.  How did you do that?

5    A    After I downloaded that image file, I right clicked and

6    checked the property of the image file, and then I went to see

7    the details of the image file in the property.

8         There is a detail tab on it, and when you see it, there is

9    a date that the original image was taken and the file name, and

10   so forth.

11   Q    Are you familiar with the term metadata?

12   A    Yes.  The metadata is basically information of the file

13   itself.  And metadata shows name of the file, file size, and

14   the file when it was originally created.

15   Q    So, is what you were doing when you went to grab that

16   e-mail from Reid Hunter's e-mail, were you trying to assess the

17   metadata associated with that image?

18   A    Yes.

19   Q    Now, I'm going to ask you to take a look at Exhibit

20   No. 49, please.

21        Do you recognize exhibit -- in your binder, sir, I'm

22   sorry.

23        Do you recognize what it is?

24   A    Yes.

25   Q    What is it?

```
 1    A    This is a screen shot of the jpeg image that I took.

 2    Q    Does it have anything else besides the image itself on it?

 3    A    Yes.  There is a small window that I right clicked and

 4    showed the property of the image file.

 5    Q    When you say "it's a screen shot," did you just then take

 6    a picture of it using your computer?

 7    A    Yes.

 8              MR. JAUREGUI:  Your Honor, government moves to admit

 9    Exhibit No. 49.

10              MS. O'CONNOR:  No objection.

11              THE COURT:  Exhibit 49 is received in evidence.

12         (Exhibit 49 received into evidence.)

13              MR. JAUREGUI:  Ms. Kim, can you please highlight

14    that?

15    BY MR. JAUREGUI:

16    Q    This is the image that was in that e-mail you went to

17    retrieve from Andrew Grammer, correct?

18    A    Yes.

19    Q    What are we looking at here that Ms. Kim has highlighted?

20    A    So when you see the details under origin and it said date

21    taken December 7th, 2016, 9:12 p.m.

22    Q    And let me go to the next page.

23         What does this show?

24    A    It shows Samsung, SM-J 100 VPP was used to take this

25    photo.
```

1  Q    So when we were on page 1 of the exhibit and it said that

2  the date taken was 12/7/2016, at 9:12 p.m., does that indicate

3  that that was the date that this photograph was taken?

4  A    Yes.

5  Q    And Mr. Nam, based on your training and experience, how

6  does the date and time associated with a picture -- okay -- how

7  does that -- how does it get associated with the picture?

8  A    So, this date and time in the metadata, it's actually --

9  there is a phone date and time when it was taken.

10 Q    And how is the phone date and time associated to a phone?

11      In this case, we're talking about a Samsung phone, right?

12 A    Yes.

13 Q    That is a mobile device, a smart phone?

14 A    Yes, it is.

15 Q    How does the date and time get associated to the phone?

16 A    So when we take any photos on the phone, and it records

17 the date and time of the photo in the metadata, and that

18 metadata, which is the date and time, is same as the phone date

19 and time setting.

20 Q    And Mr. Nam, based on your experience as a forensics

21 examiner, is the date and time that shows up in the metadata oh

22 a photograph generally correct when taken with a smart phone?

23 A    Yes.

24      MR. JAUREGUI:  No further questions, Your Honor.

25      THE COURT:  All right.  Any cross?

1               MS. O'CONNOR:  No questions for this witness, Your

2     Honor.

3               THE COURT:  All right.  Then you may step down.

4     Thank you.

5          Who is our next witness?

6               MR. JAUREGUI:  Your Honor, the United States calls

7     Andy Grammer.

8               THE COURT:  Okay.

9               THE COURTROOM DEPUTY:  Mr. Grammer, if you could

10    come forward, and I will swear you in.

11         Please raise your right hand.

12                    (Oath was administered.)

13              THE WITNESS:  I do.

14              THE COURTROOM DEPUTY:  Please be seated.

15         Please state your full name, and spell your last name for

16    the record.  Please make sure you speak into the microphone.

17              THE WITNESS:  Andrew Charles Grammer.

18    G-r-a-m-m-e-r.

19              THE COURTROOM DEPUTY:  Thank you.

20

21                    ANDREW CHARLES GRAMMER,

22         having been duly sworn, testified as follows:

23

24                    DIRECT EXAMINATION

25    BY MR. JAUREGUI:

```
 1    Q     Good afternoon, Mr. Grammer.

 2    A     Good afternoon.

 3    Q     How old are you, sir?

 4    A     I am 34.

 5    Q     Are you married?

 6    A     I am.

 7    Q     How long have you been married?

 8    A     I have been married for five years, and we have been

 9    together for about nine.

10    Q     Do you have children?

11    A     I do have a ten-month old.

12    Q     Do you live in the Los Angeles area?

13    A     Yes.

14    Q     How long have you lived in Los Angeles?

15    A     I have been in Los Angeles for over ten years.

16    Q     Do you have any family members who live here?

17    A     Yeah, my dad lives -- my dad and brother both live in Los

18    Angeles.

19    Q     What about your in-laws?

20    A     Yeah, my mother-in-law lives in my guest house, which is

21    right next door.

22    Q     What do you do for a living, sir?

23    A     I am a singer, a songwriter, and a performer, entertainer.

24    Q     How long have you been in the music business?

25    A     Quite a while.  My first song came out around 2010, 2011.
```

```
 1    I was street performing for about four years before that.
 2         So I have been in the music business for quite a long time
 3    but people might not have known me.
 4    Q    And where were you a street performer?
 5    A    Down on the Third Street Promenade.
 6    Q    Did there come a time when you were signed by a record
 7    label?
 8    A    Yes.
 9    Q    Approximately, when was that?
10    A    That was around 2009, 2010, when my first song came out.
11    Q    And was that S Curb Records?
12    A    Yes.
13    Q    Has S Curb Records released any of your music
14    commercially?
15    A    Yeah, they released all of it.
16    Q    What type of music do you record or write?
17    A    So, I write a ton of autobiographical stuff.  It's pretty
18    much my voice in music.  I get labeled as positive.
19         It's a lot of -- it's a lot of this idea that even if you
20    are tested, you grow from your tests.
21         So my first single that did really well was a song called
22    Keep Your Head Up.  It was used in Pitch Perfect, and it's kind
23    of like an inspirational anthem that I get a lot of e-mails
24    about and a lot of stories about people saying they use it for
25    those purposes.
```

63

```
1    Q    And how is your music sold?

2    A    My music is sold pretty much everywhere.  You can get it

3    on all streaming services, Apple, Amazon, Spotify.

4         It's sold in stores at like Target and Wal-Mart and it's

5    played a lot on the radio.

6    Q    Do you own the rights to your music, sir?

7    A    Yes.

8    Q    And do you make money every time one of your songs or

9    albums is sold?

10   A    Yes.

11   Q    Do you know approximately how many albums you have sold?

12   A    So it gets kind of confusing, people aren't buying as many

13   albums, they are streaming it.  It's a whole different

14   algorithm.

15        But the RIAA, the Recording Industry Association of

16   America, says I was selling the equivalent of about

17   $11 million.

18   Q    What about music singles?

19   A    Yeah.  I mean, my single -- my biggest single, Honey, I'm

20   Good, sold over 3 million singles.

21        I have six singles that are either gold or platinum being

22   500,000.

23   Q    What about on streaming services?

24   A    The biggest song on streaming has a song called, Fresh

25   Eyes.  It has about 300 million streams.
```

**UNITED STATES DISTRICT COURT**

1  Q    Mr. Grammer, when did you begin experiencing this kind of

2  commercial success?

3  A    So, I was street performing 2009, 2010.  I met my manager,

4  Ben Singer.  He came out and saw me on the street, and we

5  started working together.

6       The first thing we started working on, is you got to get a

7  better rug and better amp and better display for your

8  street-performing skills.

9       And from there, that is when I wrote, Keep Your Head Up,

10 and that's when everything started to really go in an upper

11 direction.

12 Q    What happened, when you say "things started going in an

13 upward direction," what happened for you?

14 A    It was so amazing.  I had written so many songs up to that

15 point, that nothing happened.

16      When this one hit, like I said, it got used in the movie,

17 Pitch Perfect.  That came after it became like a big radio

18 success.  It got to number 5 on the Hot AC chart.

19 Q    How did your career change?

20 A    It went from begging, really working hard to get people to

21 stop as they walked by to get jeans while you are playing for

22 them, to like playing in sold-out venues.

23      I played on so many TV shows, Jimmy Kimmel, Jimmy Fallon,

24 James Gordon, to Good Morning America, the Today Show, Sesame

25 Street -- some awesome shows.

**UNITED STATES DISTRICT COURT**

```
1   Q    I want to ask you briefly about some of the songs you
2   mentioned.
3   A    Sure.
4   Q    What is, Keep Your Head Up about?
5   A    Keep Your Head Up is an autobiographical song about how I
6   had been basically street performing for a full day, and no one
7   at all stopped to even put a dollar in my case.
8        So I looked up to the sky, was like, I'm not leaving until
9   -- I'm going to be here forever, and you have got to keep your
10  head up no matter what.  You have got to keep your head up
11  because you can let your hair down.  That is the idea about the
12  song.
13  Q    How about, Honey I'm Good?
14  A    Honey I'm Good is a song about staying faithful to your
15  wife even though there are temptations.
16       And the video is couples from all around the world and the
17  country, holding up how long they stayed together, and when you
18  cut it altogether, it's pretty cool.
19  Q    Fresh Eyes is another song you mentioned.  What was that
20  song about?
21  A    Fresh Eyes is about kind of seeing someone in a new way
22  that you may have been with for a while, and so for that video
23  we went down here to skid row, and we took homeless people that
24  were living on the street that day, and we gave them makeovers
25  and we gave them -- like put them in suits and dresses.
```

**UNITED STATES DISTRICT COURT**

```
 1        And then the video was them kind of seeing themselves, and
 2   it was really beautiful.
 3   Q    Have you had any commercial success outside United States?
 4   A    Yes.  I'm actually headed next week -- I'm headed to the
 5   Philippines, I have had three platinum singles in Australia.
 6   Q    Have you performed anywhere -- I guess the Philippines is
 7   next week.
 8        Where have you performed?
 9   A    Outside the U.S?
10   Q    Yes.
11   A    I have done many radio and television appearances in
12   London.  I have done full tours in Australia.
13        I am heading to go play in Indonesia, which I'm excited
14   about.
15   Q    Light performances, do you perform at colleges and
16   universities?
17   A    Yes.
18   Q    Is there a certain type of university or college you get
19   asked to perform at more regularly than others?
20   A    I play at all types of colleges and universities, but I do
21   extra well at the religious ones, because, like, my lyrics are
22   clear, and I'm inspirational, and yeah.
23   Q    Have you toured with other acts, Mr. Grammer?
24   A    Yeah.  Kind of wide ranging.  I have played -- I have
25   gotten to sing on stage with Taylor Swift.
```

```
 1        I have performed with younger people like Shawn Mendes and
 2   older people.
 3        I got to open for Stevie Wonder, it was amazing.
 4   Q    In terms of songwriting, who have you written songs for?
 5   A    I wrote a lot -- I write all of my own stuff, and then I
 6   have written for a country act called Hunter Haze.
 7        I have written for a group called R-5, which is a Disney
 8   group.
 9        I was just recently asked to write a song for the Captain
10   Underpants movie, which is the Dreamworks animated film.  That
11   is really cool.
12   Q    Based on your discussions with the people that are hiring
13   you to write songs for them, do you have an understanding of
14   why you get asked to do songs for say, Captain Underpants or
15   this Disney group, R-5?
16   A    The word "cool" is so lame, but it's really hard to write
17   a positive song that is not lame.
18        That is really hard to do, and I write a ton of songs to
19   try to figure out how to bridge that gap.
20        A lot of times we don't get the word positive in there or
21   people are starting to label you as positive, and then you are
22   immediately not cool and done, end of story.
23        Basically, it's hard to be positive and cool.  And I'm
24   someone who is seen as being able to do that.
25   Q    Other than music, Mr. Grammer, are there other ways you
```

1    make money?

2    A     Yes.  So, music, I perform it.  It gets used in movies.

3          I also was on, like, sometimes I can just be -- I'm trying

4    to be slow for the court reporter.

5          Sometimes I can just be like a personality, so I was on

6    Dancing With the Stars.  I did about eight episodes of that.

7          I have co-hosted the Today Show a couple of times.

8          I also just -- I'm about to be the face of a campaign like

9    a national commercial to raise money for breast cancer.

10   Q     And do you do any other partnerships -- do you have any

11   other partnerships with charities?

12   A     So yeah, I do a lot of charity work.  Sometimes I get paid

13   for to charity work.  It's not really charity work if you get

14   paid, because like how I'm describing, someone who is cool and

15   clean.  I am a good person to bring if you have -- if you are

16   trying to raise money at a gala or something.  I get a lot of

17   those, so a lot of my income comes from that.

18         And then sometimes I will just do charity concerts out of

19   being of service.

20   BY MR. JAUREGUI:

21   Q     It seems like a random question, but do you pay taxes?

22   A     Yes.

23   Q     Where do you pay taxes?

24   A     I pay taxes in the state I'm performing in.

25   Q     Does that mean you pay taxes in California and outside the

```
1    state of California?

2    A    I pay taxes in California, and I'm pretty sure every

3    state.

4    Q    I want to ask you a few more questions on your background,

5    Mr. Grammer.

6         I want to ask you about your fan base, and about your --

7    what they call social media footprint, if you know what I'm

8    talking about?

9    A    Okay.

10   Q    Are you active on social media?

11   A    Yes.

12   Q    Twitter?

13   A    Yes.

14   Q    Instagram?

15   A    Yes.

16   Q    Facebook?

17   A    Uh-huh.

18   Q    Approximately, how many followers do you have on Twitter?

19   A    On Twitter, I have around 170,000 followers.

20   Q    Instagram?

21   A    Close to 300.  I think it's 297 -- that is 297,000.

22   Q    Facebook?

23   A    On Facebook, I think it's similar to about 300,000.

24   Q    And do you get featured in print media as well?

25   A    Yes.  I was just -- I was in the sexiest man alive for
```

1    People, which I don't think I'm the sexiest man alive, but I

2    was in that, so stuff like that happens.  That is a lot, I'm

3    sorry.

4    Q    This might be an odd question, but is there a particular

5    demographic that you know of that your music appeals to?

6    A    Yeah.  So I do really well with people of faith.  I am not

7    a Christian artist.

8         But it's kind of -- there are elements of that.  Clearly I

9    am inspired, I'm positive.

10        So like if I go to Utah and it's like a Mormon college,

11   it's bonkers.

12        So that happens, that is a piece of -- I appeal to that, I

13   think, in people that don't necessarily consider themselves

14   100 percent that.

15        But when you come to one of my shows, there is definitely

16   a spiritual feel.

17   Q    Okay.  Mr. Grammer, I want to switch gears a little bit.

18   A    Uh-huh.

19   Q    Do you employ other people to help manage your career?

20   A    Yeah.  I have just on my touring side of my company, there

21   is about -- I have -- it's different from time to time.

22        The last tour we just did, there was six band and about

23   six crew, and then I have my managers, lawyer, agent,

24   publicist.  There is a lot of people.

25   Q    Do those people all live and work in California or do you

```
 1   employ anybody outside the state?
 2   A     My publicist and my lawyer are in New York.
 3         And my tour manager and one of my sound people is in
 4   Toronto.  And then my front house guy is in Chicago.  And
 5   everybody else in Los Angeles.
 6   Q     I'm sorry.
 7   A     Sorry.
 8   Q     Go ahead, say that again.
 9   A     Everyone else lives in Los Angeles.
10   Q     Whose your music agent?
11   A     My music -- my -- like one who gets me shows, my agent is
12   Jeff Crones.
13   Q     What's your manager?
14   A     My manager is Ben Singer.
15   Q     How long have you known Mr. Singer?
16   A     I have known Ben for around nine years.
17   Q     Has he been your manager for the entire time?
18   A     Yeah, the whole time.
19   Q     And I think you said this -- I apologize, how did you meet
20   him?
21   A     I met him.  He came out and saw me perform on Third Street
22   Promenade.  And we started a relationship literally on the
23   street.
24   Q     Do you consider him to be your friend in addition to being
25   your manager?
```

```
1    A     Yes, definitely.

2    Q     Is he a close friend of yours?

3    A     Yeah, I think that, you know, going from a street

4    performer and for him, he had never had like any sort of mass

5    success, so we built our careers together, and it's been a long

6    process.

7          Any time you go from being a street performer to having a

8    lot of success, there is a lot of struggles and you have to get

9    through it together and perseverance, I don't think you can do

10   it without being a close friend.

11   Q     Mr. Grammer, did there come a time when you came to learn

12   of someone named Jordan Sweet?

13   A     Yes.

14   Q     Approximately, when was that?

15   A     So, it was around the -- the beginning of January 2016, I

16   got a call from Ben, and he said that someone's lawyer is using

17   your name in connection with sexual assault allegations and

18   he's, like, do you want to tell me something?

19         I remember I was writing a song, and I was, like, I feel

20   like I would remember that, so no, definitely not.

21         So he hung up the phone and then he called me back a

22   little while later, "Dude, I have got to come clean.  I did

23   something really stupid.  I went to get a nude massage, and I

24   didn't get what I wanted, and then I got into a text battle

25   with the masseuse.
```

**UNITED STATES DISTRICT COURT**

```
 1          She must have looked me up and found out you are my
 2    client, and she is accusing you of being there, and she's also
 3    adding on that you sexually assaulted her."
 4    Q    What was your reaction upon hearing this?
 5    A    Really sad.  In the beginning, it's so ludicrous, it's
 6    like a story made up out of nowhere, so it's hard to take it
 7    too seriously right off the jump.
 8          But you are also, like, I just never had anything like
 9    this happen before.
10          Even in my own personal life, all the way up to 34 years
11    old, I never had someone blatantly lie about something to me
12    like to my face that I did something wrong.
13          So it was depressing in one sense that that is what
14    happens in the world.
15          And then, No. 2, just, you know, scary.  I don't want to
16    be connected to any of that.  I don't have anything to do with
17    any of that.
18    Q    What happened after Mr. Singer told you that it was him?
19    A    He told me it was him, and he said, "I'm going to take
20    care of all of it.  I'm extremely ashamed that your name is
21    part of this, and it's something I did in my personal life with
22    really poor judgment, and now it affected you.  So I'm going to
23    take care of it.  I'm going to handle all of it."
24    Q    So what happened after that?
25    A    So then it became a whole thing and he actually paid her,
```

1   around $250,000 to, like, I think it's a nondisclosure

2   agreement, and it was done.

3        He felt miserable about it, but he clearly was like, "I'm

4   going to do whatever I need to do to make this right."

5        And he was a standup guy about dealing with it.

6        And it was done.

7   Q    Did you ever see that nondisclosure agreement?

8   A    No.

9   Q    So, that is in January -- approximately January 2016,

10  right?

11  A    Uh-huh.

12  Q    Did there come a time when these allegations resurfaced in

13  your life?

14  A    Yes.

15  Q    Approximately, when was that?

16  A    That is near the end of 2016.

17  Q    And what happened then?

18  A    The end of 2016, I think it was Reid called and said that

19  it was resurfacing, and that now on to the already ridiculous

20  story, now someone claimed to be her husband was saying that he

21  came in -- the claim was that I was sexually assaulting his

22  wife, and he came into stop it, and then I physically assaulted

23  him, which would be the first time I have ever been in a fight

24  in my entire life.

25  Q    When you say Reid, who is Reid?

1    A    Reid is my lawyer.

2    Q    Is that Reid Hunter?

3    A    Reid Hunter.

4    Q    So now we're at the end of 2016, you said?

5    A    Yes.

6    Q    So what was your reaction upon hearing this?

7    A    Now, I'm scared.  Now, I'm really starting to get scared.

8    Q    Why?

9    A    Because I have already seen what a lie can do.

10        A lie already has caused monetary damage.  It's a lot --

11   $250,000 is a lot of money, so that is already a lie that has

12   already won in a big way with someone I know and trust.

13        And now, they are pointing at me and I'm really nervous.

14   Q    What did you do?

15   A    Ben, again, said, "I'm actually going to looking deeper in

16   it, you might have to get extra lawyers to figure this out, but

17   I'm going to handle it."

18   Q    Mr. Grammer, let me ask you, you said there were

19   allegations of physical assault and sexual assault as well,

20   right?

21   A    Uh-huh.

22   Q    Did have you separate reactions to each of those

23   accusations?

24   A    Yes.  I mean to the physical assault, that is just

25   ludicrous, I don't fight people.  I have literally never been

```
 1    in a fight in my entire life.  I have never hit another person
 2    in all of my 34 years.
 3         The sexual assault is really like saddens my heart that
 4    that allegation is even made.
 5         My mother spent a lot of time instilling in me how to
 6    treat women, and I spent a lot of time in my life, you know,
 7    about a month and a half ago I did a pro bono concert, and I
 8    spoke and was the one that like spoke to raise the money.
 9              MR. SALAHI:  Objection, Your Honor.  Relevance.
10              THE COURT:  Sustained.  Stay within answering the
11    question.
12              THE WITNESS:  Can I finish the statement?
13              THE COURT:  No, you actually can't.
14    BY MR. JAUREGUI:
15    Q    Mr. Grammer, stay away from your mother and the event you
16    were discussing.  But please continue the rest of your answer.
17    A    Right.  Got it.
18         It was a -- there was an event to raise money for a group
19    called the Tahirih Justice Center.
20              MR. SALAHI:  Objection, Your Honor.
21              THE WITNESS:  What is the question?
22    BY MR. JAUREGUI:
23    Q    The question was, did you have a separate reaction to
24    physical and sexual assault allegations.
25         I believe you testified as to the sexual assault
```

1      allegations, it made you really sad.

2          And then do you want to explain the rest of your answer?

3      A    It made me really sad because I treat women with respect,

4      and I would never do anything like that.

5          It labels me as a hypocrite, even the allegations label me

6      in my life, as a human, and then in everything I do in my

7      career, so yeah, it's super messed up.

8          I wasn't anywhere near any of this, and now even the

9      allegation is something that will like -- I can't go live my

10     life and do the things I do, or I'm, like, questioned.

11         It's super messed up.

12         Thank you.

13     Q    Was there a specific reason, Mr. Grammer, you were so

14     afraid of these allegations at that time?

15     A    I mean, we're in a period that I have never seen before

16     with this Me Too Movement.  It's the scariest thing.

17         I'm for it, I sang at the women's march, I'm in.  But even

18     allegations -- even allegations of this, are terrifying to me.

19         We're in a heightened period right now where even

20     allegations have serious consequences on entertainers.

21     Q    How do you know that?

22     A    You can see it every day.  You wake up and there is

23     another person that goes down.

24     Q    So now we're talking end of December, or end of 2016.

25         Do you know how that -- these allegations get resolved, if

1    at all, at that time period?

2    A    I don't know how they get resolved.

3          My lawyers are handling it, and it's kind of like, to me,

4    I think it's on ice.  They are handling it.

5    Q    Let's move into 2017.

6          Did there come a time where these allegations surfaced yet

7    again?

8    A    Yes, then my lawyer, Reid, tells me that there is actually

9    an actual demand letter that is threatening to sue me for

10   $1 million for these claims of sexual assault and physical

11   assault.

12   Q    Approximately, when was that?

13   A    This is around October 2017, I was getting ready to go to

14   Australia.

15   Q    And did Mr. Hunter tell you what the allegations were?

16   A    Yes.  He told me they were kind of this -- that I went to

17   get a nude massage, sexually assaulted this woman, and

18   physically assaulted her husband.  Ridiculous claims,

19   completely false.

20   Q    You mentioned that there was a demand.

21         Was this the first time there was a demand for money as

22   far as you are aware?

23   A    As far as I'm aware this is when the million dollars comes

24   into play.

25   Q    And what is your reaction upon hearing this?

```
1    A     It's -- again, it's really terrifying to be -- to have

2    your reputation in the balance with someone that I know is

3    telling blatant lies.  That is terrifying.

4         The whole situation.  I never was there.  I have never

5    even met this person, and they are willing to throw my

6    reputation into the -- destroy it, and so we're having a

7    negotiation with someone who is willing to do that from the

8    beginning.

9         It's not even a negotiation.  Now there is a demand, I

10   can't get -- I can't just go, you are insane, because there are

11   serious consequences here.

12   Q     Mr. Grammer, what did you understand the demand to be

13   exactly, $1 million or what?

14   A     Or he was going to sue me -- a public lawsuit with

15   allegations in Los Angeles, where TMZ can get whatever they

16   need, everybody can throw me under the bus.  And they could

17   say, oh yeah, this guy claims to be an upstanding citizen.

18        Well, there goes another one, another one falls, a

19   hypocrite.  It's really super scary.  It's really scary.

20   Q     At this time, Mr. Grammer, did you have any -- what

21   precisely were your concerns?

22        So you talked already about being painted as a hypocrite.

23   Did you have any concerns -- did you have any other concerns?

24   A     The problem is that my whole career is autobiographical,

25   all of my songs are autobiographical.
```

**UNITED STATES DISTRICT COURT**

1        So if you call me as someone who sexually assaults women,

2   my whole catalog, and everything I have done, my work is a big

3   lie.

4        I stand for something, and you are saying that I don't.

5   Q    So you talked about your work.

6        Did you have an understanding or belief that this was

7   going to affect your work?

8   A    Yeah.  I mean, the guy who has been accused of sexual

9   assault doesn't necessarily go on Sesame Street later.

10       It's not good, it looks terrible.  A lot of who I am, and

11  the value I bring, again, is this person who is relevant and

12  clean.

13       This now -- even being here, is so messed up.

14           MR. SALAHI:  Objection, Your Honor.  Relevance, and

15  403.

16           THE COURT:  I'm going to sustain the objection on

17  403.  You need to move on.

18           MR. JAUREGUI:  Yes, Your Honor.

19  BY MR. JAUREGUI:

20  Q    You mentioned you employed other people, Mr. Grammer?

21  A    Yeah.

22  Q    Did you have any concerns about what impact this might

23  have on them?

24  A    Yeah.  I mean, it's all connected.  So if I'm now labeled

25  a hypocrite, then these gigs that I'm getting for the reason of

1    being who I am, start to dry up, and I clearly can't employ the

2    people without having all of these gigs occur.

3         Also, I'm -- not to toot my own horn, but my voice is

4    recognizable now.

5         So Dunkin Donuts just used my song in a commercial, you

6    know, that is my voice.

7         So if people start -- like, a lot of what is happening, as

8    soon as allegations come out, companies, sponsorships, they are

9    like, let's just chill for a second, I don't want to be next to

10   this thing, because then -- let's all back away for a little

11   bit.  That could be so much money to someone like me.

12   Q    When you say to someone, did you have a concern it would

13   impact you financially?

14   A    Yes.  It can definitely impact me financially, a lot.

15   Q    So, allegations are being made, your lawyer tells you

16   about a demand letter.

17        What do you do?

18   A    At this point, we go to the FBI because it feels a lot

19   like extortion to me, so we went to the FBI.

20             MR. SALAHI:  Objection.  Your Honor.

21             THE COURT:  Sustained.  Ladies and gentlemen, his

22   opinion regarding extortion should not be considered by you,

23   that is for you to decide.

24   BY MR. JAUREGUI:

25   Q    Did you get another lawyer involved, Mr. Grammer?

```
1    A    Ben got other lawyers involved.  Ben -- the whole time has
2    -- because it was his mess, he has paid for all of the legal
3    fees.
4    Q    And did a lawyer representing you -- do you know whether a
5    lawyer representing you with criminal experience joined your
6    team?
7         In other words, Reid Hunter, you said was your music
8    lawyer, right?
9    A    Yes.
10   Q    Did you get another lawyer?
11   A    Yes, Ben hired another lawyer.
12   Q    And was that lawyer working with Reid Hunter?
13   A    I think so.
14   Q    Are you aware, Mr. Grammer -- well, you said Mr. Hunter
15   talked to you about the allegations, right?
16   A    Yes.
17   Q    Are you aware of an allegation that pre-dates January 10,
18   2016?
19   A    No.
20   Q    Let me see if I can rephrase the question.
21        Are you aware that there was an allegation that you tried
22   to reach out to a masseuse in December on Christmas, 2015?
23   A    Oh, yes.
24   Q    And do you recall where you were that day?
25   A    Yes.  That was a Christmas party at my house.
```

```
 1   Q     And there is a binder in front of you, Mr. Grammer.  I
 2   want you to turn to Exhibit 1 in that binder.
 3   A     Okay.
 4   Q     Do you recognize that document?
 5   A     Yes.
 6   Q     How do you recognize it?
 7   A     This is an e-mail from my wife.
 8   Q     Okay.  What's the date?
 9   A     The date is November 14th, 2015.
10   Q     And are you one of the addressees in this e-mail?
11   A     I am.
12   Q     Where do you see your name?
13   A     My wife puts me as, "my sweet love, heart-shaped Grammer."
14   Q     Do you recall receiving this e-mail?
15   A     I do.
16   Q     Does this look like a true and correct copy of the e-mail
17   that you received on or about November 14th, 2015?
18   A     Yes.
19         MR. JAUREGUI:  Your Honor, I move to admit
20   Government's Exhibit No. 1.
21         MR. SALAHI:  No objection, Your Honor.
22         THE COURT:  All right.  It will be received.
23      (Exhibit 1 received into evidence.)
24   BY MR. JAUREGUI:
25   Q   Mr. Grammer, can you just focus on the text for a minute.
```

UNITED STATES DISTRICT COURT

```
1        And Mr. Grammer, the first full paragraph, it says, "It's
2   time to christen."
3        Do you see that?
4   A    Yes.
5   Q    It says:  "It's time to christen our new place.  We would
6   love to invite you all over for Christmas this year.  We have
7   been slowly getting settled over here, and we can't wait to
8   make some good memories with everyone.  We are literally" blank
9   from blank "house in Highland Park."
10       Do you see that?
11  A    Yes.
12  Q    At that time did you live in Highland Park?
13  A    Yes.
14  Q    Where is that?
15  A    Highland Park is about 15 minutes northeast from here.
16  Q    Up the 110?
17  A    Up the 110.
18  Q    And for any member of the jury that is not familiar, can
19  you maybe situate us by giving us an adjacent town or city?
20  A    It's kind of near Pasadena.
21  Q    Where its says:  "With love, I kindly ask you that you
22  please discuss with me before we extend the invite to anyone
23  outside the family."
24       Do you see that?
25  A    Yes.
```

```
1    Q    Was that a family party?

2    A    This was a family party for her side of the family.

3    Q    Okay.  Why her side of the family?

4    A    It was a Christmas party -- I'm a Bahai, which is a world

5    religion, which is my faith.  So my side of the family is

6    Bahai.

7    Q    Did this party take place?

8    A    Yes.

9    Q    And I want to direct you to Exhibit 2, please.

10        Do you recognize Exhibit 2, Mr. Grammer?

11   A    Yes.

12   Q    How do you recognize it?

13   A    It is another e-mail from my wife.

14   Q    Dated December 23rd, 2015?

15   A    Yes.

16   Q    Did you receive it?

17   A    I did.

18   Q    Does this e-mail look like a true and correct copy of an

19   e-mail you received from your wife on December 23rd, 2015?

20   A    Yes.

21            MR. JAUREGUI:  Move to admit, Your Honor.

22            MR. SALAHI:  No objection, Your Honor.

23            THE COURT:  It will be received.

24       (Exhibit 2 received into evidence.)

25   BY MR. JAUREGUI:
```

```
 1   Q    It says, "Okay, seems like most people have Christmas Eve
 2   plans already, so we won't be doing that this year.  Whoever is
 3   coming on Christmas Day, 2:00 p.m. at our place, Grammer house,
 4   Los Angeles, California, 90042."
 5        Do you see that?
 6   A    Yes.
 7   Q    Did this party start at 2 o'clock on December 25th, 2015?
 8   A    I think people came probably a little bit later than that,
 9   but, yes.
10   Q    Do you know when approximately this party ended?
11   A    I -- it goes late into the evening.  We have a piano at
12   our place, and her side of the family has a lot of good
13   musicians.  It usually goes deep into the night.
14   Q    Now, I want to direct your attention to
15   Government's No. 32.
16        Actually, before I do that, Mr. Grammer, is it your
17   recollection that you were at this party on Christmas Day 2015?
18   A    Yes.
19   Q    Now if you can look at Government Exhibit No. 32 in your
20   binder.
21        And, Mr. Grammer, do you recognize this exhibit?
22   A    I do.
23   Q    How do you recognize it?
24   A    This is a Verizon bill.
25   Q    For whom?
```

**UNITED STATES DISTRICT COURT**

87

```
 1    A     For me, Andrew Grammer.

 2    Q     And is that for the account ending in 4289?

 3          If you take a look at page 3 of the exhibit.

 4    A     Okay, yes.

 5    Q     And if you flip the next page, is it for the time period

 6    of January 9th to February 8, 2016?

 7    A     I'm sorry, one more time.

 8    Q     Just one second, Mr. Grammer.  One second, Mr. Grammer.

 9    A     Uh-huh.

10    Q     So if you take a look at the first page of the exhibit,

11    Mr. Grammer, do you see where it says "quick bill summary"?

12    A     Which page is this?

13    Q     First page.

14    A     Quick bill summary.

15    Q     December 9th to January 8, 2016?

16    A     Yes.

17              MR. JAUREGUI:  Your Honor, at this time the

18    government moves to admit Government Exhibit No. 33, based on

19    Mr. Grammer's authentication -- I'm sorry, 32 based on

20    Mr. Grammer's testimony, also because it's accompanied by a

21    business records declaration from Verizon that was produced to

22    the defense.

23              MR. SALAHI:  No objection from the defense.

24              THE COURT:  It will be received.

25          (Exhibit 32 received into evidence.)
```

UNITED STATES DISTRICT COURT

```
 1   BY MR. JAUREGUI:

 2   Q    Now, Mr. Grammer, I want to turn your attention to page 9

 3   of this exhibit.

 4   A    Uh-huh.

 5   Q    And Ms. Kim, could you highlight 12/24, and 12/25, for me

 6   please?

 7        So, let's work with 12/24 first.

 8        From 12/24, what is the first phone call to or from you on

 9   that day?

10   A    9:42 a.m.

11   Q    And what is the last?

12   A    7:36 p.m.

13   Q    And do you see the origination column there, Mr. Grammer?

14   A    Yes.

15   Q    And where is the origination column you have on 12/24?

16   A    Los Angeles.

17   Q    And now what's let's look at 12/25.

18   A    Uh-huh.

19   Q    First call at 9:14?

20   A    Yes.

21   Q    Last call at 11:06 a.m.?

22   A    Yes.

23   Q    And you are in Los Angeles or Pasadena, right?

24   A    Yes.

25   Q    Do you have any recollection of why there are no calls
```

1  after 11:06 a.m. on Christmas Day?

2  A     That is probably when I was really getting ready with this

3  party and helping set up and stuff, and just being at the party

4  all day at my house.

5  Q     And, Mr. Grammer, you are aware that the allegation that

6  you received a massage, and other things happened occurred on

7  January 10th, 2016, right?

8  A     Yes.

9  Q     I'm going to direct your attention now -- well, first, do

10  you recall where you were on January 10, 2016?

11  A     I was at home.  I remember because when Ben called me to

12  initially tell me about all of this, he was then worried and he

13  said, "You need to know where you were on the day that this

14  happened."

15      So I was home all day, it was like a normal Sunday.  I did

16  some errands, then I got some pizza around 6:00 or 6:30, and

17  then me and my wife watched TV all night.

18  Q     All right.  Now, I'm going to turn your attention to

19  Government Exhibit No. 33.

20      To spare us all some time, Your Honor, this exhibit has

21  also been accompanied by business records declaration, so I

22  move to admit it under Rule 8036.

23            THE COURT:  Any objection?

24            MR. SALAHI:  No objection, Your Honor.

25            THE COURT:  It will be received.

1        (Exhibit 33 received into evidence.)

2   BY MR. JAUREGUI:

3   Q    Now, okay now, Mr. Grammer, I want to -- first of all, let

4   me ask you a few questions about this.

5        Is this your Verizon phone call for Andrew Grammer, from

6   January 9th, to February 8th, 2016?

7   A    Yes.

8   Q    And if you flip to -- flip to page 5.

9   A    Okay.

10  Q    At the top you see it says, "detail for Andrew Grammer."

11  And then there is a redaction box, and it says, "4289."

12       Do you see that?

13  A    Yes.

14  Q    At that time and you have a phone number ending in 4289?

15  A    Yes.

16  Q    Now, let me focus you on January 10th, 2016.

17  A    Uh-huh.

18  Q    First call starts at 11:56 a.m., correct?

19  A    Yes.

20  Q    Last call ends at 5:44?

21  A    That's correct, p.m.

22  Q    You are in Los Angeles, it looks like that is for each one

23  of the calls made between those two time periods, right?

24  A    Yes.

25  Q    And there are no calls after 5:54 p.m. on 1/10, right?

1    A     Yes.

2    Q     Is this the cell phone you were using at that time,

3    Mr. Grammer?

4    A     Yes.

5    Q     Now directing your attention to Government Exhibit No. 25,

6    Mr. Grammer.

7              MR. JAUREGUI:  Your Honor, this exhibit is Wells

8    Fargo Bank statement from January 1, 2016, to January 31, 2016

9    for Andrew C. Grammer doing business as Latter Soul Music, LLC,

10   accompanied in the binder, at least, with a business records

11   declaration from Wells Fargo, and I move to admit it under Rule

12   8036.

13             THE COURT:  Any objection?

14             MR. SALAHI:  No objection from defense.

15             THE COURT:  It will be received.

16        (Exhibit 25 received into evidence.)

17   BY MR. JAUREGUI:

18   Q     Mr. Grammer, just take a look at page 1 for now.

19        Who has access to this account?

20   A     Just me and my business manager.

21   Q     And where is your business manager?

22   A     He lives in New York.

23   Q     Now, you talked about having a memory of having pizza with

24   your wife on January 10th, 2016, correct?

25   A     Yeah.

```
 1   Q    So, I want to focus on page 3 of this exhibit, and Ms. Kim
 2   is going to put it up on the screen for you.
 3        If you could highlight that.
 4        Okay.  I want to direct your attention -- there is an
 5   entry on the left, it says "1/11."
 6        Now, I'm circling it on your screen here, Mr. Grammer.
 7        Do you see that entry I'm circling in blue?
 8   A    Yes.
 9   Q    It says "purchase authorized on 1/10, Super A Foods
10   Number 11, Los Angeles, California."  Amount is $36.50.
11        Do you see that?
12   A    Yes.
13   Q    Do you have any recollection of being at Super A Foods on
14   1/10/2016?
15   A    Yes.
16   Q    Where is Super A Foods?
17   A    Super A Foods is like within a mile of Town Pizza, which
18   is where I got the pizza.
19   Q    Is that in Highland Park?
20   A    Yes.
21   Q    And now I'm circling this in blue, "on 1/10, Town Pizza
22   Beer," and it has a phone number.
23        Do you see that, for 43.21?
24   A    Uh-huh.
25   Q    Is that where you purchased pizza that night on
```

1   January 10, 2016?

2   A     Town has excellent gluten-free pizza, and my wife needs

3   that, so yes, that is where it is.

4   Q     Do you have a memory of when that would have been,

5   Mr. Grammer?

6   A     Around 6:00 p.m. 6-ish.

7   Q     Did you go anywhere else -- what happened after you went

8   to Town Pizza and Super A Foods?

9   A     The pizza, Super A is where you get Lacroix drinks or

10  snacks and we got home and watched TV all night, Sunday night.

11  Q     Who was there?

12  A     Me and my wife.

13  Q     Did you go anywhere else that night?

14  A     No.

15  Q     Now, Mr. Grammer, I'm going to ask you some direct

16  questions about the allegations that were leveled against you,

17  okay?

18  A     Okay.

19  Q     Did you have a nude massage or did you have a massage,

20  nude or otherwise, on the evening of January 10th, 2016?

21  A     No.

22  Q     Did someone named Jordan Sweet provide you a nude massage

23  either on that night or on any other night?

24  A     I have never met her or that person.

25  Q     Did you send a text message or make a phone call to Jordan

```
 1   Sweet on Christmas of 2015?
 2   A     No.
 3   Q     Have you ever text messaged with Jordan Sweet?
 4   A     I have never had any contact with anyone named Jordan
 5   Sweet.
 6   Q     What about Benjamin Koziol.  Have you ever met Mr. Koziol?
 7   A     No.
 8   Q     Have you ever talked to him on the phone?
 9   A     Never.
10   Q     Have you ever texted with him, e-mailed with him?
11   A     I never had any contact with him.
12   Q     Did you punch him in the face and knock him unconscious?
13   A     I have never punched anyone, and I definitely didn't punch
14   anybody I never met.
15   Q     Have you ever seen him ever in your life?
16   A     When I met with the FBI they showed me a picture once.
17   Q     Is there any truth to any of the allegations that Benjamin
18   Koziol leveled against you?
19   A     It is a complete story.  I have never met him or this
20   other woman, and it's just super, super messed up.
21   Q     Did it matter to you, Mr. Grammer, that the demand that
22   was being made to you said that unless you give me $1 million,
23   I will file a lawsuit against you in court?
24   A     Yes, that matters a lot to me.
25   Q     Did it matter to you -- did you testify earlier it made
```

1    you scared.

2         Did it make you any less scared that the threat was to

3    file a lawsuit, instead of going to the press?

4    A    When you are talking about allegations?

5              MR. SALAHI:  Objection, leading.  It's a leading

6    question.

7              THE COURT:  It is sort of leading.

8              MR. SALAHI:  It's a compound, yes.

9              THE COURT:  It's compound, I think is the better

10   objection.

11        Do you want to rephrase?

12   BY MR. JAUREGUI:

13   Q    The threat in Mr. Koziol's letter was that unless you give

14   me $1 million, I will file a lawsuit against you in court,

15   correct?

16   A    Yes.

17   Q    Did it make you any less scared that he was threatening to

18   make the allegations public in a courtroom?

19   A    It doesn't matter where you make that allegation.

20        If it gets out to the press that I'm the guy that did

21   that, that is terrible for me.

22   Q    Are you the guy that did that?

23   A    No.  I have never met these people.  I don't know anything

24   about these people, except they are trying to do this to me.

25              MR. JAUREGUI:  One moment, Your Honor.

```
 1                  THE COURT:  Okay.

 2                  MR. JAUREGUI:  No further questions, Your Honor.

 3                  THE COURT:  Okay.

 4                  MR. SALAHI:  No questions from the defense, Your

 5      Honor.

 6                  THE COURT:  No questions, okay.  Then you may step

 7      down.  Thank you.

 8                  MR. JAUREGUI:  May the witness be excused, Your

 9      Honor?

10                  THE COURT:  Yes, he may.

11          Who is next?

12                  MS. KIM:  The United States calls Sara Shivarani.

13                  THE COURT:  Okay.

14                  THE COURTROOM DEPUTY:  Ms. Shivarani.  Please come

15      forward.  I can swear you in.

16          Please raise your right hand.

17                       (Oath was administered.)

18                  THE WITNESS:  Yes.

19                  THE COURTROOM DEPUTY:  Please be seated.  Please

20      state your full name and spell your last name for the record

21      and please make sure you speak into the microphone.

22                  THE WITNESS:  Sara Shivarani.  S-h-i-v as in

23      Victor - a-r-a-n-i.

24                  THE COURTROOM DEPUTY:  Thank you.

25                                  SARA SHIVARANI,
```

```
 1              having been duly sworn, testified as follows:
 2                        DIRECT EXAMINATION
 3   BY MS. KIM:
 4   Q    Good afternoon, Ms. Shivarani.
 5        Could you please describe for us where you attended high
 6   school or college?
 7   A    Cal State Northridge.
 8   Q    When did you graduate?
 9   A    2008.
10   Q    What was your degree in?
11   A    Music industry studies.
12   Q    What's your current occupation?
13   A    I'm a DJ and producer.
14   Q    What do you produce?
15   A    Music.
16   Q    Where do you work?
17   A    I'm self-employed.
18   Q    Do you know a man named Andy Grammer?
19   A    I do.
20   Q    How do you know him?
21   A    He is married to one of my good friends, Asia.
22   Q    When did you first meet Mr. Grammer?
23   A    I met him back in college.
24   Q    When was that?
25   A    That was before I graduated, when I entered the music
```

```
1    program around 2006, I believe.

2    Q    Do you consider Mr. Grammer a friend?

3    A    I do.

4    Q    You said you met him through -- did you meet him through

5    your friend, Asia?

6    A    No.  I actually met him before they had ever met through

7    my boyfriend at the time.

8    Q    Do you consider yourself better friends with Mr. Grammer

9    or Ms. Grammer?

10   A    Ms. Grammer.

11   Q    Do you have any business relationship with Andy Grammer?

12   A    No.

13   Q    Do you have any business relationship with Asia Grammer?

14   A    No.

15   Q    Have you gotten to know Andy and Asia Grammer as a couple?

16   A    Yes.

17   Q    How would you describe Andy and Asia Grammer's

18   relationship?

19   A    Very sweet.

20   Q    Do you know if there are any issues with their marriage?

21            MS. O'CONNOR:  Objection, Your Honor.  Relevance,

22   403.

23            THE COURT:  It is getting far afield.

24            MS. KIM:  Your Honor, I will move on.

25   BY MS. KIM:
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     Do you know Ben Singer?

 2   A     No.  I recognize his name.

 3   Q     How do you recognize his name?

 4   A     Asia has spoken about him.  I think he's Andy's manager.

 5   Q     Have you ever met him?

 6   A     I don't think so.

 7   Q     What did you do on Christmas Day of 2015?

 8   A     I was at Asia and Andy's house.

 9   Q     Do you recall what time you got there?

10   A     I don't know what time it was, but my boyfriend and I were

11   the first people there, I believe.

12   Q     Approximately, do you have an approximate time?

13   A     I don't.  The sun was up.  It may have been 2:00 or 3:00,

14   but I really don't know.

15   Q     Why were you at the Grammer's residence on Christmas Day

16   of 2015?

17   A     We were invited.  All of my family is in Florida, so Asia

18   always invites me to the parties.

19   Q     Do you recall when you left that party?

20   A     It was probably late.  We were one of the last people to

21   leave.

22   Q     Was it at night?

23   A     It was at night.

24   Q     Do you recall who else attended this party?

25   A     Not really.  It was -- it was a small party.  Some family
```

```
 1    members, a few friends, by I don't remember knowing a lot of
 2    people outside of some of Asia's family and Andy's dad.
 3    Q    Did you take any pictures at this party?
 4    A    I did.
 5    Q    Would you take a look at Exhibits 3 through 5 in your
 6    binder in front of you?
 7    A    Yes.
 8    Q    So take a look at 3, 4, and 5, if you will.
 9         Do you recognize these exhibits?
10    A    I do.
11    Q    What are they?
12    A    It's a picture of my boyfriend and I, a picture of Asia
13    and I, and her family member photo bombing us and a picture of
14    Asia and Andy.
15    Q    And these are the pictures you took on Christmas Day 2015?
16    A    I did, and I edited them as well.
17            MS. KIM:  Your Honor, I would move to admit
18    Exhibits 3 through 5.
19            MS. O'CONNOR:  No objection.
20            THE COURT:  It will be received.
21        (Exhibits 3 through 5 received into evidence.)
22    BY MS. KIM:
23    Q    What is this a picture of?
24    A    This is Asia and Andy.
25    Q    And you said you added some things to the picture.  What
```

1    did you add?

2    A     Yeah, that was an app I had during that time.  And I was

3    just adding hats and decorations.

4    Q     During the party, did you have time to interact with

5    Mr. Grammer and observe him?

6    A     I did, yeah.

7    Q     Did you notice whether he was using a cell phone or

8    calling anyone or texting anyone during the party?

9    A     I don't recall, but I do remember him being pretty present

10   there with his family and having fun with everyone.

11   Q     How would you describe Mr. Grammer's demeanor at the

12   Christmas party?

13   A     Happy, joyful, silly, playful.

14   Q     Did he seem distracted?

15   A     No.

16   Q     Did you see, like, if he was trying to leave the party?

17   A     No.

18   Q     Did you ever see him leave the party?

19   A     No.

20   Q     If you could turn to Exhibit 4, what is this a picture of?

21   A     That is a picture of Asia and I with one of her family

22   members.

23   Q     This is a photo bomb picture?

24   A     Yes.

25   Q     Can we look at Exhibit 5.

1          What is this a picture of?

2    A     That is my boyfriend and I.

3    Q     Who else was at the Grammer home when you left the party?

4    A     I really don't recall who was there when we left.  Maybe

5    Andy's dad and Asia's mom, just the close relatives, but I

6    really don't recall.

7               MS. KIM:  Your Honor, one moment, please.

8               THE COURT:  Yes.

9               MS. KIM:  No further questions for this witness,

10   Your Honor.

11              THE COURT:  Okay.

12              MS. O'CONNOR:  No cross-examination.

13              THE COURT:  Thank you.  Then you are excused.

14        Thank you very much.

15              MR. JAUREGUI:  Ready for our next witness, Your

16   Honor?

17              THE COURT:  I think we are.

18              MR. JAUREGUI:  United States calls Special Agent

19   Cody Burke.

20              THE COURTROOM DEPUTY:  Please raise your right hand.

21                   (Oath was administered.)

22              THE WITNESS:  I do.

23              THE COURTROOM DEPUTY:  Please be seated.

24              MR. JAUREGUI:  We have a question.

25              JUROR:  May I use the restroom?

```
 1              THE COURT:  Of course.  Anyone else that needs to go
 2    may go, too.
 3         Counsel, could I see you at sidebar while we are waiting?
 4    I don't need everyone.
 5                        (Sidebar begins.)
 6              THE COURT:  I am just trying to get a sense.  How
 7    long do you think this witness is going to be?
 8              MS. KIM:  20 minutes, 30 minutes.
 9              THE COURT:  Okay.  We ought to take up jury
10    instructions tomorrow.  We have how many that we disagree on?
11              MS. KIM:  There is three disputed instructions, Your
12    Honor.
13              THE COURT:  Okay.
14              MS. O'CONNOR:  Your Honor, we might have other
15    proposed instructions based on -- we also have a Rule 29 we
16    would like to raise for the Court.
17              THE COURT:  I'm going to reserve judgment on it, but
18    obviously I may deem it untimely fashion.
19              MS. O'CONNOR:  Will we be able to raise it today or
20    wait for tomorrow for argument on that, because we would
21    actually like to make argument.
22              THE COURT:  You can, but I am still going to reserve
23    judgment on it.
24              MS. O'CONNOR:  Okay.  Understood.
25         So we're going to have some additional proposed
```

```
 1    instructions based on how the case has come out.

 2         We will file them tonight.

 3              THE COURT:  I can't wait, but okay.

 4         All right.  I'm trying to figure out where we are.

 5         Have you given any thought to the amount of time closing

 6    arguments are going to require?

 7              MS. KIM:  I would say about 45 minutes at the most.

 8              MS. O'CONNOR:  The other issue, and I would say the

 9    same, Your Honor, maybe an hour.

10         But the other issue is we would ask for the -- a ruling

11    today on the issue of whether Mr. Koziol's prior conviction

12    will come in as impeachment evidence.

13         That will factor into Mr. Koziol's decision to testify or

14    not.

15              THE COURT:  As I said previously, if he testifies,

16    then I think it may well be relevant.  It may come in.

17         If he doesn't testify, I don't think it can come in.

18              MS. O'CONNOR:  Okay.  Is that a ruling that it will

19    certainly come in if he testifies, because that -- it just

20    impacts his decision whether to take the stand.

21              THE COURT:  I understand that.  I understand that.

22         I have got to go back and look at the order, but remind

23    me, was that a misdemeanor or felony?

24              MR. O'CONNOR:  It was felony for pimping and

25    pandering.
```

1          THE COURT:  Here is the question on the table:  The

2    question that I raised before and is still in my mind is

3    whether the conviction goes to his credibility, and whether it

4    can be used to impeach his credibility.  I expressed some

5    concern about it.

6          The case law is anything but clear on the point.

7          Actually, I think I'm going to stick by my earlier

8    inclination, which is that it does not go to his veracity,

9    which is, I think where I was at the time you filed your

10   motion, and I think that is the correct ruling.

11          MS. KIM:  Your Honor, the government would disagree

12   with that, to the extent the defendant gets on the stand and

13   testifies that certain events and what he believed and what he

14   understood -- to the extent that he is trying to get the jury

15   to believe his recitation of the events, what his belief was,

16   what his state of mind is.

17          The fact of his conviction, the fact that he was willing

18   to break the law before makes the case clear that it goes to a

19   person's credibility, trustworthiness, in terms of whether the

20   jury should believe him.

21          Someone who is willing to break the law once, is not going

22   to be shy about getting on the stand and lying, and the case

23   law has been clear on that.

24          To the extent that he testifies about believing his

25   version, that he believed he was entitled to file a lawsuit

1    because that is what he was told that it was Andy Grammer who

2    got the nude massage, that is a question of, you know, believe

3    me, I'm trustworthy, this is what I thought.

4        So the fact of that conviction should come in, perhaps the

5    nature of the conviction, the fact that it was a pimping and

6    pandering charge, might not be coming in, and we can sanitize

7    that by just discussing the fact that he was convicted in 2017.

8            THE COURT:  Well, here is the difficulty:  The

9    problem with the case law that was cited to me, is that it is

10   not clear that pimping and pandering necessarily includes

11   dishonesty.

12       As I indicated earlier on, it suggests to me he's not

13   unfamiliar with, you know, what people do in these

14   circumstances, but, I'm not sure that it goes to his

15   credibility.

16       The mere fact that he's been convicted is not enough to

17   say that the conviction comes into demonstrate that he's not

18   credible.

19           MS. KIM:  Your Honor, I think the Court should

20   reserve judgment until he testifies and to see what he

21   testifies to.

22           THE COURT:  I agree with that, I think.

23           MS. KIM:  So he puts his credibility at issue or his

24   trustworthiness or respect for the law -- anything like that --

25           THE COURT:  Let me say that I think that is a fair

1    request.

2         And I think that -- I think that it will depend on what

3    his testimony is as to whether that conviction comes in.

4              MS. KIM:  I think the key here is what his intent

5    was.

6         The questions that are being asked of the various

7    witnesses is the fact that Mr. Koziol believed he was entitled

8    to file a lawsuit because his understanding was that it was

9    Andy Grammer that was there.

10        Based on the representation counsel has made, it is that

11   his wife told him these things.

12             THE COURT:  Well, I understand that, but I don't

13   think that is responsive to the issue.

14        I think, you know, it's for the jury to decide whether he

15   genuinely believed it was Andy Grammer or whether he had --

16   believed it was the manager, No. 1.

17        And No. 2, there is the question of his proffering a

18   photograph of the black eye that was apparently created long

19   after the events at issue.

20             MS. KIM:  One other issue, Your Honor, should he

21   take the stand, government would reserve its right to use his

22   calls to impeach him.

23             THE COURT:  I think you can do that.

24             MR. JAUREGUI:  May I have a word with counsel?

25             THE COURT:  Sure.

1          MR. JAUREGUI:  Your Honor, may I have a moment to

2     get something from our table?

3          THE COURT:  Sure.

4          MR. JAUREGUI:  Can I use the code book?

5          THE COURT:  You can use the code book.

6          MR. JAUREGUI:  The other day you also stated that

7     you weren't sure if it was going to come under Rule 609, but

8     you thought it might be Rule 404(b) evidence.

9          THE COURT:  I did.

10         MR. JAUREGUI:  We want to reserve our right to use

11    that under Rule 404(b.)  We didn't notice the charge as 404(b),

12    but we need to research that whether or not we believe good

13    cause exists for the lack of notice, because the rule obviously

14    allows for notice during trial for good cause.

15         THE COURT:  I understand.

16         MS. O'CONNOR:  A couple of points, Your Honor.  The

17    Court's concern is not what Ms. Kim addressed, which is whether

18    Mr. Koziol's credibility will be on the line when he takes the

19    stand.  Of course, it will.

20       The jury will have to decide whether they believe him.

21    It's undisputed that his veracity is at issue.

22       The concern is his whether his conviction for pimping and

23    pandering is probative of that --

24         THE COURT:  Exactly.

25         MS. O'CONNOR:  -- with respect to the prejudice --

1   in relation to the prejudice.

2        And, I think the Court is correct, pimping and pandering

3   is not a crime that involves dishonesty.  And pimping and

4   pandering is a crime that -- it's hard to imagine a crime that

5   is more prejudicial, and that would inflame the emotions of the

6   jury.

7        It is -- I would be hard-pressed to imagine a jury who

8   would hear that Mr. Koziol has been convicted of this and would

9   not want to convict him of the current crime, based on that.

10       So, in weighing those two things, it's not whether his

11  veracity will be on the line when he takes the stand, because

12  we all agree it will.

13       It's whether the pimping and pandering conviction is

14  probative of that, which it isn't.

15            THE COURT:  Well, let's just say there are some case

16  law suggesting it is.

17       I understand what Ms. Kim is talking about.

18       Looking at it in a pristine way, I do have the feeling

19  that it's not probative of veracity, although I could argue

20  that pimping and pandering is the sort of crime where people

21  conceal certain things and engage in nefarious conduct which

22  goes to credibility.

23       I would be interested in seeing what is said about 404(b).

24  I'm obviously interested in hearing what the defendant's

25  testimony is before I make a final ruling.

1          MS. O'CONNOR:  Two things on that, Your Honor.  We

2     object to 404(b), because what the rule requires is that notice

3     -- and I'm trying to find the exact --

4          THE COURT:  I know it requires notice, but the

5     question is when the Court raises it *sua sponte*, does that

6     change things?

7          MS. KIM:  Your Honor, again, just to be clear,

8     should the defendant take the stand, I think his calls are fair

9     game to the extent they go to impeach him.

10        So the government would reserve the right to use all of

11    the calls for that purpose.

12         THE COURT:  Okay.

13         MS. O'CONNOR:  I agree if he takes the stand and

14    says something contrary to what he says in the calls, they

15    should be used for impeachment, but not just generally, because

16    he takes the stand.  They have to be contrary to something that

17    he said.

18         THE COURT:  Well, it depends what he says.

19         MS. KIM:  It would go to impeach him on a certain

20    issue if he testified in a certain way.

21         THE COURT:  It may go to where he is located.  It

22    may go to what he said on the calls.

23        I don't know what it is, but I can't sit here in a vacuum

24    and say the calls are relevant to impeach him, but I can say

25    the government can reserve its right to try to use those calls.

1          MS. O'CONNOR:  Two more things:  The first is that

2     we would ask for a decision on the impeachment issue before

3     Mr. Koziol takes the stand.

4          THE COURT:  You aren't going to get it.

5       You know my basic views, but you aren't going to get it,

6     because I don't know what he's going to say.

7          MS. O'CONNOR:  I respect the Court's ruling, and my

8     objection is that Mr. Koziol has a right to remain silent.

9       Mr. Koziol has a Fifth Amendment right to testify in his

10    own defense, and without a ruling before he testifies, he can't

11    make an informed decision on how to exercise his constitutional

12    rights.

13      That is why I raised this at pretrial, and that's why I'm

14    raising it again and respecting the Court's ruling.

15         THE COURT:  May I say that I have not seen a case

16    that requires the Court to make those kinds of rulings in

17    advance of testimony.

18      If you have one, fine, but I don't think it implicates his

19    right to remain silent.

20      He is going to have to decide on his own whether he's

21    going to get on the stand or not.

22         MS. O'CONNOR:  The other request I have is the

23    government cited a case in their brief it's called, *Martinez v*

24    *Martinez*, if my memory serves me, which stands for the

25    proposition that one possibility would be to impeach him by the

```
 1    fact of a felony conviction without getting into the nature of
 2    the conviction, so that would be another option.
 3              THE COURT:  That may be the option we follow.
 4         But what I will not have is someone -- and it's happened
 5    before with the government, and it's happened before with the
 6    defense -- I'm not going to be ramrodded into making a ruling
 7    before I know what I'm ruling on.
 8         So, with all due respect, do not expect me to make any
 9    ruling on the use of the pimping and pandering until I hear his
10    testimony.
11              MS. O'CONNOR:  Understood, Your Honor.  I'm going to
12    do more research on that.  If there is anything pertinent, I
13    will bring it to the Court's attention.
14              THE COURT:  I think we all should.
15         It may be that the solution is the fallback position you
16    have, where we don't mention what the crime is, but only
17    mention that he was convicted.
18         But I have got to do more research on that, too.
19              MS. KIM:  Your Honor, the government did cite cases
20    or did use that as an option in the alternative to sanitize the
21    conviction.
22              THE COURT:  I know you did, okay.
23              MS. KIM:  Thank you.
24              THE COURT:  We're moving ahead.
25              THE COURTROOM DEPUTY:  Please state your full name
```

**UNITED STATES DISTRICT COURT**

1    and state your last name for the record.

2              THE WITNESS:  Cody Burke.  B-u-r-k-e.

3              THE COURTROOM DEPUTY:  Thank you.

4                      CODY BURKE,

5         having been duly sworn, testified as follows:

6              THE COURT:  Okay, Mr. Jauregui.

7              MR. JAUREGUI:  Yes, Your Honor.

8

9                    DIRECT EXAMINATION

10   BY MR. JAUREGUI:

11   Q    Mr. Burke, what do you do for a living?

12   A    I'm a special agent with the Federal Bureau of

13   Investigation.

14   Q    How long have you been an FBI special agent?

15   A    I have been an agent for approximately 13 years.

16   Q    What types of cases do you handle?

17   A    I investigate violent crimes and extortions.

18   Q    How long have you handled extortion cases, specifically?

19   A    I have handled extortion cases for approximately two

20   years.

21   Q    What is your connection to this case, Agent Burke?

22   A    I am the lead case agent, and I'm assisted by two other

23   agents, Special Agent Sean Sterle, and Special Agent Catherine

24   Moore.  They assisted with the investigative steps throughout

25   this case.

```
 1    Q      How did the FBI come to get involved in this case?

 2    A      I was contacted by the U. S. Attorney's Office in late

 3    October, and I was informed that they had an extortion case to

 4    refer to the FBI.

 5           On approximately October 31st, I met with AUSA Ann Kim,

 6    and with Attorney Lynn Neils, and got a brief on the case.

 7           We then agreed to meet on November 2nd, for an interview

 8    with Benjamin Singer.

 9    Q      Before your meeting with Ms. Neils, did you receive any

10    documents to review in connection with the case?

11    A      Yes, I did.

12    Q      And were those documents electronic documents or were they

13    paper, like, PDF documents?

14    A      Electronic documents.

15    Q      And I want to direct your attention to some documents that

16    are already in evidence.

17           And if you could just briefly take a look at Exhibits 14

18    through 19, and Exhibit 48, please.

19    A      Yes, I have reviewed those documents.

20    Q      Do you recognize them?

21    A      Yes, I do.

22    Q      How do you recognize them?

23    A      Those are the documents that I received in late October

24    of 2017.

25    Q      In your experience, Agent Burke, is it unusual for a case
```

```
1    to come to you via referral from the U. S. Attorney's Office?
2    A     No, not at all.
3    Q     And in your experience, is it unusual for a case to be
4    referred to the FBI by an attorney?
5    A     No, not at all.
6    Q     Did you open up an investigation into this case
7    immediately after receiving the referral from the U. S.
8    Attorney's Office?
9    A     No, I did not.
10   Q     Why not?
11   A     Because before we open up a case, we conduct an initial
12   assessment to determine whether we want to pursue that case
13   further.
14   Q     And in this case, what did your initial assessment consist
15   of?
16   A     My initial assessment was reviewing the documents that I
17   received, conducting some database checks and to law
18   enforcement databases for the people mentioned in those
19   letters, Benjamin Koziol and Jordan Sweet.
20         And then we conducted an interview with one of the
21   witnesses on November 2nd.
22   Q     Who was that witness?
23   A     That witness was Benjamin Singer.
24   Q     And that interview was on November 2nd?
25   A     Yes, that's correct.
```

UNITED STATES DISTRICT COURT

```
1   Q    Why did you set out to interview Mr. Singer on

2   November 2nd?

3   A    Because it was his conduct on January 10th, 2016, that

4   started the wheels of this entire case in motion.

5   Q    Did you in fact meet with him?

6   A    Yes, I did.

7   Q    Who was present?

8   A    It was myself, AUSA Ann Kim, Attorney Lynn Neils, and at

9   least one or if not both of Special Agents Cat Moore and

10  Special Agent Sean Sterle.

11  Q    Did the interview that you conducted with Ben Singer have

12  an impact on what you did next?

13  A    Yes, it did.

14  Q    Okay.  What happened in the interview?

15  A    In the interview, Mr. Singer described his visit to a

16  masseuse on January 10th, 2016.  He told us that he --

17             MS. O'CONNOR:  Objection, Your Honor.  Hearsay, and

18  403.

19             THE COURT:  I think he's talking about what happened

20  at the meeting.  It's not being offered for the truth of the

21  matter asserted at this point.

22             MR. JAUREGUI:  Your Honor, I will ask Agent Burke to

23  testify about what Ben Singer said because it impacts what

24  Agent Burke did as part of his investigation.

25             THE COURT:  I understand that.
```

1    BY MR. JAUREGUI:

2    Q    So Agent Burke, please continue with your answer.

3    A    Yes.  And Mr. Singer said that he was the person that

4    received the massage on January 10th, 2016, that he then got

5    into a text dispute with Ms. Sweet, and then he, you know, he

6    received these demand letters after that.

7    Q    And did Mr. Singer tell you when he initially had contact

8    with Jordan Sweet?

9    A    He did.  He said that he first contacted that phone

10   number.

11        MS. O'CONNOR:  Your Honor, same objection.  I think

12   we're getting far afield into this statement.

13        THE COURT:  Well, with all due respect, I think that

14   he is describing what was said to him in the course of the

15   interviews that led him to continue the investigation.

16        I think he can do that, but once again, I want to admonish

17   the jury that the fact that he made a decision to continue the

18   investigation is not to be construed by you as a decision as to

19   the ultimate issues in the case.  That is for you to decide.

20        MS. O'CONNOR:  My other objection is bolstering of

21   another witness.

22        THE COURT:  I will overrule that one.

23   BY MR. JAUREGUI:

24   Q    Agent Burke, you were talking about what Mr. Singer said

25   about Christmas, 2015?

1    A    Yes.  Mr. Singer said that he first contacted that phone

2    number for Jordan Sweet on December 25th, 2015, but he was not

3    able to set up a massage for that day.

4    Q    Did he say when the massage actually happened?

5    A    He said that it happened on January 10th, 2016.

6    Q    What else did you do to preliminarily investigate the

7    claims that were being asserted in the documents that you

8    received?

9    A    I took a look at the photo, the digital photo that was

10   sent by Benjamin Koziol to Attorney Reid Hunter.  And I opened

11   up that photo on my jpeg image on my computer, and reviewed the

12   metadata on it.

13   Q    What did the metadata show?

14   A    The metadata showed that the photo was taken on

15   December 7th, 2016.

16   Q    Was that significant to you?

17   A    Yes.  It was significant in that December 7th was

18   approximately 11 months after the January 10th, 2016, nude

19   massage, and the allegations that were being made in October

20   2017, were that Andy Grammer was there and punched Mr. Koziol.

21   Q    And the photo --

22   A    And the photo showed the result of that injury.

23        I found that since the photo was taken 11 months after the

24   date of the nude massage that I did not think it was possible

25   that Mr. Koziol would still have a black eye.

1   Q     Exhibit 15, Agent Burke, has screen shots of a telephone

2   and also that photo you are talking about, right?

3   A     Yes.  That is correct.

4   Q     Did you review any of those screen shots as part of your

5   preliminary assessment?

6   A     Yes, I did.

7   Q     Why did you do that?

8   A     I did that to understand the communications between

9   Mr. Singer and Ms. Sweet, and also to better understand when

10  exactly this massage happened, not just the date, but the time

11  of day.

12  Q     And did reviewing those text messages help you to do that?

13  A     Yes, it did.

14  Q     How so?

15  A     In that I could see through that series of text messages

16  when the nude massage was set up, and could see when they were

17  making contact shortly before 7:00 p.m., that that seemed to be

18  the approximate start time of the nude massage.

19  Q     I want to ask you, Agent Burke, about -- well, then did

20  you ultimate open a case within the FBI?

21  A     Yes, I did.

22  Q     And what does that mean exactly to open up a case?

23  A     That means to open an investigation so that further

24  investigative steps can be pursued to investigate the charges.

25  Q     I want to talk to you about the steps you did take to

1    investigate the allegations that were being brought to you.

2         First, what you did set out to determine -- excuse me,

3    what did you set out to determine -- excuse me, did you set out

4    to determine there was any merit to Mr. Koziol's claims?

5    A    Yes, I did.

6    Q    How did you do that?

7    A    I set out to determine where Mr. Singer was located on

8    January 10th, 2016, and where Mr. Grammer was located on

9    January 10th, 2016.

10   Q    And how did you do that?

11   A    I requested phone records for both Mr. Grammer and

12   Mr. Singer, and I also requested the bank records for

13   Mr. Grammer.

14   Q    Okay.  Agent Burke, I'm going to show you Government's

15   Exhibit 30, which has been admitted into evidence.

16   A    Yes, I have it before me.

17   Q    Do you recognize it?

18   A    Yes, I do.

19   Q    What is it?

20   A    These are the Verizon wireless records for January 4th,

21   2016, through February 3rd, 2016, for Benjamin Grammer -- for a

22   phone subscribed to Benjamin Singer, rather, and with the phone

23   number ending in 5148.

24   Q    Okay.  And were these some of the records you requested

25   for Benjamin Singer?

1   A    Yes, that is correct.

2   Q    Now, I'm showing you page 6 of 19 of this exhibit, Agent

3   Burke.

4   A    Yes.

5   Q    On page 6, it lists some, but not all of the calls made on

6   January 10th, 2016, correct, on Benjamin Singer's phone?

7   A    Yes, that's correct.

8   Q    And it continues on to the next page?

9   A    Yes, it does.

10  Q    I'm going to ask you first some preliminary questions.

11       In your experience as an FBI agent, have you worked with

12  Verizon cell phone records before?

13  A    Yes, I have.

14  Q    I want to ask you what is your understanding of what the

15  origination column shows?

16  A    Okay.  My understanding is that the origination column

17  shows the location of the cell phone whose records are listed

18  in this document.

19  Q    And what is your understanding about what the destination

20  column shows?

21  A    Now, the destination column shows the city for the area

22  code of the other number that the 5148 was speaking with.

23  Q    And just to be clear, it doesn't indicate where that

24  person was, does it?

25  A    No, it does not.

1          For instance, if you were to look at one of these calls it

2    shows a destination of New York, New York on January 8th.

3          It looks like that one is at 3:59 p.m.

4          So even though that destination is listed as New York,

5    New York, it means that that other phone has an area code -- a

6    New York area code.

7    Q    But the origination column would show where the person

8    holding the phone is?

9    A    That is correct.

10   Q    Now, having reviewed those screen shots that we talked

11   about earlier, did you make a determination about what -- also

12   having interviewed Benjamin Singer -- did you make a

13   determination about what his phone number was?

14   A    Yes, I did.

15   Q    Was that the phone number ending in 5148?

16   A    Yes, it is.

17   Q    Did you, based on those same things, make a determination

18   about what Jordan Sweet's phone number was?

19   A    Yes, I did.

20   Q    And was that the phone number ending in 7 -- 8873?

21   A    Yes, that is correct.

22   Q    Okay.  Now, I'm marking the exhibit with a pen.  I drew a

23   line over the first entry for January 10th 2016, correct?

24   A    That is correct.

25   Q    And on this page, at least, the last call is at 5:53 p.m.

```
 1   on January 10th?
 2   A     Yes, that's correct on this page.
 3   Q     Where does this record show where the holder of this phone
 4   was on that day from 8:53 a.m. to 5:43 p.m., at least at the
 5   time these calls were made?
 6   A     This record shows that the holder of this phone was either
 7   in Santa Monica or Venice, California.
 8   Q     For anybody who does not know, is Santa Monica close to
 9   Venice?
10   A     Yes, Santa Monica is immediately north of Venice,
11   California, on the west side of Los Angeles County.
12   Q     I want to ask you about some of the entries on this date,
13   okay?
14   A     Okay.
15   Q     Are you familiar, Agent Burke, with the phone number
16   ending in 0345?
17   A     Yes, I am.
18   Q     And how are you familiar with that number?
19   A     I conducted database searchs to determine who was the user
20   of that phone number, and I also inquired of Mr. Singer's
21   representative, who was the user of that phone.
22   Q     And who did you determine that to be?
23   A     That it's a female -- female entertainer, who is a client
24   of Mr. Singer.
25   Q     Is that a pop singer?
```

1    A    Yes, a pop singer.

2    Q    And are you also familiar with the number ending in 4289?

3    A    Yes, I am.

4    Q    Whose phone number is that?

5    A    That is the phone number for Andy Grammer.

6    Q    Continuing on to page 7 of this exhibit.  I'm going to

7    mark a line, and the line that I'm putting on this exhibit, is

8    it under the last entry for January 10th, 2016?

9    A    Yes, it is.

10   Q    Okay.  And the first column on this page starts at 5:59,

11   correct?

12   A    That is correct.

13   Q    Okay.  Based on your investigation of this case, who is

14   that call to?

15   A    That call is to Jordan Sweet.

16   Q    And that would be a call, too, because the destination

17   column doesn't say incoming, right?

18   A    That is correct.  Yes, I should have mentioned that

19   earlier on the destination column.

20        If it shows incoming CL, that means that it is an incoming

21   call to this 5148 number.

22   Q    And what about the next three that I'm highlighting?

23   Excuse me.

24   A    Four.  The next four calls are also with Jordan Sweet's

25   phone number.

```
1   Q    Having reviewed the text messages, spoken with Mr. Singer,
2   and based on your investigation of this case, do you have an
3   understanding of when Mr. Koziol alleges the massage took place
4   on January 10, 2016?
5   A    Yes, at approximately 7 p.m. on January 10th.
6   Q    And based on your investigation do you also have -- well,
7   I should say based on your investigation and also the
8   allegations by Mr. Koziol, do you have an understanding of
9   where Jordan Sweet lived?
10  A    Yes, I do.
11  Q    Where was that?
12  A    In Playa Vista, California.
13  Q    And where did the records show the holder of this account
14  to be at 6:48, 6:51, 6:52, p.m.?
15  A    In Playa Vista, California.
16  Q    And now just before the first one of those -- well, second
17  one of those 8873 calls, there is a call to someone ending in
18  7705.
19       Do you see that?
20  A    Yes, I do.
21  Q    Do you have an understanding of whose phone number ends in
22  7705?
23  A    Yes, I do.
24  Q    And who is that?
25  A    That is a David Schuler, who is a -- also in entertainment
```

1    business, as a writer and musician and a business contact of

2    Benjamin Singer's.

3    Q    And did you reach out to David Schuler?

4    A    Yes, I did.

5    Q    Why did you do that?

6    A    Because Benjamin Singer's phone was in contact with David

7    Schuler while Mr. Singer appeared to be in route from Santa

8    Monica to Playa Vista, California, immediately before the

9    massage on January 10th, 2016.

10   Q    And what did Mr. Schuler say to you, have an impact on the

11   way you continued to investigate this case?

12        MS. O'CONNOR:  Objection, Your Honor.  Hearsay, and

13   Sixth Amendment Confrontation Clause, and 403.

14        THE COURT:  What was the question?

15        MR. JAUREGUI:  Your Honor, the question was, did

16   what Mr. Schuler say to you impact the way you continued to

17   investigate this case?

18        THE COURT:  Remind me who Mr. Schuler is?

19        MR. JAUREGUI:  You are asking me, Your Honor, or the

20   witness?

21        THE COURT:  I'm asking you.

22        MR. JAUREGUI:  Mr. Schuler, I believe, the witness

23   testified is a business contact of well -- I have a proffer

24   that Mr. Schuler is a business contact of Benjamin Singer's.

25        MS. O'CONNOR:  Objection, Your Honor.

 1          THE COURT:  Why don't you just rephrase the
 2   question?
 3   BY MR. JAUREGUI:
 4   Q    The question was did you interview David Schuler?
 5   A    Yes, I did.
 6          MR. JAUREGUI:  Excuse me, one moment.
 7   BY MR. JAUREGUI:
 8   Q    And Agent Burke, did your interview with Mr. Schuler lead
 9   you to cease your investigation?
10   A    No.
11          MS. O'CONNOR:  Objection, Your Honor.  Same
12   objection, and also misleading under 403 as to the contents of
13   the conversation with Mr. Schuler.
14          THE COURT:  I don't follow.  I really have to tell
15   you, I just don't follow.
16      I'm going to overrule the objection.
17          THE WITNESS:  No, it did not.
18   BY MR. JAUREGUI:
19   Q    Then there is a call here which appears to be the last
20   call on January 10th, correct?
21   A    That is correct.
22   Q    Okay.  That call is at 8:26 p.m.?
23   A    Yes, it is.
24   Q    That's to 0345, the phone number we saw on the previous
25   page?

1    A    That is correct.  The pop star is a client of Benjamin

2    Singer's.

3    Q    Where is the phone at that point?

4    A    Santa Monica, California.

5    Q    Mr. Burke, I want to direct your attention to Exhibit 33.

6    A    Yes.  I'm looking at it.

7    Q    And 33 is in evidence.

8         What is Exhibit 33, Agent Burke?

9    A    These are the Verizon wireless phone records for phone

10   subscribed to by Andrew Grammer.

11        The bill dates are January 9th, to February 8th, 2016, and

12   the phone number ends in 4289.

13   Q    Are these records you requested from Verizon?

14   A    Yes, they are.

15   Q    As part of your investigation to this case?

16   A    That is correct.

17   Q    Agent Burke, do you see the first entry on 1/10?

18   A    Yes, I do.

19   Q    And that is at 11:56 a.m.?

20   A    Correct.

21   Q    The last entry on 1/10 is when?

22   A    5:54 p.m.

23   Q    Where do these records show that the holder of the Andrew

24   Grammer's phone was located on that day?

25   A    The record shows that the holder of the phone was in

1   Los Angeles, California.

2   Q    Do you recognize that number ending in 5148?

3   A    Yes, I do.

4   Q    What number is that?

5   A    That is the phone number for Benjamin Singer.

6   Q    Do you recognize this number, 6834?

7   A    I don't recall that number at this time.

8   Q    Are there any calls after 5:54 p.m.?

9   A    No, there are not.

10  Q    Agent Burke, did you try to recover text messages for

11  either Andrew Grammer or Ben Singer as part of your

12  investigation of this case?

13  A    Based on my training and experience, I'm aware that

14  Verizon wireless only keeps text messages for 2 to 3 days after

15  they are sent.

16       I was contacted about this investigation in October

17  of 2017, almost two years after this incident in January, 2016,

18  so the text messages were no longer available.

19  Q    Did there come a time, Agent Burke, where you interviewed

20  Andy Grammer?

21  A    Yes.

22  Q    Did you talk to Andy Grammer about the massage and what he

23  was doing on January 10, 2016?

24  A    Yes, I did.

25  Q    Did you review any records with Mr. Grammer at the time

1    you interviewed him?

2    A    Yes, I did.

3    Q    Did Mr. Grammer tell you whether or not he had a massage

4    on January 10th, 2016?

5    A    Yes.  He told me that he did not have a massage on

6    January 10th, 2016.

7         MS. O'CONNOR:  Objection, Your Honor.  Hearsay.

8         MR. JAUREGUI:  Again, Your Honor, this goes to the

9    investigative steps that the agent took based on his interviews

10   with the witnesses.

11        THE COURT:  I agree they are not offered for the

12   truth of the matter asserted.  They are offered to explain why

13   the agent did what he did.

14   BY MR. JAUREGUI:

15   Q    And Agent Burke, what did he say he did that night?

16   A    He said that he picked up pizza, took it back to his house

17   and ate it at home with his wife.

18   Q    And did you do anything to test Mr. Grammer's statement to

19   you, that he was with his wife that night having pizza at home?

20   A    Yes, I did.

21   Q    What did you do?

22   A    I ordered Wells Fargo Bank account records to review

23   purchases made that night.

24   Q    And I'm showing you Government's Exhibit No. 25, page 3,

25   which is in evidence.

1       Are these at least one part of those records you received

2  from Wells Fargo?

3  A     Yes, they are.

4  Q     Directing your attention to those two entries that I

5  circled, the first one says "purchase authorized on 1/10,

6  Super A Foods, Los Angeles, California."

7       Do you see that?

8  A     Yes, I do.

9  Q     The second one that I circled said Town Pizza.  It says,

10  "purchased authorized on Town Pizza Beer."

11  A     Yes, I do see that.

12  Q     Okay.  And did you ask Mr. Grammer about these purchases?

13  A     Yes, I did.

14  Q     Did he -- did he tell you approximately when he made those

15  purchases?

16  A     He thought it was in the evening on January 10th.

17  Q     Do the records show what time the purchases were made?

18  A     In this record, they do not.

19  Q     Did you do anything to find out what time those purchases

20  were made?

21  A     Yes, I had to request additional records from Wells Fargo

22  to find out the times of those purchases, and all purchases on

23  January 10th, 2016.

24  Q     Okay.  I'm going to direct your attention to Government's

25  Exhibit 17.  Excuse me, Agent Burke.

1        Okay, I'm going to direct your attention to 27, I

2   apologize.

3        Do you recognize Exhibit 27?

4   A    Yes, I do.

5   Q    What is it?

6   A    These are Wells Fargo transaction records.

7   Q    And are these records you received in response to a

8   request you made to Wells Fargo?

9   A    Yes, they are.

10  Q    Were they returned with the business records declaration

11  from Wells Fargo?

12  A    Yes, they were.

13          MR. JAUREGUI:  Your Honor, the government moves to

14  admit Government's Exhibit 27, under Rule 8036.

15          MS. O'CONNOR:  No objection.

16          THE COURT:  It may be received.

17       (Exhibit 27 received into evidence.)

18  BY MR. JAUREGUI:

19  Q    Now, Agent Burke, on Exhibit 25, there was an entry, one

20  of them I highlighted for $36.50 at Super A Foods, correct?

21  A    Yes, that's correct.

22  Q    And did you request additional information about that

23  purchase from Wells Fargo?

24  A    Yes, I did.

25  Q    Is that reflected in the part -- I'm circling here at the

1  bottom of this exhibit?

2  A     Yes, it is.

3  Q     And it says, "purchase authorized at 1/10/16, time 18:32."

4        Do you see that?

5  A     Yes.

6  Q     Is that 6:32 p.m.?

7  A     Yes, that is correct.

8  Q     The amount is $36.50?

9  A     Correct.

10 Q     Address is says, "unable to locate."

11 A     Yes, it does.  I just had to pair this record with the

12 earlier records to see that the $36.50 purchase was made at

13 Super A Foods.

14 Q     And then highlighting the top entry, it says,

15 "purchase authorized on 1/10/16 at 18:35."

16       Do you see that?

17 A     Yes, I do.

18 Q     Is that 6:35 p.m.?

19 A     That is correct.

20 Q     That would be on January 10, 2016?

21 A     Correct.

22 Q     Address it says, "unable to locate"?

23 A     Yes.  The same as the previous transaction, and that I had

24 to take the $43.21 amount and look back at the phone records --

25 or rather the account records in Exhibit 25, and that 43.21

1    purchase was made at Town Pizza.

2         And I did further research to determine the locations of

3    the Town Pizza and the Super A Foods.

4    Q    Where are they?

5    A    The Town Pizza is the at 5101 York Boulevard in Highland

6    Park, in Los Angeles, California, in the Highland Park area.

7         And the Super A Foods is right down the street.  I believe

8    the address is 5250 York Boulevard, Los Angeles, California,

9    also in the Highland Park area.

10        And they are within very close proximity, you know, less

11   than half a mile apart.

12   Q    Okay.  I want to redirect your attention to Exhibit 17,

13   which is in evidence.

14        The first line says, "you first contacted my wife for a

15   nude massage via text on December 24th, 2015."

16        Do you see that?

17   A    Yes, I do.

18   Q    Having reviewed Andy Grammer's phone records for December

19   24th, 2015, I believe you testified you couldn't get any text

20   messages, right?

21   A    That is correct.

22   Q    Did you see any phone calls on that day or the next day to

23   Jordan Sweet's telephone number, as you understand it to be?

24   A    No, I did not.

25   Q    Did you request Benjamin Singer's phone records?

```
 1   A     Yes, I did.

 2   Q     I'm sorry, for the December time period as well?

 3   A     Yes, I did.

 4   Q     I'm going to show you what has been introduced into

 5   evidence as Exhibit No. 29, and I'm going to take you to

 6   page 18, and these are Ben Singer's phone records, correct?

 7   A     Yes, they are for the phone ending in 5148.

 8                 MR. JAUREGUI:  One moment.  Sorry about my old man's

 9   eyes, Agent Burke.

10   BY MR. JAUREGUI:

11   Q     12/25 p.m., I'm sorry, 12/25 3:53 p.m., do you see that?

12   A     Yes, I do.

13   Q     Do you recognize the number, 8873?

14   A     Yes, I do.

15   Q     Whose number do you recognize that to be?

16   A     That is the number for Jordan Sweet.

17   Q     Where was the caller?

18   A     Santa Monica, California.

19   Q     And again, the destination column shows where the phone is

20   registered to, right?

21   A     Right.  The area code for the phone in contact with 5148.

22   Q     Okay.  I want to ask you about some of the communications

23   you received that were previously reviewed that were

24   communications from Benjamin Koziol to Reid Hunter, okay?

25   A     Okay.
```

```
 1   Q    So, I'm going to use, as an example, Exhibit No. 15, okay?
 2   A    Okay.
 3   Q    In the signature block it says Benjamin Koziol.  It has an
 4   e-mail and phone number; is that correct?
 5   A    That is correct.
 6   Q    What are the e-mail address?
 7   A    Benk1472@Yahoo.com.
 8   Q    What's the phone number?
 9   A    (424) 330-9724.
10   Q    Did you do any investigation into either the phone number
11   or this e-mail address?
12   A    Yes, I did further investigation into both.
13   Q    Let's start with the phone number.  What did you do?
14   A    I requested the subscriber information and called the util
15   records from Verizon wireless for that telephone number.
16   Q    Okay.  If we can go to -- if you just look in your binder
17   at Exhibit No. 52, please.
18   A    Yes, I'm looking at Exhibit 52.
19   Q    Do you recognize it?
20   A    Yes, I do.
21   Q    What is it?
22   A    These are the subscriber records for that phone number
23   listed on the e-mail.  It's from Benjamin Koziol.
24   Q    These are documents you requested?
25   A    Yes, they are.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     From Verizon?

 2   A     Yes, they are.

 3              MR. JAUREGUI:  Your Honor, the government moves to

 4   Exhibit 52 pursuant Rule 8036, a business records declaration

 5   is in the government's binder and has been produced.

 6              MS. O'CONNOR:  No objection.

 7              THE COURT:  It will be received.

 8         (Exhibit 52 received into evidence.)

 9   BY MR. JAUREGUI:

10   Q     This is small, so I'm going to ask AUSA Kim to blow that

11   up.

12         Directing your attention, Agent Burke, on the right-hand

13   side of this little rectangle that is being highlighted, do you

14   see where it says "MTN"?

15   A     Yes, I do.

16   Q     Based on your experience with Verizon records, what does

17   MTN mean?

18   A     Mobile telephone number.

19   Q     What is the number listed?

20   A     424-330-9724.

21   Q     And the column next to that says, "MTN effective date."

22   Do you see that?

23   A     Yes.

24   Q     Do you have an understanding of what that means?

25   A     Yes again, MTN is mobile telephone number and that is the
```

```
 1    date the account was opened for that number.

 2    Q    What date was that account opened?

 3    A    October 12th, 2017.

 4    Q    And then there is a column for name on the left, last name

 5    and first name.

 6         Do you see that?

 7    A    Yes, I do.

 8    Q    What are the last name and first name associated with this

 9    phone number?

10    A    Last name Doe, first name John.

11    Q    And then to the right, there is an address line 1, do you

12    see that?

13    A    I do.

14    Q    What is the address?

15    A    512 Rialto Avenue.

16    Q    City and state?

17    A    Venice, California, 90291.

18    Q    Did you do any investigation to determine what that

19    address is?

20    A    Yes, I did.

21    Q    What did you do?

22    A    I first looked online to see if I could determine whether

23    that was -- whether that address existed and it did not seem to

24    exist.

25         So I drove by on that street, and there is a 510 Rialto
```

1    Avenue, and there is a 514 Rialto Avenue, but I did not see a

2    512 Rialto Avenue.

3    Q    Now, turning your attention to the e-mail address that is

4    provided in this exhibit.

5    A    Yes.

6    Q    Could you take a look at Government Exhibit No. 43?

7         Do you recognize it?

8    A    Yes, I do.

9    Q    What is it?

10   A    These are the -- the subscriber information -- account

11   information received from Yahoo for the Benk1472@Yahoo.com

12   e-mail account.

13            MR. JAUREGUI:  Your Honor, the government moves to

14   admit Exhibit No. 43, pursuant to Rule 8036.  Same thing, we

15   have a business records declaration in the exhibit binder.

16   It's been produced to the defense.

17            MS. O'CONNOR:  No objection.

18            THE COURT:  It will be received.

19        (Exhibit 43 received into evidence.)

20   BY MR. JAUREGUI:

21   Q    And if we can go to page 2.

22        Okay.  Agent Burke, what does it say under Yahoo mail

23   name?

24   A    BenK1472@Yahoo.com.

25   Q    What does it say under alternate communication channels?

```
1    A      1-424-330-9724.

2    Q      And that is the phone number we just finished talking

3    about that was registered to John Doe?

4    A      Yes, that is correct.

5    Q      What does this page of Exhibit 43 say about the date this

6    e-mail address was created?

7    A      This was created on October 12th at 0602, GMT, Greenwich

8    Mean Time.

9    Q      Year?

10   A      2017.

11   Q      Then, what does it say about the registration IP address?

12   A      It says the registration IP address is 96.65.201.105.

13   Q      Did Yahoo, in addition to providing you that information,

14   provide you information about IP addresses?

15   A      Yes, they did.

16   Q      Can we go to page 1 of this exhibit?

17          What are we looking at here, Agent Burke?

18   A      These are the IP addresses where the Yahoo account was

19   signed in from.

20          IP stands for Internet protocol.

21   Q      And what's the time period covered by this?

22   A      This is from approximately October 16th, through

23   November 7th, 2016.

24   Q      And did you request this time period?

25   A      Yes, I did.
```

```
 1   Q      Why?

 2   A      Well, I requested a wider time frame than this, but since

 3   the account was created just on October 12th, I got from

 4   October 12th until the date that I requested these records.

 5   Q      Okay.  Did you make any investigative use of this

 6   information here, the IP addresses?

 7   A      Yes, I did.

 8   Q      What did you do?

 9   A      Well, I first put each of these IP addresses into an

10   online tool that will tell the user, who is the service

11   provider for these Internet protocol, for these IP addresses.

12   Q      Then?

13   A      I determined that all of these IP addresses were assigned

14   to Comcast at these log-in times.

15   Q      Did you request information from Comcast?

16   A      Yes.  I requested the subscriber information from Comcast

17   for each of these IP addresses.

18   Q      Let's talk about the first three in time here that end

19   with .105.

20          Do you see that?

21   A      Yes.

22   Q      What did the information you received from Comcast tell

23   you about that?

24   A      That they were assigned to a hotel company and it is

25   located in Portland, Oregon.
```

```
1    Q    What about the rest?

2    A    The rest were assigned to a residence -- well, the

3    accountholder was Benjamin Koziol at a residence in Portland,

4    Oregon.

5         I believe the address was 11603 Southeast Madison Street,

6    Portland, Oregon.

7    Q    Okay.  So after receiving the information about these IP

8    addresses, what did you do?

9    A    Then I made contact with the Portland division and

10   requested that they conduct a surveillance at that address in

11   Portland.

12   Q    Did the FBI ultimately determine that that address was

13   Benjamin Koziol's address?

14   A    Yes, they did.

15   Q    What else?

16   A    We also -- I also had a Portland agent go to the hotel

17   there, in Portland, indicated by this subscriber information

18   for these IP addresses and check for reservation records for

19   Benjamin Koziol and Jordan Sweet or Jordan Koziol.

20   Q    What did you determine?

21   A    That they -- there was -- at each of these times in which

22   the accounts were assigned to that hotel -- in these e-mails --

23   there were log-ins to this Yahoo account, Benjamin Koziol or

24   Jordan Koziol had a reservation at that hotel -- at that motel.

25   Q    Did you use that information from Yahoo Comcast,
```

```
 1   information from your co-case agent -- I think you said
 2   Portland division, that is the Portland division of the FBI?
 3   A     Yes.
 4   Q     And from the hotel.  What was the name of the hotel?
 5   A     The Roadway Inn.
 6   Q     Did you use the information from all of those sources to
 7   put together a summary chart?
 8   A     Yes, I did.
 9   Q     Is that the chart located in Exhibit 50?
10   A     Yes, it is.
11            MR. JAUREGUI:  Your Honor, the government moves to
12   admit Government Exhibit 50, under Rule 1006.
13            MS. O'CONNOR:  No objection.
14            THE COURT:  All right.  It will be received.
15         (Exhibit 50 received into evidence.)
16            MR. JAUREGUI:  If Ms. Kim could publish Exhibit 50.
17            THE COURT:  Then when you get to the end of this
18   area of questioning, I think we should probably adjourn because
19   it's getting later.
20            MR. JAUREGUI:  Yes, Your Honor.  I will take my
21   scratches off of this thing.  By the end of the trial, I will
22   get good at this.
23   BY MR. JAUREGUI:
24   Q     Agent Burke, what are we looking at?
25   A     This is the summary of Koziol's e-mail communications and
```

1    associated IP addresses.

2    Q    Why did you put this together?

3    A    Because there is so much information from various sources

4    that I thought it would be easier to summarize this in a

5    timeline so that others could understand the details.

6    Q    What does this chart show -- let's start with the first

7    line.

8    A    This chart shows -- and some of the -- or the information

9    provided by -- let me start with a time there -- the

10   information provided by Yahoo was in Greenwich Mean time, so I

11   had to convert that to Pacific Time where both California and

12   Oregon are located, and so the time there is listed as Pacific

13   Time throughout.

14        So that first line shows on October 11th, at 11:02 p.m.

15   the account, BenK1472@Yahoo.com was created and that was

16   created at an IP address, 96.65.201.105.

17        And Comcast provided that subscriber information for that

18   IP address at that date in time as the Portland Lodging

19   Company, at 9727 Northeast Sandy Boulevard, which I learned was

20   the Roadway Inn.

21   Q    Is that what is reflected here?

22   A    Yes, it is.

23   Q    And moving down from there, what does the chart show?

24   A    Then on 10/15 at 5:42 p.m., that is when Singer received

25   his e-mail, the first e-mail on October from BenK1472@Yahoo.com

1    and signed by Benjamin Koziol.

2    Q    In the interest of time, do the next 1, 2, skipping the

3    12:38 a.m. one, and then the next one after that, reflect times

4    when e-mails were sent from that e-mail address to Reid Hunter?

5    A    Yes, they do.

6    Q    Okay.  And based on -- where would Benjamin Koziol, the

7    Benjamin Koziol associated with this be at that time?

8    A    He was staying at the Roadway Inn.

9    Q    Okay.  Starting at the top here, let's go here.

10        So 11/4, 2017, what does that show?

11   A    That shows that an e-mail was received by Attorney Reid

12   Hunter at 5:42 p.m.

13   Q    And then does this chart show that someone logged into

14   this account on 11/5, 11/6, 11/6 again, and that Mr. -- that it

15   was from IP address registered to Mr. Koziol's residence?

16   A    Yes, it does.

17            MR. JAUREGUI:  Your Honor, I'm going to switch

18   subjects, so maybe now would be a good time to break.

19            THE COURT:  Okay.  I think this is taking a bit

20   longer than I had expected, so I think we will call it a day.

21        Please keep an open mind, don't discuss the case with one

22   another or anyone else.

23        I believe -- don't hold me to it -- we will wrap up

24   tomorrow, but then we will have to assess, obviously, where we

25   go from here regarding Juror No. 1.

1          In the meantime, please keep an open mind, don't discuss

2     the case with one another or anyone else, and we will see you

3     tomorrow at 9:30.

4               THE COURTROOM DEPUTY:  All rise.

5               (JURY EXITED THE COURTROOM AT 4:55 P.M.)

6               THE COURTROOM DEPUTY:  Please be seated.

7               MR. JAUREGUI:  Your Honor, I only have ten minutes,

8     I think, left with this witness.

9               THE COURT:  Then obviously, I know the defense

10    forecasted 20 minutes, maybe longer.  It may be less long, I

11    just don't know.

12              MS. O'CONNOR:  I think it will be longer, Your

13    Honor, more like 45 minutes to an hour.

14              THE COURT:  Okay.  So that means that your

15    assignment tonight is to try to agree on as many jury

16    instructions as you can.

17         If you have new ones to offer, please keep in mind that

18    unless they come from the Ninth Circuit or some other treatise,

19    I'm probably not going to give them.

20         So let's start there.

21         Hopefully, in the morning, we will have a set.

22         I'm going to ask the government, if possible, once we get

23    to a final set to put together a full set for me to read to the

24    jury with the preliminary instructions and everything else.

25              MS. KIM:  Will do, Your Honor.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Thanks.  We will see you at 9:30 a.m.

2          THE COURTROOM DEPUTY:  This Court is adjourned.

3            (The matter was concluded at 4:57 p.m.)

4                              * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6          I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  June 14, 2018

17

18

19                    /s/ TERRI A. HOURIGAN

20           _____
             TERRI A. HOURIGAN, CSR NO. 3838, CCRR
21              Federal Official Court Reporter

22

23

24

25

**UNITED STATES DISTRICT COURT**