1  NICOLA T. HANNA
   United States Attorney
2  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
3  Chief, Criminal Division
   ANN C. KIM (Cal. Bar No. 212438)
4  EDDIE A. JAUREGUI (Cal. Bar No. 297986)
   Assistant United States Attorneys
5  Major Frauds Section
        1100 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-2579/4849
        Facsimile: (213) 894-6269
8       E-mail:    ann.kim@usdoj.gov
                   eddie.jauregui@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                 UNITED STATES DISTRICT COURT

12             FOR THE CENTRAL DISTRICT OF CALIFORNIA
                                 8
13 UNITED STATES OF AMERICA,          No. CR 18-00022-CAS

14          Plaintiff,                GOVERNMENT'S SENTENCING POSITION;
                                      EXHIBITS
15               v.
                                      [DECLARATION OF ANN C. KIM;
16 BENJAMIN KOZIOL,                   EXHIBITS FILED MANUALLY
                                      CONCURRENTLY HEREWITH]
17          Defendant.
                                      Hearing Date: December 5, 2018
18                                    Hearing Time: 12:00 P.M.
                                      Location:     Courtroom of the
19                                                  Hon. Christina A.
                                                    Snyder
20

21

22      Plaintiff United States of America, by and through its counsel

23 of record, the United States Attorney for the Central District of

24 California and Assistant United States Attorneys Ann C. Kim and Eddie

25 A. Jauregui, hereby files its sentencing position as to defendant

26 Benjamin Koziol.

27 //

28 //

The government's position is based upon the attached memorandum of points and authorities, exhibits, the Declaration of Ann C. Kim and Exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 21, 2018          Respectfully submitted,

                                  NICOLA T. HANNA
                                  United States Attorney

                                  LAWRENCE S. MIDDLETON
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                  _____/s/_____
                                  ANN C. KIM
                                  EDDIE A. JAUREGUI
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                PAGE

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION...................................................1

II.   STATEMENT OF FACTS.............................................2

      A.   Defendant Waged a 16-Month Campaign to Extort
           Entertainer of $1 Million By Threatening to Smear Him
           With False and Defamatory Allegations of Sexual and
           Physical Assault..........................................2

      B.   In August 2016, Defendant Falsely Claimed, For the
           First Time, That He Was Assaulted by Manager..............4

      C.   Having Failed to Extort Manager, Defendant Invented a
           New Claim of Assault, This Time Against Entertainer.......6

      D.   With the Statute of Limitations On His False Claim
           Running, Defendant Ramped Up His Effort to Shakedown
           Entertainer and Demanded $1 Million.......................7

      E.   Defendant's Threats to File False Public Accusations
           that Entertainer Sexually and Physically Assaulted
           Sweet and Defendant Put Entertainer in Grave Fear for
           His Personal Reputation and His Career....................9

III.  THE PRESENTENCE REPORT........................................10

IV.   THE GOVERNMENT'S SENTENCING POSITION..........................12

      A.   The Nature and Circumstances of the Offense and
           History and Characteristics of Defendant Justify a 78-
           Month Prison Sentence....................................13

      B.   A 78-Month Sentence is Warranted to Reflect the
           Seriousness of the Offense, Promote Respect for the
           Law, Provide Just Punishment, and Afford Adequate
           Deterrence...............................................19

      C.   Need to Avoid Unwarranted Sentence Disparities..........19

V.    Conclusion....................................................20

**<ins>TABLE OF AUTHORITIES</ins>**

<ins>DESCRIPTION</ins>                                                                    <ins>PAGE</ins>

<ins>United States v. Booker</ins>,
   543 U.S. 220 (2005) ........................................... 12

<ins>United States v. Cantrell</ins>,
   433 F.3d 1269 (9th Cir. 2006).................................. 13

<ins>United States v. Goff</ins>,
   501 F.3d 250 (3d Cir. 2007).................................... 19

<ins>United States v. Knows His Gun</ins>,
   438 F.3d 913 (9th Cir. 2006)................................... 13

<ins>United States v. Mares</ins>,
   402 F.3d 511 (5th Cir. 2005)................................... 19

<ins>United States v. Nichols</ins>,
   464 F.3d 1117 (9th Cir. 2006).................................. 13

<ins>United States v. Teofil Brank</ins>,
   15-131-JFW .............................................. 19, 20

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

On June 1, 2018, a jury convicted defendant Benjamin Koziol ("defendant") of one count of attempted extortion affecting commerce by nonviolent threat, in violation of 18 U.S.C. § 1951(a).  As the Court is aware from the proceedings in this case, defendant threatened to publicly disclose false allegations of physical and sexual assault against a well-known recording artist ("Entertainer") by filing a lawsuit if Entertainer did not pay defendant $1 million. The evidence at trial was overwhelming and at the conclusion of the case, the jury quickly voted to convict.

On July 23, 2018, the United States Probation Office ("USPO") filed its Presentence Investigation Report ("PSR") (Dkt. 143), and disclosed recommendation letter (Dkt. 142) in this matter.  As detailed in the PSR, the USPO determined that the total applicable offense level is 23, given the base offense level and specific offense characteristics.  The USPO also determined that defendant falls within criminal history category of IV, based on his criminal history score of nine.  Using an offense level of 23 and a criminal history category IV, the USPO calculated a Guidelines range of 70-87 months.  The USPO recommended a custodial sentence of 70 months.

As reflected below, the government agrees with the USPO's calculated Guidelines range, and its determination of the criminal history category IV.  The government submits, however, that an appropriate custodial sentence in this case is 78 months of imprisonment.  Defendant's conduct in this case was threatening, malicious, and prolonged, causing great fear and emotional harm to Entertainer, who believed the false allegations against him could

ruin his reputation and career.  Defendant has also failed to show any remorse for his actions, even savoring the opportunity to inflict mental pain and anguish on Entertainer and his Manager by going to trial.  As set forth below, defendant's conduct in this case is consistent with his history of abuse and depraved criminal conduct.  Indeed, at the time defendant attempted the extortion in this case, he recently had been convicted of pimping a 26-year old homeless woman whom defendant plied with alcohol and sexually abused.  It was only one of defendant's ten criminal convictions.  For these reasons, and others explained below, the government requests that the Court impose the following sentence: 78 months' imprisonment; a three-year term of supervised release; restitution in an amount to be determined later at a restitution hearing; and a $100 special assessment.

## II.  STATEMENT OF FACTS

### A.  Defendant Waged a 16-Month Campaign to Extort Entertainer of $1 Million By Threatening to Smear Him With False and Defamatory Allegations of Sexual and Physical Assault.

The jury in this case convicted defendant of attempted extortion by wrongful use of fear, in violation of 18 U.S.C. § 1951(a).  At trial, the evidence showed that defendant attempted to extort Entertainer with false and defamatory allegations that Entertainer sexually assaulted defendant's wife and physically assaulted defendant during a nude massage.  Specifically, the evidence at trial revealed the following:

On Christmas day 2015, Entertainer's Manager tried to schedule a nude massage with defendant's wife, Jordan Sweet ("Sweet").  (RT 5/31/2018 A.M., 36:4-37:14, 41:6-43:18, 44:17-45:12, 46:14-48:9, Ex.

1   6.)[1]  Because Sweet was not available until 5 p.m., the massage did
2   not take place that day.  (Id., 50:11-18, Ex. 6.)

3        On January 10, 2016, at approximately 7:00 P.M., Manager
4   received a half hour massage from Sweet at her apartment in Playa
5   Vista, but was not satisfied because he expected, but did not
6   receive, a "happy ending."  (RT 5/31/2018 A.M., 50:23-54:22, 56:17-
7   57:7, 58:18-21, 70:1-9, 73:22-24.)  Manager testified that after the
8   massage, he began text messaging Sweet, telling her that he was going
9   to report her to her apartment manager for operating a naked massage
10  business in her unit.  Sweet replied that she was going to do some
11  "digging" on Manager using his telephone number.  (Id., 68:6-69:11,
12  71:2-73:10.)  Manager testified that a "Google" search of his phone
13  number on January 10, 2016, would have led to his clients' or his
14  company's websites.  (Id., 51:8-20.)

15       Manager further testified that on January 12, 2016, he received
16  voicemail messages from Bobby Saadian ("Saadian"), an attorney
17  representing Sweet, regarding alleged inappropriate behavior during
18  the massage on January 10, 2016.  The message was addressed to
19  "[Entertainer]."  (Id., 59:24-60:20.)  That same day, Manager spoke
20  to Saadian and discovered that Saadian was calling about the nude
21  massage Manager received on January 10, 2016.  (Id., 62:22-63:16.)
22  Manager clarified that it was he who received the nude massage on

24  _____

25       [1] "RT" refers to the reporter's transcripts of the trial.
    Citations include the date of the proceedings, identification of
26  morning sessions and afternoon sessions, and page and line
    references.  All trial exhibits referenced in this Statement of Facts
27  are attached to the Declaration of Ann C. Kim in Support of
    Government's Sentencing Position ("Kim Dec.") as Exhibit 1, which is
28  being manually filed concurrently herewith, along with two audio
    recordings.

January 10, not Entertainer, and that all of the other allegations, including the sexual assault allegation, were untrue. (Id., 60:6-61:1, 62:19-64:8.)[2]

On January 14, 2016, Saadian sent a demand letter seeking $250,000 from Manager or else he would promptly file and serve a lawsuit——and notify the media of said lawsuit——alleging that Manager sexually assaulted Sweet during the January 10, 2016 nude massage. (Id., 64:11-66:20, Ex. 6.)  On or about February 3, 2016, Manager entered into a confidential settlement agreement with Sweet denying the allegations but settling the matter for $225,000 to keep the false allegations from being published. (Id., 67:10-14, 74:24-75:25, 77:15-20; Ex. 8.)

**B.    In August 2016, Defendant Falsely Claimed, For the First Time, That He Was Assaulted by Manager.**

Seven months later, in August 2016, Manager received a voicemail from someone purporting to be Sweet's husband. (RT 5/31/2018 A.M., 79:23-80:5.)  Manager asked his attorney, Kerry Garvis Wright ("Wright"), to return the call. (Id., 80:6-21; RT 5/30/2018 A.M., 56:17-24.)  Wright testified that she spoke to defendant twice, with the first call taking place on or about August 22, 2016.[3]  (RT

---

[2] Entertainer testified that he never communicated with Sweet on December 25, 2015, or any other time, and never received a nude massage from Sweet. (RT 5/31/18 P.M., 93:19-94:5.)  On December 25, 2015, Entertainer was at home in the Highland Park area of Los Angeles hosting a Christmas party with his wife. (RT 5/31/18 P.M., 82:21-86:18.)  Entertainer testified that he never got a nude massage from Sweet on January 10, 2016, and never met her before. (RT 5/31/2018 P.M., 93:19-24.)  At the time Manager received the nude massage from Sweet on January 10, 2016, Entertainer was near his home in Highland Park picking up drinks and pizzas to take home to watch television with his wife. (Id., 89:9-17, 90:16-93:14.)

[3] In this same month, on August 3, 2016, defendant was arrested on charges of human trafficking for purposes of pimping. (PSR ¶ 49.)

5/30/2018 A.M., 57:2-15.)  During that call, defendant said he was hoping to talk to Manager about an incident that occurred "a while ago," and said it was about the massage.  (Id.)  Wright suggested defendant speak to her, inviting defendant to meet in person to discuss the issue.  (Id.)  Defendant responded that he would get back to her.  (Id.)  Wright testified that shortly thereafter, defendant called her and stated that he would not meet with Wright in person, and that he was at the apartment the day of the massage and he too was a victim.  (Id., 57:19-58:24.)  Defendant further told Wright that "[o]bviously, my wife would not give a nude massage alone . . . obviously, I was there . . . in the bedroom with a Doberman."  (Id.)  Wright testified that during this call, defendant stated that "something occurred" and he went to where the massage was taking place, where Manager verbally and physically assaulted him.  (Id.)  Wright responded that defendant's claims were "interesting" because she had never before heard that he was present during the massage and defendant was not mentioned in the detailed demand letter from defendant's wife's lawyer.  (Id.)  Wright testified that she told defendant that "[her] client was extorted once.  He's not going to be extorted a second time."  (Id.)  Wright thought that defendant's claims that Manager verbally and physically assaulted defendant were unbelievable and testified that Saadian never mentioned defendant during any of the phone calls she had with him, nor was defendant mentioned in Saadian's detailed demand letter.  (Id., 58:25-59:11.) Similarly, Wright testified that defendant never mentioned Entertainer during either conversation she had with him in August

---

According to court records, defendant, who was released on bail, had a court appearance on August 5, 2016, and another on August 18, 2016, days before he spoke with attorney Wright.

2016.  (Id., 59:12-14.)  Wright did not hear from defendant again until late December 2016.  (Id., 59:15-60:24; Exs. 11 & 12.)

C. **Having Failed to Extort Manager, Defendant Invented a New Claim of Assault, This Time Against Entertainer.**

At the end of 2016, defendant, through an attorney, Sherwin Arzani, sent letters to Wright claiming for the first time that Entertainer, not Manager, physically assaulted defendant during the January 10, 2016 massage.  (Id., 59:15-60:24, 61:2-15; Exs. 11 & 12.) Defendant claimed that Entertainer "physically assaulted and battered [defendant] while he was protecting his wife from unwanted physical advances from [Entertainer] while she provided masseuse services to him."  (Id., 62:8-12; Exs. 11 & 12.)  On January 3, 2017, Wright drafted a response to Arzani.  In her letter, Wright responded that defendant knew that (1) the Glaser firm represented Manager, not Entertainer, and (2) it was Manager, not Entertainer, who was at the Playa Vista address on January 10, 2016.  (RT, 5/30/2018 A.M., 62:13-63:4, 63:18-23; Ex. 13.)  The letter also pointed out that defendant was aware of these facts because he tried the same "criminal shakedown" four months earlier in August 2016, at which time he had only one fact correct: it was Manager who was at the Playa Vista address on January 10.  (Id., 64:4-18; Ex. 13.)  The letter further noted that when defendant's "wife asserted her fraudulent claim arising out of the January 10 massage, she asserted it against [Manager], and reached a settlement with [Manager]," which Manager honored but regretted "to this day."  (Ex. 13.)  The January 3 letter also warned attorney Arzani that if he filed his threatened lawsuit against Entertainer, he would expose defendant to a variety of counterclaims and expose himself to sanctions.  (Ex. 13.)  Arzani

6

never responded to Wright's January 3, 2017 letter. (RT 5/30/2018 A.M., 66:18-19.)

> **D.    With the Statute of Limitations On His False Claim Running, Defendant Ramped Up His Effort to Shakedown Entertainer and Demanded $1 Million.**

Having lay dormant for ten months, defendant resurfaced on October 16 and 17, 2017, when he sent Entertainer's lawyer, J. Reid Hunter, emails containing a demand letter for $1 million, as well as text messages that defendant claimed were from Entertainer, and a picture depicting defendant with a black eye.[4] (RT 5/31/2018 P.M., 19:1-8, 21:8-23:14; Exs. 15 & 17.) In his demand letter, defendant claimed, among other things, that (1) defendant was present during the January 2016 nude massage in a separate bedroom of the apartment; (2) Entertainer repeatedly tried to touch Sweet during the January 2016 nude massage, including by grabbing her vagina, despite Sweet repeatedly telling him "no touching;" (3) after Sweet told Entertainer to get dressed and leave, Entertainer immediately began cursing her out and telling her this was a scam; (4) Entertainer called Sweet a "fucking bitch" and several other names and became more irate; (5) defendant came out of the bedroom and confronted Entertainer and told him to "get the fuck out;" (6) Entertainer advanced toward defendant and punched defendant in the face, knocking defendant to the ground and rendering him unconscious for 20 to 30 seconds; and (7) Entertainer said that he was going to report Sweet to building management about the nude massages being performed in

---

[4] Within that ten month period, defendant was tried and found guilty of pimping and pandering. On August 29, 2017, defendant was sentenced to four years' imprisonment. (PSR ¶ 49.)

their apartment. (Id., 23:7-27:7; Ex. 17). Defendant claimed he suffered physical pain, emotional pain and suffering, and feelings of embarrassment and insecurity because he did not do more to protect Sweet that day. (Id.) Defendant then demanded $1 million in damages on or before November 1, 2017, or he would file a complaint with the court. (Id.) Attached to defendant's demand email was a photograph (a .jpeg image) that defendant claimed was a picture of the injury he sustained on January 10, 2016. (RT 5/31/2018 P.M., 21:8-22:4, Ex. 15). The .jpeg image showed defendant with a black eye. (Ex. 15.) FBI CART Examiner Chris Nam testified that the metadata associated with the .jpeg image revealed that the photograph was taken on or about December 7, 2016, nearly 11 months after the alleged assault.[5] (RT 5/31/2018 P.M., 56:3-59:4; Ex. 49.)

In his October 16, 2017 email to Hunter, defendant – demonstrating that he was both savvy and calculating – stated that there was a two-year statute of limitations on personal injury cases in California, so he had less than three months to file his complaint. (Id., 22:25-23:6; Ex. 16.) Hunter tried to schedule a meeting with defendant, but defendant refused to meet with Hunter and continued to reiterate his demand for money from Entertainer. (Id., 31:16-33:7; Ex. 19.) On November 4, 2017, defendant reiterated his demand for $1 million from Entertainer or else he would "be filing [his] lawsuit, with all evidence [he] sent to [Hunter] attached and possibly more." (Id., 31:16-32:17; Ex. 19.) On November 7, 2017, defendant emailed Hunter and stated that Hunter's threats to take legal action against defendant "d[id] not intimidate or deter [him]

---

[5] The file name on the photograph also included the date "2016 12 07".

1   at all," and that defendant "ha[d] no money or assets to go after."

2   (Id., 33:10-34:20; Ex. 19.)  Defendant's last demand was on November

3   27, 2017.  (RT, 6/1/2018 A.M., 37:2-38:2; Ex. 21.)  FBI Special Agent

4   Cody Burke testified that he searched the Los Angeles County Superior

5   Court records and found that defendant never filed any lawsuit

6   against Entertainer.  (RT 6/1/2018 A.M., 39:4-14.)

7           **E.   Defendant's Threats to File False Public Accusations that**

8                **Entertainer Sexually and Physically Assaulted Sweet and**

9                **Defendant Put Entertainer in Grave Fear for His Personal**

10                **Reputation and His Career.**

11       Entertainer testified at trial about his life, career as a

12   singer, songwriter, performer, and entertainer, and the fact that he

13   writes and performs positive, inspirational music.  (RT 5/31/2018

14   P.M., 61:22-62:25.)  Entertainer noted that he was a street performer

15   in 2009-2010 when he was discovered by Manager.  (Id., 64:1-25.)

16   Shortly thereafter, his career took off and he began playing in sold-

17   out venues.  (Id.)  From there, he began performing on television

18   shows like, "Jimmy Kimmel," "Jimmy Fallon," "Good Morning America,"

19   the "Today Show," and "Sesame Street," and writing songs for a

20   DreamWorks animated film and a Disney group called "R5."  (Id.,

21   64:19-25, 67:4-11.)  Entertainer testified that he is asked to write

22   songs for Disney groups and animated films because he is seen as

23   being "positive" and "cool."  (Id., 67:12-24.)

24       Entertainer testified that he was terrified when he learned that

25   defendant was accusing him of sexually assaulting defendant's wife

26   and physically assaulting defendant.  (Id., 74:12-75:13, 78:6-79:11.)

27   Entertainer testified that he was afraid of the sexual assault

28   allegations because, in the #MeToo era, "even allegations of [sexual

1   assault] have serious consequences for entertainers."[6]  (Id., 77:13-

2   23.)   Entertainer's fear was that defendant's threat to file a public

3   lawsuit with allegations of sexual and physical assault would become

4   public because "TMZ can get whatever they need," and it can get out

5   to the press.  (Id., 78:6-79:-19, 95:13-24.)   These false allegations

6   would label Entertainer as a "hypocrite" in both his personal life

7   and his career, because they were contrary to Entertainer's own moral

8   code and his public image, including, specifically, his publicly

9   stated views on relationships, the treatment of women, and his

10  adherence to his faith.  (Id., 70:4-16, 75:18-77:11.)   Entertainer

11  feared that the allegations, even if baseless, would not only hurt

12  his reputation, but also his business interests.  (Id., 77:13-23,

13  78:25- 81:14).   If Entertainer were accused of sexual assault, he

14  explained, companies and sponsors would not want to work with him

15  because they do not want to be associated with sexual misconduct

16  allegations, which could result in the loss of substantial income.

17  (Id., 80:22-81:14.)

18  **III. THE PRESENTENCE REPORT**

19       The PSR calculates defendant's total offense level as 23 and his

20  criminal history category as IV, with a resulting advisory guidelines

21  range of 70 to 87 months in prison.  (PSR ¶ 75.)   The base offense

22  level for the defendant's conviction is 9 and is enhanced 14 levels

23  because defendant demanded $1 million.  (PSR ¶¶ 28-29.)   The

24  government concurs with the USPO's analysis and offense level

25  calculation.

26

27       [6] Entertainer further testified with regard to the #MeToo
    movement: "It's the scariest thing.  I'm for it, I sang at the
28  women's march, I'm in.  But even allegations – even allegations of
    this, are terrifying to me."  (RT 5/31/2018 P.M., 77:13-23.)

                                    10

According to the PSR, defendant's criminal history spans more than 16 years, during which time he amassed ten convictions. (PSR ¶¶ 42-49.) Seven of those convictions earned defendant points towards his criminal history score, including the following:

- 2007 misdemeanor conviction for driving while under the influence, for which he was sentenced to 30 days in jail and a $500 fine (PSR ¶ 45);

- 2011 misdemeanor conviction for obstructing legal process and interfering with a peace officer, for which he was sentenced to 2 years' probation and 365 days in jail[7] (PSR ¶ 46);

- 2013 misdemeanor convictions for deprivation of custodial rights, concealing a minor and domestic abuse, and violating an order for protection, for which he was sentenced to 2 years' probation and 365 days in jail[8] (PSR ¶ 47);

- 2014 misdemeanor conviction for driving while impaired, for which he was sentenced to 4 years' probation and 365 days in jail (PSR ¶ 48); and

- 2017 felony convictions for pimping and pandering, for which he was sentenced to 4 years in prison (PSR ¶ 49).

---

[7] This conviction stemmed from an incident in which defendant tried to resist deputies' efforts to take him into custody, requiring officers to use a K9 and taser to subdue defendant. (PSR ¶ 46.)

[8] As reflected in the PSR, "defendant was the subject of an Order [of] Protection by an ex-girlfriend, who is the custodial parent of a child she had with the defendant. The defendant picked the child up from daycare and did not return the child to the custodial parent. During a telephone call with the custodial parent, the defendant threatened to not return the child until he obtained joint custody. According to the Complaint, the child was concealed from the custodial parent from April 18, 2012 to May 23, 2012." (PSR ¶ 47.)

11

1    Defendant earned four total criminal history points for his
2    misdemeanor convictions in 2007, 2011, 2013, and 2014.  (PSR ¶¶ 45-
3    48.)  He earned an additional three criminal history points for his
4    2017 felony convictions.  (PSR ¶ 49.)  Because defendant committed
5    the instant offense while under a criminal justice sentence, he
6    earned an additional two criminal history points.  (PSR ¶ 51.)  This
7    results in a total criminal history score of nine points and a
8    criminal history category of IV.[9]

9    **IV.  THE GOVERNMENT'S SENTENCING POSITION**

10       The government recommends that the Court impose a sentence of 78
11   months of imprisonment, followed by a three-year period of supervised
12   release, restitution to Entertainer in an amount to be determined at
13   a later hearing, and a special assessment of $100.[10]  The government
14   submits that, taking into account the factors the Court must consider
15   under 18 U.S.C. § 3553(a), such a sentence is sufficient but not
16   greater than necessary to address the offense at issue.  See United
17   States v. Booker, 543 U.S. 220, 260 (2005).

18
19

---

20   [9] The convictions that did not count toward defendant's criminal
21   history score are (1) a 2001 conviction for driving while impaired,
     (2) a 2004 conviction for interfering with a 911 call, and (3) a 2004
22   violation of a no contact order.  (PSR ¶¶ 42-44.)

23   [10] The victim in this matter, Entertainer, is seeking restitution
     for legal expenses he claims he incurred during his participation in
24   the criminal investigation and at trial in this matter pursuant to 18
     U.S.C. § 3663A(a)(4).  The government is not in a position to
25   determine whether restitution for legal expenses related to this
     matter would be warranted because the government lacks information
26   regarding the party who actually paid for these expenses and whether
     under those circumstances, restitution would be warranted.  The
27   government requests that the Court set a hearing for restitution
     within 90 days of sentencing, so that the government and USPO have
28   sufficient time to ascertain whether restitution for legal fees under
     the present circumstances is appropriate.  See 18 U.S.C.
     § 3664(d)(5).

While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must be considered with the factors set forth in Section 3553(a).  See United States v. Cantrell, 433 F.3d 1269, 1279 (9th Cir. 2006).  "To comply with the requirements of Booker, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a).  This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence."  United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d 913, 918 (9th Cir. 2006).

A.   **The Nature and Circumstances of the Offense and History and Characteristics of Defendant Justify a 78-Month Prison Sentence**

The nature and circumstances of defendant's attempted extortion of Entertainer warrant a 78-month prison sentence.  Defendant's conduct in this case was brazen and greedy.  As the evidence showed, there was not a shred of truth to defendant's allegations.  Defendant knew that it was Manager, not Entertainer, who received a massage from defendant's wife in January 2016, and he also knew that he was not beaten by Entertainer or by anyone else that night.  But defendant sensed deep pockets.  His wife had already settled with Manager for $225,000 and, having researched Entertainer, he believed he could shake down Entertainer for more.  Entertainer was well-known in the music industry and given his publicly stated views on relationships, the treatment of women, and his adherence to his faith, he was a perfect target for defendant's attempted extortion.

13

1    Indeed, Entertainer feared that the allegations, even though
2    they were baseless, would severely harm his reputation and business
3    interests.  (Id., 70:4-16, 75:18-77:11.)  Not only was the nature of
4    the threats deplorable, but the duration of the threat and the
5    repeated attempts to reach Entertainer caused Entertainer to be in
6    fear at multiple points in time and to be re-victimized again and
7    again.

8    Further, defendant's history and characteristics warrant a 78-
9    month sentence.  Since 2001, defendant has been convicted of ten
10   offenses.  (PSR ¶¶ 42-49.)  These offenses include eight misdemeanors
11   and two felonies, and they range from driving under the influence and
12   violating a domestic abuse protection order to pimping and pandering.
13   Id.  Over this time period, defendant was charged with approximately
14   seven additional offenses that were later dismissed, including
15   domestic assault and domestic abuse.  Id.  In 2012, only four years
16   before the attempted extortion in this case, defendant was convicted
17   of deprivation of custodial rights and concealment of a minor.
18   According to the PSR, defendant picked up the child - his with a
19   former girlfriend's - from daycare and did not return the child for
20   over a one-month period.  Defendant threatened to not return the
21   child until he obtained joint custody.  (PSR ¶ 47.)  At the time of
22   the offense at issue, defendant had an undischarged, four-year prison
23   sentence stemming from his pimping and pandering convictions.  (Dkt.
24   142 at 4.)

25   The evidence from defendant's 2017 pimping and pandering trial
26   reveals a dangerous person who preys on the weak and vulnerable.
27   Specifically, defendant and his wife were convicted of pimping and
28   pandering a 26-year-old woman identified as "Jessica V.," who was

14

homeless and suffering from anorexia and alcohol abuse.[11]  Some of the details from the trial about defendant's conduct included the following:

- Jessica looked on Craigslist for a place to stay after she became homeless and responded to an advertisement for a free place to stay in exchange for helping the apartment owners "make money with their business."  Jessica contacted the person who placed the ad and ultimately spoke to a woman she later learned called herself "Brittany."[12] Shortly thereafter, Jessica moved into the apartment with "Brittany" (Jordan Sweet) and "Cory" (Benjamin Koziol). Ex. A (Transcript of April 25, 2017 Trial) at 1239:8-1246:7.

- After Jessica moved into the apartment with defendant and Sweet, and told them "[her] story," they provided Jessica with alcohol.  Defendant then asked Jessica to wear a bra and underwear to take pictures, and had her hold a placard with a telephone number for those pictures.  Jessica thought the pictures were related to her performing nude massages because Sweet was performing nude massages and making money.  Jessica was told that she could make money performing nude massages to get home to Iowa or to find a

---

[11] Jessica testified that she was from Iowa, but came to California to enter a residential treatment center for anorexia and alcohol abuse.  Ex. A (Transcript of April 25, 2017 Trial) at 1235:13-1236:27.  She became homeless when she was forced to leave the residential treatment center because her insurance was terminated.  Id. at 1238:9-26.

[12] Jessica knew defendant Koziol as "Cory" and Jordan Sweet Koziol as "Brittany" and, thus, used those names during her testimony in the state court trial.

15

place to live.  Jessica said she felt uncomfortable posing for the photographs holding a telephone number, but she went forward with it because she was desperate to make money.  Ex. A (Transcript of April 25, 2017 Trial) at 1247:7-1258:5.

- After these photographs were taken and posted online, men would come to defendant and Sweet's apartment for nude massages that Jessica was expected to perform.  All of the money from these nude massages was kept by defendant and Sweet.  Defendant told Jessica that she had to perform a "hand job" (or give the customers a "happy ending") during the nude massages because that is what the men expected. Jessica did not want to perform these sex acts, but did so anyway because she was desperate and had nowhere to live. Ex. A (Transcript of April 25, 2017 Trial) at 1262:6-1267:22.

- At first, the sex acts Jessica performed only included "happy endings," but later defendant would direct Jessica to have sexual intercourse with some of the men.  The price charged for sexual intercourse was more than the price for a "happy ending."  All of the money Jessica earned from prostitution was kept by defendant and Sweet.  Jessica did not want to perform sexual intercourse with the customers, but did so anyway.  Ex. A (Transcript of April 25, 2017 Trial) at 1269:7-1271:27.

- Defendant caused bruising to Jessica's shoulder when he held her to make clear that she should not refuse to have sexual intercourse with a customer and needed to get the

16

1    money.  Ex. A (Transcript of April 25, 2017 Trial) at
2    1276:24-1277:15.

3    •    Jessica performed sex acts with four or five customers <u>per</u>
4         <u>day</u> while she was living with defendant and Sweet.  Ex. A
5         (Transcript of April 25, 2017 Trial) at 1279:26-28.

6    •    Jessica also described being sexually assaulted by
7         defendant when defendant's wife was out of the apartment.
8         She testified that defendant had sex with her each day she
9         was living with defendant and Sweet.  Jessica said she did
10        not want to have sexual intercourse with defendant, did not
11        invite him to have sex with her, and defendant never asked
12        if he could have sex with Jessica.  Even though Jessica did
13        not want to have sex with defendant, she laid there while
14        it was happening because she did not want to upset
15        defendant and knew that if she did not have sex with him,
16        she would be homeless again.  Jessica also described that
17        she witnessed defendant being verbally abusive to Sweet.
18        Ex. A (Transcript of April 25, 2017 Trial) at 1283:6-
19        1286:25.

20   This conduct reflects the true Benjamin Koziol.  He is
21   opportunistic, controlling, manipulative, abusive, and depraved.
22   Further, defendant has never expressed any remorse for his conduct in
23   this case.  Quite the opposite, rather than accept responsibility for
24   his conduct, defendant attempted to obstruct and impede the
25   prosecution of this case.  Specifically, in a March 14, 2018 recorded
26   jailhouse phone call between defendant and an unidentified person at
27   approximately minute 10:01, defendant told the unidentified person:
28   **"Make sure Jordan is not, when you talk to Flann, tell Jordan not to**

1    **talk to anybody else.  Any more interviews . . . . And make sure**

2    **she's not talking over the phone will ya?  She can really fuck me in**

3    **anything she says.  I don't think she realizes anything she says can**

4    **. . . ."**[13]  (Kim Dec., ¶ 3, Ex. 2.)  The USPO found that this conduct

5    did not warrant an offense level increase for attempted obstruction

6    of justice.  (PSR ¶ 33.)  However, the government believes that this

7    behavior demonstrates that defendant is unrepentant, unreformed, and

8    undeterred by any prior convictions or sentences.  Indeed, in another

9    jailhouse recording, defendant claimed that Entertainer and Manager

10   brought this situation upon themselves for reporting defendant's

11   attempted extortion.  In an April 13, 2018 call, at approximately

12   minute 5:55, defendant stated, **"I thought they were going to try to**

13   **keep it under wraps . . . He kind of fucked himself . . .  They**

14   **fucked both of themselves by even going through with this."**  (Kim

15   Dec., ¶ 4, Ex. 3.)  Later in that same call, at approximately minute

16   9:15, defendant stated about the upcoming trial: **"It's just stupid.**

17   **They shoulda left it alone.  Yeah.  Woulda been in everybody's best**

18   **interest.  Now it's going to ruin him, both of them – Entertainer and**

19   **Manager.  It's gonna pretty much ruin their fucking life more than**

20   **mine, even if I got convicted . . . ."**  (Id.).  This makes clear that

21   defendant is a danger to the community.  A 78-month sentence would

22   protect the community from defendant's further crimes and send a

23   strong message of specific and general deterrence.

24

25

26

_____

27        [13] In a previous recorded jailhouse call, defendant discussed the
     fact that Sweet had been interviewed by the FBI following the
28   execution of a search warrant and defendant's arrest in this case,
     and provided the FBI with information detrimental to his case.

**B.** **A 78-Month Sentence is Warranted to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence**

A 78-month prison sentence is also warranted to reflect the seriousness of defendant's threats to induce fear of reputational and economic harm in Entertainer.  This was a threat that not only would have impacted Entertainer, but also the numerous people he employed in his entertainment career.

As noted above, defendant's criminal history reflects a defendant who is not deterred by prior criminal sentences.  Rather, defendant's criminal activities have only escalated over time, evidencing the need to impose a 78-month sentence that would reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence.

**C.** **Need to Avoid Unwarranted Sentence Disparities**

Section 3553(a)(6) requires the Court to impose a sentence to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  United States v. Goff, 501 F.3d 250, 258 (3d Cir. 2007) ("Part of 'just punishment' is the avoidance of unwarranted sentencing disparities").  A sentence within the Guidelines range is usually the best way to avoid sentencing disparities.  See United States v. Mares, 402 F.3d 511, 518-19 (5th Cir. 2005).  A 78-month sentence is within the guidelines range.

Moreover, in the only other extortion by threat to reputation case in this district that counsel are aware of, the district court sentenced defendant to a term of 70 months' imprisonment.  See United States v. Teofil Brank, 15-131-JFW, Dkt. 344.  While there are, of

19

course, differences between the cases – including the fact that Brank successfully extorted his victim – the government notes that Brank was in a lower criminal history category and did not have as serious a criminal background as Koziol (although they both share a history of domestic abuse).  (Id., Dkt. 326, Gov't Sentencing Br. at 6-7.) In light of the need to deter defendant and protect the community from his further crimes, the government submits that a higher sentence is warranted in this case.

**V.    Conclusion**

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to 78 months in prison followed by three years of supervised release, and a $100 special assessment. The government further requests that the Court set a restitution hearing to determine if restitution should be ordered and, if so, the amount of restitution after the victim provides supporting documents for restitution.